# 23-7376(L)

## 23-7471(XAP), 23-7667(XAP)

### UNITED STATES COURT OF APPEALS
### FOR THE SECOND CIRCUIT

ETON PARK CAPITAL MANAGEMENT, L.P., ETON PARK MASTER FUND, LTD.,
ETON PARK FUND, L.P.,

*Plaintiffs-Appellees-Cross-Appellants*,

v.

ARGENTINE REPUBLIC,

*Defendant-Appellant-Cross-Appellee*,

YPF S.A.,

*Defendant-Conditional Cross-Appellant.*

On Appeal from the United States District Court for the
Southern District of New York, No. 16-cv-08569

### FINAL FORM OPENING AND RESPONSE BRIEF FOR
### PLAINTIFFS-APPELLEES-CROSS-APPELLANTS

MARK C. HANSEN
DEREK T. HO
ANDREW E. GOLDSMITH
KELLOGG, HANSEN, TODD,
FIGEL, & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, DC 20036

(*additional counsel on inside
cover*)

PAUL D. CLEMENT
 *Counsel of Record*
C. HARKER RHODES IV
NICHOLAS M. GALLAGHER*
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

*Supervised by principals of the firm who are
members of the Virginia bar

*Counsel for Plaintiffs-Appellees-Cross-Appellants*

March 25, 2024

RANDY M. MASTRO
KING & SPALDING LLP
1185 Avenue of the Americas, 34th Floor
New York, NY 10036

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a), Plaintiffs-Appellees-Cross-Appellants state the following:

Plaintiffs-Appellees-Cross-Appellants Petersen Energía Inversora, S.A.U. and Petersen Energía, S.A.U. (together "Petersen") are nongovernmental corporate entities. Petersen Energía Inversora, S.A.U. is a Spanish corporation wholly owned by Petersen Energía Inversora Holdings, S.A.U., a Spanish corporation that in turn is wholly owned by Petersen Energía Inversora, S.A., a privately held Argentine corporation. Petersen Energía, S.A.U. is a Spanish corporation wholly owned by Petersen Inversiones Spain, S.A.U., a Spanish corporation that in turn is wholly owned by Petersen Energía Inversora, S.A., a privately held Argentine corporation. No public corporation owns 10% or more of the stock of either Petersen Energía Inversora, S.A.U. or Petersen Energía, S.A.U.

Plaintiffs-Appellees-Cross-Appellants Eton Park Capital Management, L.P., Eton Park Master Fund, Ltd., and Eton Park Fund, L.P. (together "Eton Park," and together with Petersen, "Plaintiffs") are non-governmental entities that have no parent corporations, and no public corporation owns 10% or more of the stock of any of them.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................... i

INTRODUCTION ................................................................................................ 1

JURISDICTION................................................................................................... 6

STATEMENT OF THE ISSUES .......................................................................... 7

STATEMENT OF THE CASE.............................................................................. 8

I.      Factual Background ................................................................................... 8

      A.      Argentina and YPF Amend YPF's Bylaws and Promise Investors Strong Tender-Offer Protections............................. 8

      B.      Plaintiffs Purchase YPF ADRs ............................................. 14

      C.      Argentina Seizes a Majority Stake in YPF, and Argentina and YPF Breach Their Obligations Under the Bylaws Tender-Offer Provisions.................................................................. 15

II.     Procedural History .................................................................................. 19

      A.      The District Court Denies Defendants' Motions to Dismiss and This Court Affirms.......................................................... 19

      B.      The District Court Denies Defendants' Renewed Motion to Dismiss for Forum Non Conveniens.................................... 21

      C.      The District Court Grants Summary Judgment Against Argentina on Liability and Grants Summary Judgment for YPF............................................................................... 23

      D.      The District Court Holds a Damages Trial and Enters Judgment .............................................................................. 26

SUMMARY OF ARGUMENT............................................................................ 27

STANDARDS OF REVIEW .............................................................................. 32

ARGUMENT ..................................................................................................... 32

I.      The District Court Correctly Rejected Argentina's Attempt To Force Plaintiffs To Litigate This Case In Argentina ................................ 32

        A.      The District Court Correctly Rejected Argentina's Forum Non Conveniens Arguments.......................................................... 33

        B.      Argentina's Late-Breaking Attempt to Seek Dismissal on International Comity Grounds Is Forfeited and Meritless ................ 41

II.     The District Court Correctly Rejected Argentina's Strained Efforts To Escape Liability For Its Clear Breach Of Its Contractual Obligations.......................................................................................... 45

        A.      The District Court Correctly Held That Plaintiffs Have Breach-of-Contract Claims Against Argentina ................................. 47

        B.      The District Court Correctly Held That Plaintiffs Were Not Limited to Contractual Penalties or Specific Performance ............... 52

                1.      The Bylaws do not preclude Plaintiffs' damages claim........... 52

                2.      Plaintiffs were not obligated to seek specific performance ................................................................... 56

        C.      The District Court Correctly Held That Plaintiffs Were Shareholders at the Time of the Breach ........................................... 60

        D.      The District Court Correctly Held That Argentina's General Expropriation Law Does Not Bar Plaintiffs' Claims ........................ 63

III.    The District Court Correctly Determined The Damages That Argentina Owes Plaintiffs.......................................................... 66

        A.      The District Court Correctly Calculated Plaintiffs' Damages in Dollars ..................................................................... 67

        B.      The District Court Correctly Determined the Breach Date and Awarded Appropriate Prejudgment Interest ....................................... 74

IV.     The District Court Made Only Two Errors In Resolving This Case ............ 80

        A.      The District Court Erred in Granting Summary Judgment for YPF .................................................................................... 81

B.    The District Court Erred in Dismissing the Promissory Estoppel Claims as Duplicative ............................................................ 89

CONCLUSION ...................................................................................... 92

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## Cases

*Animal Sci. Prods., Inc. v Hebei Welcome Pharm. Co.*,
  585 U.S. 33 (2018) ..................................................................................... 32, 46

*Argentine Republic v. Petersen Energia Inversora S.A.U.*,
  139 S.Ct. 2741 (2019) .................................................................................... 21

*Bartenwerfer v. Buckley*,
  598 U.S. 69 (2023) .......................................................................................... 86

*Colo. River Water Conservation Dist. v. United States*,
  424 U.S. 800 (1976) ........................................................................................ 42

*Competex, S.A. v. Labow*,
  783 F.2d 333 (2d Cir. 1986) ........................................................................... 70

*E.I. du Pont de Nemours & Co. v. Train*,
  430 U.S. 112 (1977) ........................................................................................ 86

*Ezrasons, Inc. v. Travelers Indem. Co.*,
  89 F.4th 388 (2d Cir. 2023) ............................................................................ 32

*Goldberg v. Pace Univ.*,
  88 F.4th 204 (2d Cir. 2023) ............................................................................ 90

*Gross v. German Found. Indus. Initiative*,
  456 F.3d 363 (3d Cir. 2006) ........................................................................... 43

*Havlish v. 650 Fifth Avenue Co.*,
  934 F.3d 174 (2d Cir. 2019) ........................................................................... 84

*In re Air Crash Disaster Near New Orleans*,
  821 F.2d 1147 (5th Cir. 1987) ........................................................................ 34

*In re Trib. Co. Fraudulent Conv. Litig.*,
  10 F.4th 147 (2d Cir. 2021) ............................................................................ 32

*In re Vitamin C Antitrust Litig.*,
  8 F.4th 136 (2d Cir. 2021) .............................................................................. 44

*Indasu Int'l, C.A. v. Citibank, N.A.*,
   861 F.2d 375 (2d Cir. 1988) ................................................................. 32, 33, 34

*Iragorri v. United Technologies Corp.*,
   274 F.3d 65 (2d Cir. 2001) ................................................................. 35

*Jota v. Texaco, Inc.*,
   157 F.3d 153 (2d Cir. 1998) ................................................................. 44

*JP Morgan Chase Bank v. Altos Hornos de Mexico, S.A. de C.V.*,
   412 F.3d 418 (2d Cir. 2005) ................................................................. 42

*Maine Cmty. Health Options v. United States*,
   140 S.Ct. 1308 (2020) ................................................................. 85

*Malmberg v. United States*,
   816 F.3d 185 (2d Cir. 2016) ................................................................. 69

*Manu Int'l, S.A. v. Avon Prods., Inc.*,
   641 F.2d 62 (1981) ................................................................. 38

*McLennan v. Am. Eurocopter Corp.*,
   245 F.3d 403 (5th Cir. 2001) ................................................................. 33

*Morrison v. Nat'l Australia Bank Ltd.*,
   561 U.S. 247 (2010) ................................................................. 10

*Mujica v. AirScan, Inc.*,
   771 F.3d 580 (9th Cir. 2014) ................................................................. 43

*Murray v. British Broad. Corp.*,
   81 F.3d 287 (2d Cir. 1996) ................................................................. 36

*Nature's Plus Nordic A/S v. Nat. Organics, Inc.*,
   78 F.Supp.3d 556 (E.D.N.Y. 2015) ................................................................. 68, 69

*Newmont Mines Ltd. v. Hanover Ins. Co.*,
   784 F.2d 127 (2d Cir. 1986) ................................................................. 69

*Oden v. Chemung Cnty. Indus. Dev. Agency*,
   661 N.E.2d 142 (N.Y. 1995) ................................................................. 69

*Olin Holdings Ltd. v. Libya*,
　73 F.4th 92 (2d Cir. 2023) ................................................................ 32, 33

*Oliveira v. Quartet Merger Corp.*,
　662 F.App'x 47 (2d Cir. 2016) ................................................................ 51

*Otto Candies, LLC v. Citigroup, Inc.*,
　963 F.3d 1331 (11th Cir. 2020) ........................................................ 36, 37

*Petersen Energía Inversora S.A.U. v. Argentine Republic*,
　895 F.3d 194 (2d Cir. 2018) ........................................................... passim

*R. Maganlal & Co. v. M.G. Chem. Co.*,
　942 F.2d 164 (2d Cir. 1991) ............................................................ 36, 37

*Reliable Credit Ass'n v. Credithrift of Am., Inc.*,
　570 P.2d 379 (Or. 1977) .......................................................................... 51

*Repsol v. Republic of Argentina*,
　No. 12-cv-3877 (S.D.N.Y. filed May 15, 2012) .................................... 19

*Republic of Argentina v. NML Capital, Ltd.*,
　573 U.S. 134 (2014) ................................................................................. 44

*Royal & Sun All. Ins. Co. of Can. v. Century Int'l Arms, Inc.*,
　466 F.3d 88 (2d Cir. 2006) ...................................................... 32, 42, 43

*Sczepanski v. Saul*,
　946 F.3d 152 (2d Cir. 2020) ............................................................ 42, 48

*Sleepy's LLC v. Select Comfort Wholesale Grp.*,
　909 F.3d 519 (2d Cir. 2018) ................................................................... 32

*Stoyas v. Toshiba Corp.*,
　896 F.3d 933 (9th Cir. 2018) .................................................................. 72

*United States Naval Inst. v. Charter Commc'ns., Inc.*,
　936 F.2d 692 (2d Cir. 1991) ................................................................... 74

*United States v. Peguero*,
　34 F.4th 143 (2d Cir. 2022) .................................................................... 83

*Yukos Cap. S.A.R.L. v. Samaraneftegaz,*
    592 F.App'x 8 (2d Cir. 2014) ................................................................. 33, 34

*Zelinski v. Columbia 300, Inc.,*
    335 F.3d 633 (7th Cir. 2003) .............................................................. 33

## Statutes and Rule

N.Y. Jud. Law §27 ..................................................................... 67, 69

N.Y. Jud. Law §27(b) ............................................................ 68, 69, 72

Fed. R. Civ. P. 15(b)(2) ................................................................ 89

## Other Authority

*Black's Law Dictionary* (11th ed. 2019) ..................................... 70

## INTRODUCTION

In the early 1990s, the Argentine Republic ("Argentina" or "the Republic"), with a new president committed to free-market principles and privatization, decided to privatize its crown jewel—the state-controlled energy company YPF S.A. ("YPF," and together with Argentina, "Defendants")—to raise much-needed foreign capital. To accomplish this objective, Defendants needed access to the New York Stock Exchange ("NYSE") along with other international markets. But Defendants had a problem. Because of Argentina's long history of defaults and economic nationalism, would-be investors were skeptical that Argentina's commitment to free markets would last, and they needed extraordinary reassurances that they would be fully protected if Argentina returned to its old ways and re-nationalized YPF.

To address that problem, Defendants amended YPF's Bylaws to provide clear protections for would-be investors. The amended Bylaws required anyone obtaining a specified stake in YPF, expressly including Argentina, to make a tender offer to other shareholders at a price set by predetermined, backward-looking formulae that would typically require an above-market offer. Defendants repeatedly touted those extraordinary protections when marketing YPF's shares to potential investors in the United States, and that effort succeeded: YPF's initial public offering ("IPO") raised billions of dollars, including $1.1 billion from NYSE-listed shares alone.

For nearly twenty years, those provisions worked as intended. YPF remained in private hands, and parties (including one of Plaintiffs) who acquired significant stakes complied with the tender-offer provisions. But after the election of a populist president and YPF's discovery of an enormous oil reserve, Argentina yielded to the temptation to return to its old ways and retake majority control of YPF. On April 16, 2012, Argentina issued an executive decree seizing control of YPF from its then-majority shareholder, followed a few weeks later by legislation formally expropriating a majority stake in the company—all without honoring the Bylaws' obligation to make a tender offer and respect the rights of YPF's minority shareholders. Argentina's failure to honor that obligation was not some honest mistake, but an extraordinarily clear breach of its equally clear promise: Argentina publicly proclaimed that it had no intention of making good on its tender-offer obligation (which it estimated would cost $11 billion to $14.5 billion), and would not be "stupid" enough to "comply" with the Bylaws. That deliberate breach caused Plaintiffs—the second- and third-largest holders of YPF stock—billions of dollars in damages.

Argentina does not seriously dispute that by failing to make a tender offer to YPF's minority shareholders, it breached its contractual obligations under the Bylaws—nor could it, when it openly celebrated its deliberate breach in real time. Instead, Argentina devotes most of its appellate argument to attempting to move this

litigation to Argentina and strip Plaintiffs of their straightforward remedy for that clear and flagrant breach after nine years of hard-fought litigation, including Argentina's earlier unsuccessful appeal, *see Petersen Energía Inversora S.A.U. v. Argentine Republic*, 895 F.3d 194 (2d Cir. 2018) ("*Petersen II*"). It argues that instead of bringing a breach-of-contract claim in a U.S. court for a contractual tender-offer obligation that was owed and breached in the United States, Plaintiffs were required to first seek a corporate resolution at a YPF shareholders' meeting, then file suit within three months in Buenos Aires, and then hold their YPF shares until Argentina chose to formally take title to the expropriated shares (years after Argentina seized control of those shares). Even then, Argentina says, Plaintiffs would only be entitled to some portion of whatever compensation Argentina chose to pay *Repsol* for Repsol's expropriated shares, even though Plaintiffs' shares were excluded from the expropriation and their claims are for a separate breach of obligations to minority shareholders. And if its efforts to start over in Argentina or escape liability altogether fail, Argentina insists that Plaintiffs can only recover in pesos, which lost some 95% of their value in the decade between Argentina's breach and final judgment as a result of Argentina's policy choices.

None of those unlikely assertions is correct under Argentine or New York law, and none can be reconciled with the clear promise of a "compensated exit" that Argentina made to investors in 1993 to entice them to invest over $1 billion in YPF's

IPO through the NYSE alone, *id.* at 200. Quite the opposite: If Argentina had told its investors in 1993 what it is telling this Court now, no rational person would have invested in YPF, and the IPO would have been an abject failure.

The district court correctly rejected all of Argentina's efforts to evade the consequences of its flagrant breach—unsurprisingly, as this Court has already effectively resolved a number of the issues on appeal against Argentina. After giving Argentina not one but two chances to seek dismissal for forum non conveniens, the district court properly weighed the relevant factors, and correctly recognized the strong interest of the United States—attested to by the Solicitor General in recommending denial of Defendants' certiorari petitions—in providing a forum for claims against foreign sovereigns who choose to engage in commercial activity here. When investors, including a New York-based fund, invest in an NYSE-listed company, and are injured by the breach of a contractual promise that was made to solicit investments in New York and required performance in New York, the balance tips strongly in favor of hearing their claims here. At the very least, the district court plainly did not abuse its discretion in reaching that conclusion, and Argentina cannot show the requisite substantial prejudice from litigation in this forum to prevail on forum non conveniens post-trial. As for Argentina's late-breaking international comity argument, it was never raised as an independent basis for dismissal below,

4

and it fails regardless given the absence of any parallel foreign proceedings and the strong interests in hearing this case here.

Argentina's efforts to escape liability are numerous, but equally unavailing. Its claim that Argentine law categorically bars enforcing corporate bylaws provisions through breach-of-contract suits was contradicted by its own expert, and its claims that damages are unavailable because the Bylaws provide a separate penalty for Argentina's breach or because Plaintiffs did not seek specific performance are defeated by the plain text of the Argentine Civil Code. Its contention that its tender-offer obligation was not triggered until it took formal title to the expropriated shares—two years after seizing control over those shares—contravenes both the Bylaws' clear language and common sense, and would leave Argentina free to evade its binding obligations by the simple expedient of delaying the formal transfer of title. And its assertion that Argentine public law precludes Plaintiffs' claims cannot be squared with this Court's prior recognition that Plaintiffs do not challenge the expropriation itself in any way, but only Argentina's separate breach of its distinct contractual obligations, and the fact that the compensation Argentina paid Repsol did not and could not include compensation for Plaintiffs' separate contractual rights.

The district court likewise correctly rejected Argentina's efforts to reduce or eliminate its damages award. Argentina's cursory attacks on the district court's factual findings after trial regarding the date of breach and the court's discretionary

5

determination of the appropriate prejudgment interest rate are plainly meritless, and its attempt to reduce the judgment by some *95%* based solely on the fall in the value of the Argentine peso over the last decade is wrong under both New York law and basic economics. In fact, the district court made only two errors in the long course of this litigation: in failing to follow this Court's lead in recognizing YPF's own independent contractual obligation to enforce the Bylaws' tender-offer provision, *see id.* at 210, and in dismissing Plaintiffs' distinct promissory estoppel claims.

It is always appropriate to hold parties to their contractual promises—but when it comes to foreign governments and international capital markets, it is absolutely essential. Defendants' promises here were not offhand remarks or casual agreements. They were unusual—and unusually clear—commitments that were necessary to give would-be investors comfort and to allow a foreign nation with a checkered economic past to access U.S. capital markets and raise billions of dollars. If those promises can be shrugged off with impunity, Plaintiffs will be injured in the short run, but everyone—investors and foreign governments alike—will lose in the long run. This Court should uphold Defendants' clear promises and redress their clear breaches.

## JURISDICTION

The district court had jurisdiction under 28 U.S.C. §§1330 and 1367(a). It entered final judgment on September 15, 2023. Argentina filed timely notices of

appeal on October 10, 2023, and Plaintiffs filed timely notices of cross-appeal on October 18, 2023. This Court has jurisdiction under 28 U.S.C. §1291.

## STATEMENT OF THE ISSUES

1. Whether the district court properly exercised its discretion in denying Argentina's motion to dismiss this case for forum non conveniens and the judgment should stand in any event because Argentina suffered no substantial prejudice.

2. Whether the district court properly exercised its discretion in declining to dismiss this case on international comity grounds that Argentina never raised as an independent basis for dismissal.

3. Whether the district court correctly concluded that Plaintiffs' claims for damages incurred due to Argentina's flagrant breach of its tender-offer obligations under the Bylaws are cognizable as a matter of Argentine law.

4. Whether the district court correctly calculated the damages that Argentina owes Plaintiffs for breaching its obligations under the Bylaws.

5. Whether the district court erred in granting summary judgment for YPF despite YPF's breach of its own independent contractual obligation to take action if an acquirer violated the Bylaws' tender-offer requirements.

6. Whether the district court erred in dismissing Plaintiffs' promissory estoppel claims against Argentina and YPF.

## STATEMENT OF THE CASE

Plaintiffs are former minority shareholders of YPF who have sued Argentina and YPF for their flagrant breach of their contractual obligations under the YPF Bylaws. The district court (Preska, J.) denied Defendants' attempt to claim sovereign immunity under the Foreign Sovereign Immunities Act ("FSIA") for their breach of their contractual obligations, but dismissed Petersen's promissory estoppel claims as duplicative. SA1-47. This Court affirmed the denial of sovereign immunity, *Petersen II*, 895 F.3d 194, and the Supreme Court denied certiorari. The district court granted summary judgment against Argentina but for YPF on liability, SA89-152, held a bench trial on damages, and entered judgment against Argentina awarding Plaintiffs approximately $16.1 billion in damages, SA188-91.

## I. Factual Background

### A. Argentina and YPF Amend YPF's Bylaws and Promise Investors Strong Tender-Offer Protections.

YPF was founded in 1922 as the world's first state-owned oil company. *See* SA93. For decades, Argentina operated the company as a "politically managed, government-owned monopoly" whose management and operation "generally reflected broader Argentine political and social objectives rather than business strategies designed to maximize the Company's profitability." JA507-08. Perhaps unsurprisingly, government-run YPF lost money consistently and in large amounts. YPF "lost more than $6 billion in the 1980's," JA1411, and by the early 1990s was

"considered inefficient, antiquated and a bastion of bureaucratic gridlock," JA1417. Argentina's economy was also in dire straits more broadly after decades of Peronist policies. *See* JA1798-99. As a result, President Carlos Menem came to power in 1989 on a platform of reform and free-market principles and embarked upon an ambitious privatization program—with the privatization of YPF through an IPO as its cornerstone. *See Petersen II*, 895 F.3d at 199 & n.1.

Convincing private investors to invest in YPF was no mean feat. Argentina had a long history of political and financial crises, owing in large part to populist economic policies that elevated internal political expedience over commitments to foreign investors. *See* JA1797-1800. Accordingly, in light of Argentina's "checkered economic past" and "persistent economic ills," private investors were "very skeptical" of Argentina and viewed its economy as "not suitable for foreign investment." JA845.

To overcome this extraordinary skepticism, Argentina and YPF undertook a series of extraordinary steps to convince foreign investors—including NYSE investors—that YPF would be an attractive and safe investment. *See Petersen II*, 895 F.3d at 199. Argentina was focused on raising capital from U.S. investors and so offered YPF shares as American depositary receipts ("ADRs") listed on the NYSE. *See id*. ADRs are certificates that represent an ownership interest in foreign securities, allowing investors to acquire equity in foreign companies through

securities denominated in U.S. dollars on U.S. stock exchanges with the protections of the U.S. exchanges and the regulatory oversight of the Securities and Exchange Commission ("SEC").  *See*, *e.g.*, *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 251 (2010).  YPF's ADRs were priced in U.S. dollars, and the deposit agreement required Bank of New York Mellon as depositary to make distributions to NYSE investors in U.S. dollars.  JA522.[1]

More extraordinary and more relevant to this case, Argentina and YPF amended YPF's Bylaws before its 1993 IPO.  Those Bylaws are "the contract governing the relationship among YPF, Argentina (in its capacity as a shareholder), and other YPF shareholders."  *Petersen II*, 895 F.3d at 199.  To encourage foreign investors to take part in the IPO, Argentina and YPF amended §7 and §28 of YPF's Bylaws "to incorporate protections for investors from (1) hostile takeovers and (2) attempts by Argentina to renationalize the company."  *Id.*

Under §7(d) of the amended Bylaws, it "shall be forbidden" for a shareholder to acquire 15% or more of YPF stock—a scenario the Bylaws define as an "acquisition of control"—without complying with §7(e) and §7(f) of the Bylaws. JA651.  Sections 7(e) and 7(f) in turn require shareholders who wish to acquire control of such shares to comply with certain obligations, including making a tender

---

[1] Following the IPO, YPF's capital stock was divided into four classes, including Class D shares sold to private investors.  JA496.

offer before taking control and adhering to any "additional or stricter requirements" imposed by the jurisdictions and stock exchanges where YPF's shares are listed—including, therefore, SEC and NYSE requirements. JA652; *see Petersen II*, 895 F.3d at 199.

Section 7(f) also sets the price at which the tender offer must occur, setting forth four different formulae and entitling minority shareholders to the "highest" of the four different prices. JA654-55; *see Petersen II*, 895 F.3d at 199. As relevant here, the "Formula D" provision establishes the per-share consideration as YPF's "net income per class D share during the last four complete fiscal quarters" multiplied by "the highest price/income ratio for [YPF]" over the last two years. JA655. Like the other §7(f) price formulae, Formula D incorporates a backward-looking formula based on past market conditions to ensure that the acquirer cannot "take steps to depress the stock price and reduce the cost of taking control of YPF, which would erode the protection afforded by the tender-offer provisions." JA1094. Section 7(h) further provides that any shares acquired "in breach of" §7(e) and §7(f), including the tender-offer requirement, "shall not grant any right to vote or collect dividends or other distributions that [YPF] may carry out, nor shall they be computed to determine the presence of the quorum at any of the shareholders' meetings." JA657.

Section 28 specifically extends the requirements and sanctions of §7 to the Argentine government, in the event of the kind of re-nationalization investors feared, while setting certain government-specific thresholds for triggering the tender-offer protections. Titled "Provisions applicable to acquisitions by the National Government," §28 provides in relevant part:

> The provisions of subsections e) and f) of Section 7 … shall apply to all acquisitions made by the National Government, whether directly or indirectly, by any means or instrument, of shares or securities of [YPF], … if, as a consequence of such acquisition, the National Government becomes the owner, or exercises the control of, the shares of [YPF], which, in addition to the prior holdings thereof of any class of shares, represent, in the aggregate, at least 49% of the capital stock ….

JA674. Section 28(C) provides that the sanctions in §7(h) "shall be applied" to Argentina "with no kind of limitation whatsoever," unless "the acquisition in breach of the provisions of Section 7 and [Section 28] has occurred gratuitously," i.e., without intent to exceed the applicable acquisition thresholds, in which case the sanction is limited to "the loss of the right to vote." JA674-75.

These provisions were "clearly designed" to "create a structure that would give U.S. investors (and other investors as well) sufficient assurance that they would invest in the Class D shares" notwithstanding Argentina's unstable economic past. JA881; *see Petersen II*, 895 F.3d at 199. In particular, these "shareholder protection measures" in the amended Bylaws "promise[d] investors a compensated exit from their ownership position in the firm if Argentina were to decide to renationalize

12

YPF." *Petersen II*, 895 F.3d at 200. Section 28 thus gave "special attention to the acquisition of stock … by Argentina," which addressed a principal fear of potential investors and was thus "central to Argentina's and YPF's efforts" to convince foreign investors to take part in the IPO "despite [Argentina's] long history of prior defaults and frequent disregard for the interests of foreign investors." JA882.

Argentina and YPF "touted these protections" for minority shareholders in the IPO prospectus that YPF filed with the SEC. *Petersen II*, 895 F.3d at 200. In particular, the prospectus repeatedly referred to the amended Bylaws, the tender-offer requirement for acquisitions of control generally, and the applicability of that requirement to the Argentine government specifically. JA501-02, JA511-13. These provisions, emphasized in the prospectus and repeated in subsequent SEC filings for years thereafter, were critical not only to the success of the IPO but also to ensuring that future investors could purchase with confidence, knowing they were guaranteed a "compensated exit" in the event of a re-nationalization. *Petersen II*, 895 F.3d at 200.

"Argentina's marketing efforts worked." *Id.* Through the sale of YPF securities, Argentina "raised billions of dollars in investment capital," with "the largest share (more than $1.1 billion in total) coming from the sale of ADRs in the United States on the NYSE." *Id.* The protections afforded by the Bylaws were "critical" to the IPO's success, as Argentina "likely could not have achieved the

13

valuation it did at the time of its IPO, or even completed the IPO itself, without providing prospective investors with protections in the event that Argentina either reverted to a nationalist agenda of maintaining state control or did not protect minority investors from a change-of-control event."  JA842, JA859.

### B. Plaintiffs Purchase YPF ADRs.

Petersen (plaintiffs in No. 23-7370) and Eton Park (plaintiffs in No. 23-7376) both became significant shareholders in YPF by purchasing NYSE-listed ADRs.  By the spring of 2012, Petersen and Eton Park were the second- and third-largest investors in YPF, respectively.  JA1899-1901.

Between 2008 and 2011, Petersen purchased ADRs representing more than 100 million Class D shares of YPF—accounting for slightly more than 25% of YPF's outstanding Class D shares—in two separate acquisitions from YPF's then-majority owner, Spanish oil company Repsol S.A. ("Repsol"). *See Petersen II*, 895 F.3d at 200.  In acquiring its shares, Petersen complied with YPF's Bylaws, making a tender offer in accordance with §7 in connection with crossing the 15% ownership threshold.  *Id.*  Petersen's equity owners contributed $110.1 million in cash to the purchase, and financed the remainder with a consortium of major international banks, depositing the YPF ADRs in a collateral account in New York.  *Id.*; *see* JA448.  Argentina, as YPF's Class A shareholder, approved the acquisitions, as did Argentine regulators.  *See* JA1801-02.  Even then-Argentine President Cristina

14

Kirchner—who later authorized YPF's re-nationalization—spoke positively of Petersen's acquisition. *See* JA1363.

Eton Park, a prominent New York-based investment fund, purchased ADRs representing approximately 11.95 million Class D shares between late 2010 and early 2012. SA96. Eton Park recognized the risks of investing in an Argentine company, but was "reassured by the existence of [the] minority protection" provisions in the Bylaws and YPF's decision to list on the NYSE. JA1226-27.

## C. Argentina Seizes a Majority Stake in YPF, and Argentina and YPF Breach Their Obligations Under the Bylaws Tender-Offer Provisions.

In the fall of 2011, YPF announced the discovery of a major new oil field known as Vaca Muerta. Argentina saw that discovery as a reason to return to its old ways, and soon began a campaign to retake control of YPF (and the newly discovered oil field) by depressing YPF's share price and ultimately seizing a majority stake in the company.

On January 29, 2012, an Argentine newspaper closely allied with the government reported rumors that Argentina was considering re-nationalization. JA1402. Rumors continued for the next several months, with a predictably negative effect on the value of YPF shares. On February 29, the *Financial Times* reported that "[m]ounting fears" of greater government intervention had caused YPF's shares to "fall off a cliff, wiping more than $4 b[illio]n off YPF's value in less than a week."

JA1420.  Between January and April 2012, YPF's share price fell from $35 to less than $15.  JA1219; *see* SA5.

As would soon become clear, Argentina's plans did not include honoring the Bylaws.  On February 21, 2012, Argentine Secretary of Energy Daniel Cameron sent a memorandum to Roberto Baratta, the government's appointed YPF board member, that addressed "the magnitude of an eventual takeover of the company" and "explore[d] the different forms of accessibility to the company."  JA1378, JA1380 (emphasis omitted).

The "first possibility of acquiring control of" YPF, Cameron wrote, "would be under the rules of its own bylaws," which "implies moving forward with a stock tender offer."  JA1380.  Cameron recognized that the Bylaws were "carefully intended at the outset to defend its future minority shareholders," and estimated that, if Argentina made a tender offer and all shareholders tendered, Argentina would have to pay "between 11 billion and 14.5 billion dollars."  JA1380-81.  In Cameron's view, "this is not the path that will allow us greater possibilities."  JA1381.  Instead, he stressed, "[t]**he only way to go is expropriation.**"  JA1381 (emphasis original).  That was so, he advised, even though the failure to make a tender offer would "probably involve lawsuits."  JA1382.

In a cover email, Cameron explained that, based on the memo's analysis, Argentina had "rejected the ... Stock Tender Offer" approach.  JA1373.  He

16

recommended "to move toward an expropriation law ... with the acquisition of a simple majority." JA1373.

On April 16, 2012, having already wiped billions of dollars from YPF's market value through press leaks, Argentina executed its plan to seize control. First, the government issued Decree 530/2012, which appointed Julio De Vido, Argentina's then-Minister of Planning, Public Investment, and Services, as an "Intervenor" to exercise the powers of YPF's Board of Directors and President for 30 days (later extended for another 30 days). *See Petersen II*, 895 F.3d at 202. Argentina simultaneously issued Decree 532/2012, which appointed Axel Kicillof, then-Secretary of Economic Policy and Development Planning, as YPF's Vice-Intervenor. SA97. The Intervenor "seized control of YPF's facilities, replaced top management with government officials, and escorted YPF's then-CEO off the premises." *Petersen II*, 895 F.3d at 202. The market immediately reacted, with YPF shares "plummet[ing] by over 40%." SA171.

Argentine officials were "quick to declare that, despite having acquired control of the company, Argentina and YPF had no intention of complying with the tender offer provisions of YPF's bylaws." *Petersen II*, 895 F.3d at 202. On April 17, 2012—one day after the intervention—Kicillof, speaking as both Argentina's Secretary of Economic Policy and Development Planning and YPF's new Vice-Intervenor, told the Argentine Congress that Argentina and YPF would not honor the

17

Bylaws terms that they had, for years, touted as protecting minority private investors. Kicillof described as "fools ... those who think that the State has to be stupid and buy everything according to the law of YPF itself, respecting its bylaws," and dismissed the tender-offer requirement as a "bear trap." JA3693. Consistent with Kicillof's declaration, Argentina never made a tender offer, nor did it comply with the other requirements of §7 and §28. *See* SA97. Likewise, YPF never enforced the requirements and sanctions of §7 and §28 vis-à-vis Argentina.

On May 3, 2012, consistent with Cameron's proposal months earlier, Argentina introduced legislation—Law 26,741—to expropriate 51% of YPF's shares from Repsol. *See Petersen II*, 895 F.3d at 202-03. The law passed the Argentine Congress on the same day, and took effect four days later. *Id.* at 202. Beyond designating 51% of YPF's shares for expropriation, Law 26,741 explicitly provided that "the Argentine Executive Branch shall ... exercise all rights carried by the stock to be expropriated." JA1433-34; *see Petersen II*, 895 F.3d at 203. The legislation did not, however, override or modify the Bylaws. JA321. To the contrary, it "provide[d] that YPF shall remain a publicly-traded company after the expropriation." *Petersen II*, 895 F.3d at 208.

## II.     Procedural History

### A.     The District Court Denies Defendants' Motions to Dismiss and This Court Affirms.

Within days, Repsol filed a putative class action on behalf of all private shareholders against Argentina in New York for breaching §7 and §28 of the Bylaws. *Repsol v. Republic of Argentina*, No. 12-cv-3877 (S.D.N.Y. filed May 15, 2012). Plaintiffs were members of that putative class; however, Repsol individually settled with Argentina and voluntarily dismissed that suit in May 2014, before the class was certified.

Petersen filed suit against Defendants in May 2015, alleging breach of contract, promissory estoppel, and breach of the implied duty of good faith. JA133-62. Defendants moved to dismiss based on a host of grounds, including FSIA immunity, the act-of-state doctrine, forum non conveniens, and failure to state a claim.

The district court denied the motion in substantial part. As to forum non conveniens, it applied this Court's three-step inquiry, considering (1) "the degree of deference owed to the plaintiff's choice of forum," (2) "whether the defendant's proposed forum is adequate," and (3) "whether the balance of private and public interest weighs in favor of the alternative forum." SA30. It explained that while "deference to Plaintiffs' choice of forum is not at its greatest height," Argentina was not an adequate alternative forum in light of the "well-founded fear of prosecution

19

of [Plaintiffs'] counsel" if Petersen sought to pursue this case in Argentina. SA31-33. In fact, Argentina had already "announced the initiation of criminal proceedings" against Plaintiffs' counsel and litigation funder for participating in another international arbitration against Argentina, and Argentina's then-Attorney General had specifically declared that this case "raised similar concerns." SA9. The court found that Argentina had not shown the balance of private and public interests tilted strongly in favor of dismissal, given that both New York and Argentina "have an interest in adjudicating this dispute," and that the mere "need to apply foreign law" was not a sufficient "justification for dismissal." SA36.

While denying most of Defendants' motion, the court did dismiss Petersen's promissory estoppel claims. The court recognized Petersen's allegations that Defendants repeatedly "promised that Argentina would not retake control of YPF without making a tender offer," including in YPF's "IPO Prospectus, SEC filings, and other documents," and that Petersen "foreseeably and justifiably relied on that promise." SA45-46. But the court nevertheless dismissed the promissory estoppel claims as "duplicative of the breach of contract claims," on the theory that the complaint did not identify any promise "distinct from the obligations imposed by the Bylaws." SA46.

Defendants took an interlocutory appeal of the district court's FSIA and act-of-state holdings, and this Court affirmed the FSIA holding and dismissed the act-

of-state appeal. *Petersen II*, 895 F.3d at 198-99. This Court explained that Argentina was not entitled to FSIA immunity because the claims against it are "'based on' Argentina's breach of a commercial obligation": namely, its "obligation under section 28(A) of YPF's bylaws to make a tender offer for the remainder of YPF's outstanding shares," which Argentina triggered when it expropriated a majority stake in YPF from Repsol. *Id.* at 207. "That obligation and Argentina's subsequent repudiation of it," this Court concluded, "were indisputably commercial in nature," and so Argentina could not claim FSIA immunity for that commercial breach. *Id.* As to YPF, this Court concluded that its "obligation to enforce the tender offer provision triggered by Argentina's expropriation" was likewise "commercial in nature." *Id.* at 210. After calling for the views of the Solicitor General, the Supreme Court denied Defendants' request for further review. *See* 139 S.Ct. 2741 (2019).

Meanwhile, Eton Park, another member of the putative class in Repsol's action, filed suit against Argentina and YPF in November 2016. JA421-46. The district court designated Petersen's and Eton Park's actions as related, and they have since proceeded in tandem.

## B. The District Court Denies Defendants' Renewed Motion to Dismiss for Forum Non Conveniens.

Back in district court, Defendants filed a renewed motion to dismiss for forum non conveniens. SA48. The court again denied the motion, explaining that Defendants' arguments did "little to alter the Court's original analysis." SA50. First,

the court explained that deference was warranted to Plaintiffs' choice of forum, particularly as "this litigation plainly has a bona fide (and significant) connection to New York" given that Eton Park's claims "arose from New York-based traders—acting on instructions from a New York-based investment firm—purchasing shares of YPF stock that were advertised to New York-based investors and sold (through ADRs) on the New York Stock Exchange." SA65-66. Second, because Argentina had dismissed its criminal investigation into Petersen's counsel and litigation funder (and despite a new investigation in connection with this very case), SA69-70, the court accepted that Argentina would qualify as an adequate alternative forum, while noting that doing so "would not affect the overall outcome of the Court's forum non conveniens analysis." SA74-75.

Third, the court concluded that the relevant public and private interests "weigh heavily in favor of litigation in New York," particularly the "very strong" interests of the United States and New York in adjudicating claims against entities that "affirmatively sought out investors in New York and induced them to buy a stake in YPF through YPF ADRs listed on the NYSE." SA84-85, 87. The court rejected Defendants' argument that Argentine law assigned exclusive jurisdiction over this case to the Argentine courts, explaining that Defendants' own expert Professor Cabanellas acknowledged that the relevant provision merely "determines which court within Argentina has jurisdiction," and does not purport to address foreign

22

courts' jurisdiction. SA82. The court also rejected Defendants' reliance on international comity—a consideration that Defendants raised only *in support of* forum non conveniens, not as an independent basis for dismissal—explaining that Defendants had not shown "the exceptional circumstances[] required for such relief," and that in any event the "untold amounts of time and money" that the parties had spent litigating in this forum would make dismissal on comity grounds "woefully inefficient." SA87 n.15.

### C. The District Court Grants Summary Judgment Against Argentina on Liability and Grants Summary Judgment for YPF.

After extensive discovery, the parties each moved for summary judgment. The district court granted summary judgment for Plaintiffs against Argentina on liability, but granted summary judgment for YPF.

As the court explained, the "key facts [we]re not in serious dispute." SA102. Defendants "d[id] not dispute that Sections 7 and 28 of YPF's Bylaws, on their face, required that [Argentina] make a tender offer upon acquisition of more than 49% of YPF's capital stock," that Argentina acquired control of 51% of YPF's capital stock, and that it "failed to make the tender offer called for by the Bylaws." SA102-03. In fact, Argentina barely challenged "the merits or substantive elements of Plaintiffs' breach of contract claim." SA104. The court accordingly had little difficulty concluding that Plaintiffs had satisfied all the elements of their breach-of-contract claim against Argentina. *See* SA122-24.

The court likewise rejected all of Argentina's attempts to escape liability for that straightforward contractual breach. First, the court rejected Argentina's argument that Plaintiffs had no claim because they no longer held their YPF shares when Argentina formally acquired title to the expropriated shares (in 2014) and when Plaintiffs brought suit (in 2015 and 2016). Under both Argentine law and New York law, the court explained, what mattered was that Plaintiffs held their shares when Argentina breached its tender-offer obligations in 2012; they were not required to keep holding their shares in perpetuity to recover. SA114-22.

Second, the court rejected Argentina's argument that Plaintiffs' claims failed because Argentine law does not allow one shareholder to sue another for breaching corporate bylaws. As the court explained, the tender-offer provisions in the YPF Bylaws created bilateral contractual obligations under which Argentina "promised security holders that *it* would provide *them* with a compensated exit" if it reacquired control of YPF—an obligation that "could as easily have been created via a shareholder agreement or a simple contract." SA126. That this contractual obligation "is contained in the Bylaws does not change its nature," and does not affect Plaintiffs' ability to sue Argentina for breaching that obligation. SA126. The court likewise rejected Argentina's arguments that Plaintiffs should be limited to the remedies provided by Argentina's General Corporations Law, the consequences outlined in the Bylaws for shares acquired in violation of the tender-offer provisions,

or a claim for specific performance. SA126-34. And the court rejected Argentina's arguments that its General Expropriation Law barred Plaintiffs' claims, explaining that holding Argentina to its contractual commitments did not impermissibly "impede [the] expropriation or its effects." SA136-41.

Finally, the court rejected a "series of legal arguments" that Argentina raised "in an effort to reduce or eliminate Plaintiffs' damages," including that the damages should be determined in Argentine pesos as of the judgment date. SA146-50. Its decision left only two issues to resolve in a brief damages trial: (1) whether Argentina first acquired control of the expropriated shares (and so breached its tender-offer obligations under the Bylaws) on April 16, 2012, when it issued its executive intervention decree, or only on May 7, 2012, when the expropriation law went into effect; and (2) what prejudgment interest rate should apply. SA144-46, 150-51.

The court also granted summary judgment for YPF. The court acknowledged this Court's previous statement in *Petersen II* that YPF had a contractual "obligation to enforce the tender offer provision," in keeping with the general principle that "every corporation is obligated to abide by its bylaws." 895 F.3d at 210; *see* SA108. The district court, however, viewed that statement as "not a binding conclusion." SA108. Instead, it viewed the Bylaws' "use of passive voice when establishing the tender offer requirement" as indicating that YPF had no duty to enforce that

provision.  SA110.  The court recognized Plaintiffs' argument that this interpretation would mean the Bylaws "would leave nobody to enforce the relevant provisions" despite their unambiguously mandatory language, but it found that concern adequately addressed by Argentina's contractual liability for its own breach.  SA112. The court was unpersuaded by the conflict between its prior dismissal of the promissory estoppel claim against YPF as "duplicative" of the breach-of-contract claim, *see* SA45-46—a ruling premised on the existence of a valid contractual obligation—and its subsequent holding that YPF had no such contractual obligation after all.  SA112-13 & n.6.

Argentina sought reconsideration, submitting with its reply a new advisory opinion that it had "solicit[ed]" from a judge on its National Court of Appeals for Commercial Matters to critique the district court's decision.  SA159-61 & nn.2-3. The district court rejected that "improper" and "belated" opinion and denied reconsideration in relevant part.  SA160-62.

### D.    The District Court Holds a Damages Trial and Enters Judgment.

To resolve the remaining contested issues—the exact date on which Argentina had breached its Bylaws obligations, and the proper rate of prejudgment interest— the district court held a three-day trial in July 2023, where it heard testimony from multiple expert witnesses on Argentine law and extensive arguments from counsel. Argentina emphasized at trial—as it does in this Court, *see, e.g.*, Arg.Br.4—the size

26

of the damages required by the Bylaws' tender-offer formula.  But even as the trial was being held, YPF's chairman publicly boasted that the company's massive oil and gas reserves would enable Argentina to pay the potential judgment "with one annual EBITDA" and still have "150 years of gas reserves," making the expropriation "a good decision" and "we would do it again."  JA3650-52.

The district court issued its decision on September 8, 2023, determining that Argentina had "exercised indirect control" over the expropriated shares on April 16, 2012, the date on which it "took control of YPF … via the Intervention Decree" and thereby "deprived Repsol [the former majority shareholder] of control over its shares."  SA165; *see* SA166-68.  The court also exercised its discretion to select a prejudgment interest rate of 8% simple interest, a rate "well within the range imposed by Argentine [c]ourts" and warranted by Argentina's decision "knowingly to violate the bylaws" and to "force Plaintiffs to be its involuntary creditors for a massive amount over the course of a decade."  SA172, 174-76.

## SUMMARY OF ARGUMENT

Argentina and YPF made clear promises to NYSE investors, and just as clearly broke those promises by doing what investors feared most and brazenly dismissing their legal obligations.  The district court correctly held Argentina liable for its deliberate breach of its contractual obligations, and correctly awarded Plaintiffs the full measure of their damages.  While the damages award is large, it

27

reflects the enormity of the breach and has only two components: the precise amount Argentina promised to pay, and interest to account for the reality that Argentina promised to pay over a decade ago. Each of Argentina's numerous attacks on the decision below is meritless.

Argentina starts by asking this Court to rely on the discretionary doctrine of forum non conveniens to undo some nine years of litigation in the federal courts, all the way through trial and final judgment, and force the parties to start over from scratch in the Argentine courts. That argument fails at the threshold, as Argentina comes nowhere near making the requisite showing of substantial prejudice. And that argument fails on the merits as well, as the district court properly balanced the relevant factors—including the involvement of Eton Park, a New York plaintiff— and was well within its discretion to conclude that they tipped strongly in favor of deciding this case here. That is especially true in light of the United States' strong interest (acknowledged by the Solicitor General) in allowing claims against foreign sovereigns who solicit investment in the United States, and New York's equally strong interest in regulating promises to NYSE investors. As for Argentina's late-breaking international comity argument—which Argentina failed to assert as a standalone ground for dismissal below—it is not only forfeited, but depends on a sweeping approach to international comity abstention that this Court has never

adopted and that contravenes the virtually unflagging obligation of the federal courts to exercise the jurisdiction granted by Congress.

Argentina fares no better in its attempts to deprive Plaintiffs of a remedy for Argentina's clear breach of its contractual obligations. Despite Argentina's efforts to mystify Argentine contract law, the elements are not meaningfully different from the familiar elements from first-year Contracts class stateside, as Argentina conceded below. Argentina argues for the first time that even if *some* bylaws provisions can give rise to a breach-of-contract claim, as its expert conceded, the *particular* provision at issue here does not. That argument is not only forfeited, but plainly meritless. As the district court explained (and Argentina does not meaningfully dispute), the tender-offer provision here involved specific promises that could just as easily have been made in a shareholder agreement or a simple contract, and they are no less binding just because Argentina chose to put them in the Bylaws instead. The district court also correctly rejected Argentina's attempts to limit Plaintiffs to a (largely illusory) specific-performance remedy. Section 7(h) of the Bylaws—which does not mandate any substitute performance by Argentina—is not a penalty clause and does not disentitle shareholders to the recovery promised by the elaborate pricing formulae in the Bylaws, especially given Argentina's willful breach. Nor were plaintiffs required to seek specific performance rather than damages; Article 505 of the Civil Code imposes no such requirement, and in any

29

event any demand for specific performance would have been futile in light of Argentina's open repudiation of its obligations.

Argentina's other liability arguments are equally meritless. Its claim that it did not breach the Bylaws until it took formal title to the expropriated shares contravenes the Bylaws' clear text and common sense, and would let Argentina eviscerate its tender-offer promise by the simple expedient of delaying the formal transfer of title. And its argument that Article 28 of the General Expropriation Law bars Plaintiffs' claims is impossible to reconcile with the simple fact that, as this Court has already recognized, Plaintiffs do not challenge the expropriation itself in any way or assert any interest in the expropriated shares. Because Plaintiffs' claims challenge only Argentina's separate breach of its distinct contractual obligations— which would have been equally triggered if Argentina had bought Repsol's shares on the open market rather than expropriating them—they are unaffected by Article 28.

As to damages, Argentina opens with a bold attempt to deflate its damages bill based on the dramatic decline in the Argentine peso over the last decade (due to Argentina's own inflationary policies), arguing that the court should have calculated the damages award using the exchange rate on the judgment date. But as New York law makes clear, the judgment-date exchange rate applies only to obligations denominated in a foreign currency—and here, the tender-offer obligation was a

performance obligation, not a payment obligation denominated in pesos (or any other foreign currency). In fact, the Bylaws and established practice make clear that Argentina was required to offer dollars for Plaintiffs' ADRs, and Plaintiffs would have been paid in dollars in 2012 when they tendered. Argentina accordingly cannot rely on its decade-long devaluation of its currency—and its efforts to prolong this litigation nearly as long—to attempt to eliminate 95% of its damages. Its cursory challenges to the district court's factual findings regarding its breach date and discretionary choice of prejudgment interest rate are likewise in vain, as the court clearly and correctly explained both its conclusion that Argentina controlled the expropriated shares as of the intervention and its determination that the interest rate it chose was appropriate and equitable.

In the end, Argentina's liability is as clear as its breach, and the only errors in the proceedings below involved letting YPF off the hook entirely and eliminating Plaintiffs' promissory estoppel claims. First, the court erred by failing to recognize YPF's own contractual obligation under its Bylaws to enforce the tender-offer provision against Argentina. Second, the court also erred by dismissing Plaintiffs' promissory estoppel claims, which would provide an independent basis for liability if Defendants could somehow avoid liability for breach of contract. This Court should reverse on those points and affirm the rest of the judgment.

**STANDARDS OF REVIEW**

A decision denying dismissal for forum non conveniens is reviewed for abuse of discretion, *see Olin Holdings Ltd. v. Libya*, 73 F.4th 92, 109 (2d Cir. 2023), and will not be reversed after trial absent substantial prejudice, *Indasu Int'l, C.A. v. Citibank, N.A.*, 861 F.2d 375, 380 (2d Cir. 1988). A decision on dismissal for international comity is likewise reviewed for abuse of discretion. *Royal & Sun All. Ins. Co. of Can. v. Century Int'l Arms, Inc.*, 466 F.3d 88, 92 (2d Cir. 2006). Decisions granting dismissal for failure to state a claim or summary judgment are reviewed de novo. *Ezrasons, Inc. v. Travelers Indem. Co.*, 89 F.4th 388, 394 (2d Cir. 2023), *In re Trib. Co. Fraudulent Conv. Litig.*, 10 F.4th 147, 159 (2d Cir. 2021). A district court's legal conclusions, including on issues of foreign law, are reviewed de novo, *Animal Sci. Prods., Inc. v Hebei Welcome Pharm. Co.*, 585 U.S. 33, 42 (2018), and its factual findings are reviewed for clear error, *Sleepy's LLC v. Select Comfort Wholesale Grp.*, 909 F.3d 519, 527 (2d Cir. 2018).

**ARGUMENT**

## I. The District Court Correctly Rejected Argentina's Attempt To Force Plaintiffs To Litigate This Case In Argentina.

The federal courts have now dedicated some nine years to this litigation, including motions to dismiss, a prior appeal to this Court, certiorari-stage briefing at the Supreme Court, discovery, extensive summary judgment briefing, trial on damages, and final judgment. Argentina does not like that the district court found a

breach and awarded the damages and interest plainly contemplated by the Bylaws, but it does not (and cannot) claim that there was anything fundamentally unfair about all those proceedings. Nevertheless, Argentina asks this Court to cast aside the "untold amounts of time and money" the parties have spent litigating to final judgment here, SA87 n.15, and to force the parties to start over from scratch in Argentina's courts instead. That request is meritless. The district court properly concluded that the relevant interests here "weigh heavily in favor of litigation in New York," SA86, and Argentina provides no sound reason for disturbing that judgment on either forum non conveniens or international comity grounds.

## A. The District Court Correctly Rejected Argentina's Forum Non Conveniens Arguments.

To reverse on forum non conveniens grounds *after* trial and final judgment, Argentina must show not only that the district court abused its discretion, *see Olin Holdings*, 73 F.4th at 109, but also that Argentina suffered "substantial prejudice" as a result, *Indasu*, 861 F.2d at 380; *see, e.g.*, *Yukos Cap. S.A.R.L. v. Samaraneftegaz*, 592 F.App'x 8, 9 (2d Cir. 2014); *Zelinski v. Columbia 300, Inc.*, 335 F.3d 633, 643 (7th Cir. 2003) ("great prejudice"); *McLennan v. Am. Eurocopter Corp.*, 245 F.3d 403, 423-24 (5th Cir. 2001) (same). Argentina's arguments come nowhere near clearing those hurdles.

1. As an initial (and dispositive) matter, Argentina cannot show any "substantial prejudice" from the district court's decision to try this case in New York.

*Indasu*, 861 F.2d at 380. Argentina does not and cannot claim that any "key evidence or witnesses were unavailable during trial" in this forum, or that it "did not receive a fair trial because of the forum's animosity or prejudice," or any other serious prejudice from having to litigate this case here. *In re Air Crash Disaster Near New Orleans*, 821 F.2d 1147, 1168 (5th Cir. 1987), *vacated on other grounds sub nom. Pan Am. World Airways, Inc. v. Lopez*, 490 U.S. 1032 (1989); *see Indasu*, 861 F.2d at 380 (citing *Air Crash*, 821 F.2d at 1168); *Yukos*, 592 F.App'x at 9. That failure to show substantial prejudice is itself sufficient to doom Argentina's forum non conveniens argument.

Argentina's only attempt to meet the substantial prejudice requirement—which its amici ignore entirely and Argentina tellingly relegates to a single paragraph—is to complain that the district court was less familiar with Argentine law than the Argentine courts. Arg.Br.36-37. That generic complaint comes nowhere near the concrete evidence of missing testimony or deep-seated bias that courts have deemed necessary to warrant upsetting a final judgment on forum non conveniens grounds. *See, e.g.*, *Air Crash*, 821 F.2d at 1168; *Yukos*, 592 F.App'x at 9 (no substantial prejudice where the movant did not show "what testimony [the missing witness] might have given or how that testimony might have affected the case's outcome"). Indeed, accepting Argentina's argument would largely eviscerate the substantial prejudice requirement, as a defendant can always claim that foreign

34

courts will know foreign law better than their U.S. counterparts. That is plainly insufficient to warrant the "woefully inefficient" result of dismissal on forum non conveniens grounds after the parties have spent "untold amounts of time and money" litigating to final judgment. SA87 n.15.

2. In any event, the district court did not abuse its discretion in denying Argentina's motion to dismiss on forum non conveniens grounds. As Argentina concedes, the district court applied the correct legal framework—namely, the three-step inquiry set out in *Iragorri v. United Technologies Corp.*, 274 F.3d 65 (2d Cir. 2001). SA62; *see* Arg.Br.30. None of Argentina's challenges to the district court's application of that standard shows any abuse of discretion.

a. At the first step, the district court correctly concluded that "heightened deference" was due to Plaintiffs' decision to bring suit in New York, where Eton Park "is at home" and "has maintained its principal place of business." SA64; *see Iragorri*, 274 F.3d at 71. As the court explained, Eton Park's claims "arose from New York-based traders—acting on instructions from a New York-based investment firm—purchasing shares of YPF stock that were advertised to New York-based investors and sold (through ADRs) on the New York Stock Exchange," showing that this litigation has "a bona fide (and significant) connection to New York." SA66. Even as to Petersen alone, the court recognized that while deference to its choice of forum was "not at its greatest height," that does not mean it "receives *no* deference."

SA63, 64 n.5; *see, e.g.*, *Murray v. British Broad. Corp.*, 81 F.3d 287, 290 (2d Cir. 1996); *R. Maganlal & Co. v. M.G. Chem. Co.*, 942 F.2d 164, 168 (2d Cir. 1991) (foreign plaintiff's choice of forum "is entitled to some weight").

Neither of Argentina's attacks on that analysis is persuasive. First, Argentina contends that Eton Park's choice of its home forum is "irrelevant," because Petersen brought suit in New York first. Arg.Br.30-31. But the fact that *both* Petersen (whose choice of forum receives "some weight," *Murray*, 81 F.3d at 290) *and* Eton Park (whose choice of forum receives "substantial deference," SA65) chose to bring suit in New York only strengthens the case for deferring to their choice. And contrary to what Argentina suggests, Arg.Br.30-31, Eton Park was hardly a johnny-come-lately in the district court for forum non conveniens purposes. Indeed, the actual first-filed suit was Repsol's 2012 putative class action, which included both Petersen and Eton Park as putative class members and was also filed in the Southern District of New York, underscoring that you cannot raise capital on the NYSE and then express surprise when you are sued in the SDNY. *See* SA179-80; *supra* p.19. Given that context, Eton Park's decision to sue in its home forum—where Petersen's suit was pending and had already survived one forum non conveniens motion—plainly does not suggest the kind of "blatant gamesmanship" that might warrant "reduced deference." *Otto Candies, LLC v. Citigroup, Inc.*, 963 F.3d 1331, 1345 (11th Cir. 2020).

Second, Argentina argues that even if Eton Park's strong ties to New York warranted trying its suit here, the district court should have "analyzed the cases separately" and dismissed Petersen's. Arg.Br.31-32. Argentina never raised that argument below, with good reason: It would be beyond absurd to force the parties to litigate these near-identical cases in different countries. *See Otto Candies*, 963 F.3d at 1345 (forcing cases to proceed in two forums would "defeat the purpose of forum non conveniens"). And if the Eton Park suit properly belongs in New York, Argentina could not begin to show the requisite substantial prejudice from litigating the same basic suit vis-à-vis Petersen here. Regardless, looking at Petersen's case alone produces the same result: Petersen's choice of forum is entitled to "some weight"—especially since Petersen purchased NYSE-traded ADRs, deposited them in a New York collateral account, lost them in a New York foreclosure when Defendants breached, and filed suit after a class action in New York where it was a putative class member was voluntarily dismissed—and Argentina has not shown that the remaining factors warrant disturbing "the presumption in favor of [Petersen's] choice." *Maganlal*, 942 F.2d at 168; *see* SA30-37 (denying forum non conveniens dismissal as to Petersen alone); SA50 (subsequent events "do little to alter the Court's original analysis").

b. Argentina also shows no abuse of discretion in the district court's conclusion that the balance of public and private interests "weigh[s] heavily in favor

of litigation in New York." SA87. As the federal government noted in recommending denial of Defendants' previous certiorari petitions, the United States has a "strong interest … in ensuring that foreign states that enter U.S. markets as commercial actors do not enjoy immunity from lawsuits regarding violations of their commercial obligations." SA83. Likewise, New York has a "considerable interest" in adjudicating claims that Defendants "affirmatively sought out investors in New York and induced them to buy a stake in YPF through YPF ADRs listed on the NYSE." SA84. The district court reasonably concluded that these "compelling reasons" outweighed any factors favoring litigating this case in Argentina, SA83—and that conclusion is all the more persuasive now, when dismissal would undo years of work litigating this case to final judgment.

Argentina's contrary arguments show at most that it weighs the relevant factors differently, not that the district court abused its discretion. First, Argentina contends the district court should have given more weight to the fact that this case involves Argentine law. Arg.Br.32-34. But the district court *did* consider that fact, *see* SA85-86; it just refused to find it conclusive, recognizing that courts must "guard against an excessive reluctance to undertake the task of deciding foreign law," which is "a chore federal courts must often perform." *Manu Int'l, S.A. v. Avon Prods., Inc.*, 641 F.2d 62, 67-68 (1981); *see* SA85. In fact, as the district court predicted and as explained in more detail below, the issues of Argentine law in this case are relatively

straightforward—and as the district court also predicted, "the high quality of the parties' expert submissions" gave it "a more than adequate basis to inform itself and reach a decision on any potentially thorny issues." SA86.[2]

Second, Argentina asserts that the district court did not adequately credit Argentina's "statutorily expressed interest" in having corporate disputes heard where the corporation is headquartered. Arg.Br.34-35. But as the district court explained, the statute Argentina cites "does not speak to international jurisdiction" or "purport to address the ability of foreign courts" to hear these claims. SA82. Instead, as Argentina's own expert Professor Cabanellas acknowledged, that statute merely "determines which court within Argentina has jurisdiction … *within* the Argentine jurisdictional system." SA82 (ellipsis original) (emphasis added). Because Argentine law "does not itself require a forum in Argentina," it follows that "Defendants' interests in litigating there are greatly lessened." SA83. Regardless, the district court *did* acknowledge Argentina's "policy interest" in having its corporate disputes litigated in Argentine courts, and found it "entitled to some weight," SA83; the court just found the countervailing interests in allowing this

---

[2] While the district court later noted that it had "decided issues of first impression *and* questions of Argentine law," it did not specify that the Argentine law questions (as opposed to U.S. and New York law) were novel or suggest any lack of confidence in its rulings. JA3934 (emphasis added). On the contrary, the court explicitly noted that it was "dubious that the Republic will succeed on appeal." JA3934.

litigation to proceed here more persuasive, a reasonable determination that was well within its discretion.

As to those countervailing interests, the district court did not abuse its discretion in finding "compelling reasons for litigating this case in the United States and specifically in New York." SA83. As the court explained—and Argentina fails to mention—the United States has already informed the Supreme Court in this very case of its significant interest in "ensuring that foreign states that enter U.S. markets as commercial actors do not enjoy immunity from lawsuits regarding violations of their commercial obligations." SA83. That interest was "already substantial" based on Petersen's suit alone, and "has indubitably been heightened" now that Eton Park (headquartered in New York) is also involved. SA83-84. For similar reasons, "New York specifically has a considerable interest in hosting this litigation," given its "strong interest in policing activities directed toward its stock markets." SA84.

Argentina notes that this case is not "a U.S. securities action." Arg.Br.35. But no one ever said otherwise, and the district court was more familiar than anyone with the claims here, which remained materially unchanged throughout the litigation. As the district court explained, New York has a strong interest in hearing suits against defendants who "affirmatively sought out investors in New York and induced them to buy a stake in YPF through YPF ADRs listed on the NYSE," regardless of whether the underlying claims are brought under the federal securities laws. SA84. Through

their "aggressive marketing tactics," Argentina and YPF deliberately induced investors to invest over $1 billion in YPF through the NYSE by trumpeting the protections that the Bylaws promised minority shareholders if Argentina decided to retake control. SA84. The United States and New York have a compelling interest in providing a forum for claims alleging that those contractual promises were breached. Weighing all the relevant factors together, the district court did not abuse its discretion in concluding that the balance of private and public interests tips "heavily in favor of litigation in New York." SA87.

### B. Argentina's Late-Breaking Attempt to Seek Dismissal on International Comity Grounds Is Forfeited and Meritless.

Argentina next contends that the district court should have "independently" dismissed this litigation under "principles of international comity." Arg.Br.37. That late-breaking argument is both forfeited and meritless.

1. First, Argentina never argued below that international comity provides an independent basis (separate from forum non conveniens) for dismissing this case. In fact, Argentina did not mention international comity in its initial motion to dismiss at all. *See* JA193-234. Argentina first mentioned that concept in its renewed motion to dismiss for forum non conveniens—and not as a standalone argument, but merely as a public-interest factor in the forum non conveniens calculus. *See, e.g.*, JA463 ("Plaintiffs' Claims Should Be Dismissed Pursuant to the Doctrine of Forum Non Conveniens" (capitalization altered)); JA485 (arguing in subpart I.D.2.(2), as part of

41

Argentina's discussion of the public interest factors, that "Argentina's Interest Should Be Recognized Pursuant to Principles of International Comity"). That is why the district court disposed of the issue in a footnote, *see* SA87 n.15, and why this Court need not consider Argentina's new standalone international-comity argument, *see, e.g.*, *Sczepanski v. Saul*, 946 F.3d 152, 161 (2d Cir. 2020) (arguments not raised below are forfeited).

2. Argentina's late-breaking argument is meritless in any event. In its accepted form, international comity abstention allows a court "to decline to exercise jurisdiction over a case before it when that case is pending in a foreign court with proper jurisdiction." *JP Morgan Chase Bank v. Altos Hornos de Mexico, S.A. de C.V.*, 412 F.3d 418, 424 (2d Cir. 2005); *cf. Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800 (1976) (abstention based on parallel state proceedings). Even in that limited (and obviously inapposite) category of cases, abstention is only appropriate in "exceptional circumstances"; indeed, given the "virtually unflagging obligation" of the federal courts to hear cases within their jurisdiction, "only the clearest of justifications will warrant dismissal" on international comity grounds. *Royal & Sun*, 466 F.3d at 92-93 (brackets omitted).

Argentina does not (and cannot) invoke that accepted form of international comity abstention, because there is no parallel foreign proceeding here. Instead, Argentina argues for a far broader rule that conflates international comity abstention

and forum non conveniens—namely, that international comity warrants abstention whenever "a second sovereign also has a legitimate claim to jurisdiction" and "has a greater interest in the dispute," even if no foreign proceeding is pending and even if no exceptional circumstances are involved. Arg.Br.38-39. That breathtakingly unconstrained approach would replace well-developed principles of forum non conveniens with a bizarre "America-last" approach that would ignore the deference owed to the plaintiff's choice of forum and the federal courts' virtually unflagging obligation to exercise jurisdiction (especially when no other litigation is pending). It has been rightly rejected by other circuits, *see, e.g.*, *Gross v. German Found. Indus. Initiative*, 456 F.3d 363, 393-94 (3d Cir. 2006); goes beyond even Argentina's cited caselaw, *see Mujica v. AirScan, Inc.*, 771 F.3d 580 (9th Cir. 2014) (dismissing where, unlike here, the State Department "forcefully" endorsed dismissal); and runs squarely contrary to the narrow limits on abstention recognized by this Court, *see Royal & Sun*, 466 F.3d at 92-93. Notably, Argentina has no explanation whatsoever for why this Court would require strict limits and exceptional circumstances in the context of pending foreign proceedings (which would appear to be a *necessary* condition for abstention), *see id.*, but ignore those limits and well-established forum non conveniens principles when foreign proceedings are non-existent.[3] Argentina's

---

[3] While this Court has occasionally discussed international comity abstention in other circumstances, *see, e.g.*, *Jota v. Texaco, Inc.*, 157 F.3d 153, 159-61 (2d Cir.

freewheeling view of international comity also contravenes Congress' judgment in enacting the FSIA, which ended the prior practice of analyzing international disputes case-by-case to determine which ones "will undermine international comity," replacing that amorphous case-by-case regime with a "comprehensive set of legal standards." *Republic of Argentina v. NML Capital, Ltd.*, 573 U.S. 134, 141, 146 (2014) (brackets omitted).

3. Argentina's misguided argument also ignores the substantial interest of the United States in this litigation, especially after nine-plus years of judicial effort. According to Argentina itself, dismissal on international comity grounds is proper only if "the United States has a weak interest in the case," Arg.Br.39—and in this case, the United States has already declared its strong interest in "ensuring that foreign states that enter U.S. markets as commercial actors do not enjoy immunity from lawsuits regarding violations of their commercial obligations." SA83. The district court properly considered that and all the other relevant factors, including Plaintiffs' choice of forum, as part of its forum non conveniens analysis, which is

---

1998), it has never affirmed dismissal on that ground absent a pending foreign proceeding. Insofar as Argentina's amici suggest otherwise, they confuse prescriptive comity (whether laws apply extraterritorially) with adjudicative comity (whether to abstain). *See, e.g.*, Profs.of.Law.Arg.Br.6 (citing *In re Vitamin C Antitrust Litig.*, 8 F.4th 136 (2d Cir. 2021)).

the proper place for considerations of international comity in the absence of a pending foreign proceeding.

## II. The District Court Correctly Rejected Argentina's Strained Efforts To Escape Liability For Its Clear Breach Of Its Contractual Obligations.

Argentina fares no better on the merits. The elements of a breach-of-contract claim are not materially different in Argentina and are all readily met here. As the district court noted, Argentina largely "does not engage with the merits or substantive elements of Plaintiffs' breach of contract claim." SA104. That is because the undisputed facts show all those familiar substantive elements are plainly met. *See* SA122 (recognizing that those elements "are not in serious dispute"). The tender-offer provisions in the Bylaws imposed a binding and enforceable contractual obligation on Argentina, *see* SA125-26; Argentina breached that contractual obligation by acquiring majority control of YPF but refusing to make a tender offer, *see* SA122; and Plaintiffs suffered substantial resulting damages, *see* SA122-23. Those largely undisputed elements establish Argentina's liability for breach of contract under Argentine law.

Unable to meaningfully contest the substantive elements of Plaintiffs' claims, Argentina resorts to a host of strained legal arguments designed to render its clear promises in the Bylaws illusory. Those *post hoc* arguments—many of which rely on previously unmentioned statutes and legal authorities—are non-starters as a matter

of both law and common sense.[4] There is a reason that Argentina made clear promises at the time of the IPO and acknowledged the clarity of its breach in real time when it re-nationalized YPF in 2012. If Argentina had surfaced any of its current arguments at the time of YPF's IPO, that privatization would have been dead on arrival. And if any of its arguments had any merit, Argentina would have invoked them when it breached its obligations. Instead, when Argentina re-nationalized YPF in April 2012, it publicly and proudly *renounced* its promises to minority shareholders, dismissing compliance as "foolish" and a "bear trap." Even assuming that Argentina is due "respectful consideration" on its views of Argentine law here, *Animal Sci.*, 585 U.S. at 36—which the district court gave it, SA102, 105 n.5, even though "the appropriate weight" to give a foreign government's views "depend[s] on the circumstances" and "there may be cause for caution" when those views are "offer[ed] … in the context of litigation," *Animal Sci.*, 585 U.S. at 43—Argentina's newfound attempts to render its necessary promises illusory and deprive Plaintiffs of the benefit of their bargain are wholly groundless.

---

[4] So too for the Argentine-law arguments raised by Argentina's various amici, which echo Argentina's attempt on reconsideration to improperly introduce "newly created expert testimony." SA161.

46

A. **The District Court Correctly Held That Plaintiffs Have Breach-of-Contract Claims Against Argentina.**

The basis for Plaintiffs' breach-of-contract claim is straightforward. As this Court has already explained, the Bylaws are "the contract governing the relationship among YPF, Argentina (in its capacity as a shareholder), and other YPF shareholders." *Petersen II*, 895 F.3d at 199; *see, e.g.*, JA1087 ("[C]orporate bylaws are contracts."). That contract included a straightforward promise on Argentina's part: if it ever acquired control of a majority of YPF's shares, it would make a tender offer to the remaining shareholders at the price specified in the Bylaws. JA652-55, JA674. Under the Argentine Civil Code, the breach of that contractual promise "give[s] rise to contractual civil liability" and entitled Plaintiffs to sue Argentina for breach of contract. JA1087-88; *see* SA201 (Civil Code Articles 505, 508, 511); SA205 (Civil Code Article 889).

Argentina opens its response with a sweeping assertion: that Argentine law categorically "does not recognize" any breach-of-contract claim by one shareholder against another based on the breach of a corporate bylaw. Arg.Br.43. Argentina concedes that as a general matter, the Civil Code provides a breach-of-contract claim for the breach of "ordinary bilateral contracts." Arg.Br.43. But Argentina claims that there is "no similar rule for corporate bylaws," because (it says) corporate bylaws are "organizational documents that govern how a company functions" rather than ordinary contracts. Arg.Br.43. Instead, according to Argentina, the only option

47

available to a plaintiff harmed by the breach of a corporate bylaws provision is the process provided by the General Companies Law (GCL)—which requires first seeking a corporate resolution to enforce the bylaws at a shareholder meeting, and then (if unsuccessful) challenging the failure of that resolution by filing suit within three months in the Argentine court where the company is headquartered. Arg.Br.44; *see* SA226.

That categorical view—the only view that Argentina advanced below, *see* JA1833-34—was contradicted by Argentina's own expert Dr. Manóvil, who conceded in both his reply report and his deposition that corporate bylaws *can* include bilateral contractual promises that will support a breach-of-contract claim under Argentine law. JA1735-36 & n.173; JA3957; *see* Arg.Br.48 (recognizing the concession); SA125 (same). Unable to overcome that concession, Argentina pivots to a new argument: It asserts that while *some* corporate bylaws provisions can create bilateral obligations enforceable by a breach-of-contract suit, the *particular* tender-offer provision here does not, because (Argentina says) it does not involve "specific promises from one party to another." Arg.Br.48.

Argentina never made that alternative non-categorical argument below, *see* JA1833-34, and so it is forfeited. *Sczepanski*, 946 F.3d at 161. It is also meritless. As the district court explained, "based on the plain language of the Bylaws," the tender-offer obligation here *did* involve specific promises from one party to another:

48

Argentina "promised security holders that *it* would provide *them* with a compensated exit if it reacquired control over the requisite number of shares." SA126. That is, the contractual promise here was made "to specific and identifiable persons, the remaining shareholders, and was owed by a specific and identifiable person, the Republic." SA126. Indeed, Argentina does not dispute that "[t]his bilateral obligation could as easily have been created via a shareholder agreement or a simple contract," SA126—in which case, as Argentina appears to concede, its breach would plainly give rise to a breach-of-contract claim. *See* Arg.Br.47. The fact that the obligation was instead contained in the Bylaws "does not change its nature." SA126; *see* JA3957-58 (Dr. Manóvil recognizing that in deciding whether an obligation is bilateral, "it doesn't matter whether [the obligation] is in the bylaws or outside the bylaws").

None of Argentina's other assorted arguments is remotely persuasive. Argentina claims that Article 1138 of the Civil Code defines contracts as "bilateral" where the parties "assume reciprocal obligations." Arg.Br.47 (quoting SA208). But that article, which Argentina never cited below, has nothing to do with whether a breach-of-contract claim is available under the Bylaws; it merely categorizes contracts as either "unilateral," where "only one of the parties undertakes an obligation," or "bilateral," where the parties "assume reciprocal obligations." SA208. Even assuming that dichotomy applies, the tender offer provisions here are

plainly bilateral, as they impose reciprocal obligations on all shareholders—which is why Petersen itself was required to (and did) make a tender offer when it crossed the 15% ownership threshold. *Petersen II*, 895 F.3d at 200.

Argentina instead suggests that bilateral agreements can only arise between individually identified parties—"a named Shareholder A" and "a named Shareholder B"—and that any change in those parties requires novation. Arg.Br.48. Once again, Argentina never made that argument below, and so has forfeited it. Regardless, Argentina cites nothing in the Code to support its apparent view that a breach-of-contract claim is categorically unavailable under Argentine law for any contract that allows the parties to assign their rights to others. *Contra* Arg.Br.47. And to the extent "an agreement between the original parties to allow a new party to enter the contract" is required, Arg.Br.47, the Bylaws embody just such an agreement with respect to new shareholders. *See Petersen II*, 895 F.3d at 199 (recognizing that the Bylaws "govern[] the relationship among … YPF shareholders").[5]

Argentina emphasizes that other YPF shareholders chose to pursue remedies under the GCL, and that (it says) this appears to be the first case in which one

---

[5] Argentina notes that its Capital Markets Law—enacted in 2018 and never mentioned below—imposes a tender-offer requirement without providing a breach-of-contract claim. Arg.Br.45-46. But the fact that Plaintiffs have a breach-of-contract claim for Argentina's breach of its *contractual* obligation in the Bylaws hardly implies that the same remedy must be available for the breach of a *statutory* obligation under a law enacted years later. *Contra* Arg.Br.48-49.

shareholder has sued another under Argentine law for breach of contract based on the breach of a bylaws provision. Arg.Br.44-45. But Argentina does not even attempt to argue that the remedies provided by the GCL are exclusive, or that they preclude Plaintiffs' claims under the Civil Code—because the Argentine Commercial Code (which includes the GCL) specifies that the Civil Code continues to apply to "all matters and business transactions" unless specifically displaced. JA940 (quoting Commercial Code Article 207); *see* SA128 (rejecting the argument that Plaintiffs claim "was somehow modified or displaced by ill-fitting and indirect intra-corporate procedures").[6] The absence of reported cases involving similar claims is readily explained by the uniquely clear promises Argentina made in order to reassure investors that they would be amply protected in the event of a feared re-nationalization, and its uniquely egregious breach. Having made extraordinary promises and committed an extraordinary breach, Argentina cannot avoid the consequences just because there is no precedent involving comparable circumstances.

---

[6] So too under U.S. law, where it is "well established" that corporate bylaws "are contracts among a corporation's shareholders." *Oliveira v. Quartet Merger Corp.*, 662 F.App'x 47, 48 (2d Cir. 2016); *see Reliable Credit Ass'n v. Credithrift of Am., Inc.*, 570 P.2d 379 (Or. 1977) (allowing contract claim for damages based on breach of corporate bylaws); *contra* Law.Profs.Arg.Br.4-11. Argentina's only contrary authorities are one unpublished District of Oregon decision and one New York trial-court decision from 1945 (plus two treatises relying on it). Arg.Br.46.

Finally, Argentina's post hoc attempts to deny Plaintiffs their straightforward remedy for Argentina's straightforward breach fails the test of common sense. If the tender-offer obligation in the Bylaws were really as unenforceable as Argentina now claims, the IPO would have failed dramatically. Given Argentina's shaky economic past and historic weakness for economic nationalism, no reasonable investor would have invested in YPF if the promised remedy for a breach of the tender-offer obligations was not a simple breach-of-contract claim but instead a tortuous journey down the rabbit hole of Argentine corporate law in the Argentine courts. After explicitly promising in the Bylaws to provide investors a compensated exit at the predetermined price that the Bylaws set, Argentina cannot now be heard to argue that no breach-of-contract claim exists to enforce that contractual promise.

## B. The District Court Correctly Held That Plaintiffs Were Not Limited to Contractual Penalties or Specific Performance.

Argentina next attempts to avoid the consequences of its deliberate breach by arguing (on two separate grounds) that even if Plaintiffs have a claim for breach of contract, they cannot recover damages for that breach. The district court correctly rejected both of Argentina's meritless theories.

### 1. The Bylaws do not preclude Plaintiffs' damages claim.

First, the district court correctly rejected Argentina's argument that §7(h) of the Bylaws is a "penalty clause" and so "serves as Plaintiffs' exclusive remedy under Argentine law." SA129. A "penalty clause" under Argentine law, like a liquidated

damages clause under U.S. law, is "one in which a person, to ensure the fulfillment of an obligation, subjects themselves to a penalty or fine in case of delay or non-performance of the obligation." SA204; *see* JA1110 (penalty clause operates as "a sort of liquidated damages clause" that "establish[es] by agreement of the parties the amount of the damages resulting from a potential breach"). Penalty clauses "are always interpreted narrowly and in favor of the obligee" (i.e., the non-breaching party), JA1110, and "the party that asserts the penalty clause has the burden of proving its existence," JA3960. Argentine law also sets specific limits on the kind of consequences that can qualify as a penalty clause: Under Article 653 of the Civil Code, a penalty clause "may only have as its object the payment of a sum of money, or any other performance that may be the object of the obligations, either for the benefit of the non-breaching party or a third party." SA130.[7]

As the district court correctly recognized, §7(h) of the Bylaws does not meet that test. Section 7(h) in no way relieves Argentina (or any other party whose acquisition triggers a tender-offer requirement) of its tender-offer obligations. Instead, it imposes an obligation on YPF to ensure that shares acquired in breach of the Bylaws tender-offer requirements "shall not grant any right to vote or collect

---

[7] The translation of Article 653 that Argentina provides at SA204 differs from the translation the district court adopted. *See* SA130 n.10. Argentina does not dispute that the court's translation is more accurate.

dividends" and shall not be counted toward a quorum at shareholders' meetings. JA657. As the plain terms of §7(h) make clear, and as the district court explained, that provision "certainly does not provide for the 'payment of a sum of money'" by a party that breaches the Bylaws tender-offer requirements, nor does it "call for an alternate 'performance'" by that party. SA130-31. Instead, §7(h) is directed to YPF—not Argentina—and "simply operates to strip" the improperly acquired shares "of rights they would otherwise have." SA131. Because §7(h) is not directed to Argentina and does not "have as its object" either "the payment of a sum of money" or "any other performance," it is not a penalty clause under Article 653 and cannot substitute for Plaintiffs' right to seek damages for Argentina's breach. SA204; *see* SA130-31.

Argentina has no response to the plain language of Article 653. It does not (and cannot) argue that §7(h) provides for any "payment" or any actual "performance" by the breaching party. Instead, it relies on wordplay, citing two treatises—neither mentioned in its briefing below on this point—to claim that a "loss of rights or benefits" qualifies as "performance" under Article 653. Arg.Br.52. That view cannot be reconciled with the clear text of Article 653—which is why, as one of Argentina's leading scholars on penalty clauses (and YPF's expert in this case) Dr. Kemelmajer has written elsewhere, a "stipulation that consists of the loss of rights or reprimands on the debtor is not a penalty clause." JA3963. And it is

painfully ironic for Argentina to claim that the purported "loss of rights" imposed by §7(h)—which YPF refused to ever actually enforce against Argentina, and so has had no practical effect whatsoever—should qualify as an alternative "performance" and so displace any claim for damages for Argentina's willful breach.

There is likewise no conflict between Article 653's payment-or-performance requirement and other provisions of the Code. *Contra* Arg.Br.53. The fact that an alternative "performance" under a penalty clause may be "for the benefit of … a third party," SA130, does not mean something other than "performance" suffices. And the fact that a penalty clause is an exclusive remedy under Article 655 even if it does not provide "sufficient compensation," SA204, does not alter the requirement that some form of payment or performance is required, SA130.

Finally, even if §7(h) were a penalty clause (it is not), such clauses do not limit liability under Argentine law in cases of willful breach. *See* JA931 (penalty clause "can never limit liability in the context of an intentional (or willful) contractual breach."). Argentina willfully breached its contractual obligations here—by deciding months in advance to proceed despite knowing that the Bylaws required a tender offer, by proudly announcing the day after its breach that it would not be "stupid" enough to abide by its earlier promise, and by openly defying the tender-

offer requirement. Argentina cannot now rely on §7(h), an additional safeguard that it blew right through, to avoid paying for the injury it caused.[8]

### 2. Plaintiffs were not obligated to seek specific performance.

The district court also correctly rejected Argentina's argument that Plaintiffs were required to seek specific performance back when they still possessed the YPF shares and thus cannot now recover their damages. As the court explained (and Argentina agreed below), Article 505 of the Civil Code "permits the nonbreaching party to seek the following remedies: (i) performance from the breaching party, (ii) performance in-kind from a third party at the cost of the breaching party, and (iii) damages." SA132; *see* SA201; JA3541 (Argentina recognizing that Article 505 "lists the available remedies for breach"). The court found no merit in Argentina's argument that "the order in which the remedies are listed" in Article 505 is "mandatory," explaining that "nothing in the plain language of Article 505" supports that view. SA132; *see* JA1104-05; JA944 (Article 505 "does not establish a rigid hierarchy of remedies"). The court was likewise unpersuaded by Argentina's argument that Article 889 of the Civil Code makes seeking specific performance mandatory, explaining that Article 889 just makes clear that "when specific

---

[8] Argentina's only response is to claim in a footnote that penalty clauses are not exclusive only in cases of "malicious" breach, not just "willful" breach. Arg.Br.53 n.6. Argentina is wrong, *see* JA931, but its conduct here easily qualifies as "malicious" anyway, *see* JA1661 n.192 (malice includes "indifference [to] harmful consequences that it is very likely and foreseeable will arise").

performance is impossible due to the fault of the breaching party, damages remain an available remedy." SA133. That provision would seem to underscore the availability of a damages remedy here, as the form of specific performance Argentina envisions is no longer possible. But in all events, as the district court concluded, the plain language of the Code entitles Plaintiffs "to elect damages as their remedy instead of specific performance." SA134; *see, e.g.*, JA1104-05 (obligee "may seek *either* specific performance *or* damages."); JA944 (obligee "may freely choose" between specific performance or damages).

Argentina makes no attempt to revive its rejected arguments that Article 505 or Article 889 imposes a mandatory hierarchy. Instead, Argentina raises yet another new argument, claiming that its purported hierarchy of remedies is actually imposed by Article 1204 of the Civil Code and Article 216 of the Commercial Code—neither of which Argentina or its experts mentioned below. That argument is plainly forfeited, and meritless in any event. Neither of the two provisions on which Argentina now relies actually applies to this case (which is why Argentina and its experts never raised either below), and both are explicitly permissive in any event, stating only that a non-breaching party "may" demand specific performance (and that if the breaching party still fails to perform, the contract "shall be automatically resolved" and leave the non-breaching party with only its damages claim). SA205,

57

210.   The fact that non-breaching parties in other cases *may* demand specific performance rather than damages does not mean that Plaintiffs *must* do so here.

Argentina's efforts to bolster its position are unavailing.  It cites three cases to claim that Argentine courts have "consistently" required plaintiffs to first seek specific performance.  Arg.Br.55-56.  Two of those cases—*Lipnik* and *Lezcano*, neither mentioned in Argentina's briefs below—are governed by Article 216 of the Commercial Code, rather than Article 505 of the Civil Code (which controls here).  *See* SA344-45, SA369.  In cases under Article 505, by contrast, Argentine courts have repeatedly held that plaintiffs need not first seek specific performance.  *See, e.g.*, JA944 n.72 (citing cases).[9]  Argentina also notes that Article 1083—another provision it never mentioned in its district court briefing—makes damages available in tort cases.  Arg.Br.55 (quoting SA208).  But specifying damages for tort cases does not imply that they are unavailable for breaches of contract.  To the contrary, as Argentina eventually concedes, Article 505 recognizes that damages "*may* be available" in "both contract and tort" in appropriate cases.  Arg.Br.57.

In the end, Argentina's assertion that a non-breaching party *must* request specific performance turns Argentine law on its head, "transform[ing] principles … that are meant to protect the obligee into principles that harm the obligee."  JA945.

---

[9] As to *L., G.L.*, Argentina simply misconstrues it.  *See* SA326 (recognizing that Article 505 does not "prescribe a mandatory order of priority").

Argentine law is more liberal than U.S. law in permitting specific performance because it "assumes that the obligee will want the option of seeking specific performance of the obligation she was promised." JA943-44. But the right to *elect* specific performance does not entail the *requirement* to seek specific performance if the plaintiff concludes it would no longer be useful. In that circumstance, the plaintiff may seek damages instead. *See, e.g.*, JA1107 n.41 (recognizing that "the choice" to seek specific performance "is to the obligee's favor").

Finally, even if the Civil Code generally required plaintiffs to seek specific performance before seeking damages (which it does not), that requirement would be excused here. As Argentina concedes (and Article 889 makes indisputable), a plaintiff is entitled to seek damages if "the breaching party has made specific performance impossible." Arg.Br.53-54; *see* SA205 ("[i]f the performance becomes impossible due to the debtor's fault"). That is precisely what happened here: Argentina's breach of its tender-offer obligation caused Petersen's creditors to foreclose on its shares, making it impossible for Petersen to tender those shares for specific performance. *See Petersen II*, 895 F.3d at 203. Argentina's claim that Petersen has "no one to blame but [itself]" for that outcome, Arg.Br.57, is beyond remarkable. In any event, the record makes unambiguously clear—and Argentina explicitly announced—that Argentina had no intention of fulfilling its tender-offer obligations, whether Plaintiffs requested it or not. As YPF's expert Dr. Kemelmajer

acknowledged, Argentine law does not require a futile request for specific performance that the defendant has already declared it will not provide. *Petersen* Dkt.396-8 at 17-18; *see* JA2362 n.130 (plaintiff can sue for damages if the defendant "refuses to perform"); JA1128-29; JA2604-05; JA3965-66.

### C. The District Court Correctly Held That Plaintiffs Were Shareholders at the Time of the Breach.

The district court also correctly concluded that Plaintiffs are entitled to sue for Argentina's breach of its tender-offer obligation because they were YPF shareholders when that breach occurred—on April 16, 2012, when Argentina acquired at least indirect control of a majority of YPF's shares through its intervention decree. SA115-16, 144-46, SA165-71. In response, Argentina contends that its breach did not occur until more than two years later—in May 2014—when it eventually took formal title to Repsol's shares at the end of the expropriation process. That argument is meritless. As this Court has already recognized, the Bylaws did not turn on the technicalities of title, but required Argentina to make a tender offer "if 'by *any means* or instrument' it 'becomes the owner of, *or exercises the control of*,' at least 49% of YPF's capital stock." *Petersen II*, 895 F.3d at 206 (brackets omitted and second emphasis added) (quoting JA674). As a result, Argentina's contractual "obligation to make a tender offer" was first "trigger[ed]" by its "acquisition of a control position" on April 16, 2012, not the later transfer of formal title in May 2014. *Id.* at 207.

60

That conclusion follows from the plain text of the Bylaws, which squarely refute Argentina's assertion that the "acquisition" that triggers its tender-offer obligation turns on formal title rather than control. *Contra* Arg.Br.59-60. The Bylaws make clear that the tender-offer provisions "shall apply to *all* acquisitions made by the National Government, *whether directly or indirectly, by any means or instrument* … if, as a consequence of such acquisition, the National Government becomes the owner, *or exercises the control of*," shares representing at least 49% of YPF. JA674 (emphasis added). Far from limiting the tender-offer obligation to acquisitions of formal title, that language explicitly applies it broadly to "all" acquisitions, "whether directly or indirectly, by any means or instrument," by which Argentina "exercises the control of" the requisite share threshold. *Id.* That expansive language provides precisely the expansive protection that investors needed and Argentina and YPF promised—not just against the narrow risk that Argentina might take formal title to a majority of YPF's shares on a date of its choosing, but the broad risk that Argentina might take over control of that majority position by any means, leaving investors stranded as unwilling minority shareholders in a state-controlled firm. The last thing investors would have wanted was to fall victim to a de facto re-nationalization in which they had no rights unless and until Argentina executed a de jure transfer of title.

Argentina insists that its expert Dr. Manóvil had "[n]ever" in "more than half a century of professional experience" heard the term "acquisition" used for "anything other than obtaining title." Arg.Br.59 (quoting JA1703). In fact, Dr. Manóvil conceded both in his reply report and again at his deposition that when "acquisition" has as its object "control," it means acquisition of control, not acquisition of formal title. *See* JA1703-04 (giving the example "the defendant acquired *control* of the company"); JA3955-56 (recognizing that when "the word acquire is used with another qualifier," then it refers to acquiring "something else"). As Dr. Manóvil also acknowledged, the Bylaws expressly define the relevant "acquisitions" as "acquisitions of control." JA652, JA682 (Bylaws §7(d) defining "acquisitions" as "Takeovers," in Spanish "*Adquisiciones de control*"); *see* JA1703 n.37.

The Bylaws' clear text is confirmed by their equally clear purpose. The tender-offer requirements in the Bylaws were designed to reassure foreign investors, whose "main concern was Argentina's reacquisition of *control*," not just formal acquisition of title. JA938. That purpose would not remotely be served by a provision that would allow Argentina to avoid its tender-offer obligation in perpetuity—as Argentina apparently believes it could—by the simple expedient of seizing control of YPF's shares but refusing to acquire formal title. No reasonable investor would have invested in YPF on the basis of such an illusory promise.

**D.    The District Court Correctly Held That Argentina's General Expropriation Law Does Not Bar Plaintiffs' Claims.**

The district court likewise correctly concluded that Plaintiffs' claims are not barred by Argentine public law.  In fact, this Court has already squarely rejected Argentina's argument that allowing Plaintiffs' breach-of-contract claims to proceed would interfere with Argentina's sovereign authority to expropriate, explaining that Plaintiffs are challenging only Argentina's breach of its "commercial obligation under the bylaws to make a tender offer," and are "not challenging the expropriation" or "any other sovereign act."  *Petersen II*, 895 F.3d at 209, 211.  As this Court concluded, there is "no basis in the record for concluding that Argentina could not have complied with both the YPF Expropriation Law and the bylaws' tender offer requirements."  *Id.* at 209.  Argentina's attempt to resurrect the same invented conflict by citing to its General Expropriation Law rather than the YPF Expropriation Law fares no better.

Argentina premises its argument on Article 28 of the General Expropriation Law, which provides: "No action by third parties may impede the expropriation or its effects.  The rights of the claimant shall be considered transferred from the [expropriated] thing to its price or to the compensation, leaving the thing free of any encumbrance."  SA233.  But as the district court explained, nothing in Article 28 affects Plaintiffs' claims, which did not "impede the expropriation" and do not "encumb[er]" the expropriated shares.  SA136-38.  Indeed, Argentina went out of its

63

way to *exclude* Plaintiffs' shares from the expropriation in an effort to obtain control on the cheap—i.e., by expropriating only a bare majority of YPF's shares, rather than all of them. *See Petersen II*, 895 F.3d at 211 (Argentina expropriated only "Repsol's 51% stake in YPF"). It thus takes remarkable chutzpah to accuse Plaintiffs of interfering with the expropriation. Plaintiffs instead assert contractual rights that are "separate and apart from Argentina's expropriation of Repsol's shares," *Petersen II*, 895 F.3d at 209, and that arise "not from the expropriated shares but from the contractual obligations the Republic undertook when it revised the Bylaws to require it to make a tender offer if it acquired a certain number of shares," SA138. Enforcing those distinct contractual rights implicates neither the expropriation itself nor the expropriated shares. On the contrary, as this Court observed, those rights "could just as easily have been triggered by Argentina's acquisition of a controlling stake in YPF in open-market transactions." *Petersen II*, 895 F.3d at 207 (quoting SA17).

Argentina has no persuasive response. It asserts that Article 28 makes the General Expropriation Law the "exclusive" process "for third parties seeking compensation" for the expropriation, and so Plaintiffs can recover only out of the "compensation award" that Argentina paid *Repsol* for its shares. Arg.Br.63; *see* Arg.Br.61-62. But that is a non sequitur, as Plaintiffs' YPF shares were not expropriated at all. Article 28 does not reach all plaintiffs "affected by an expropriation" or all claims that "relate to an expropriation," *contra* Arg.Br.61;

instead, it applies only to "rights of the claimant" in "the thing" that is expropriated, which are "transferred from the thing to its price or to the compensation." SA233. Plaintiffs' complaint is not that they are entitled to a piece of what Repsol was paid for the shares Argentina actually expropriated from Repsol. Plaintiffs instead are suing for the damages caused to them as holders of non-expropriated shares because of Argentina's distinct obligations to minority shareholders under the Bylaws. Article 28 has nothing to do with that. *See Petersen II*, 895 F.3d at 211 (emphasizing that Argentina did not expropriate "the contractual rights of shareholders to receive tender offers").

None of the cases that Argentina cites is apposite. *Puerto de San Nicolás* involved a party that claimed a right to use the expropriated property itself, SA299; *Rosario* involved a contract provision that purported to limit when expropriation could occur (by requiring five years' notice), SA312; *Hidronor* involved a provision that purported to regulate what court would hear the expropriation suit, SA287; *Ferrocarril* involved an attempt to impose an easement on the expropriated property that would require the expropriator to build two crossings over it, SA283; and *De San Martín* did not discuss what claims are governed by Article 28 at all, SA252-55. Not one of those cases remotely suggests that Article 28 precludes a breach-of-contract claim that does not assert any interest in the expropriated property or any limitation on Argentina's power to expropriate it, and that is instead premised on

Argentina's breach of a separate and distinct contractual tender-offer obligation. *Petersen II*, 895 F.3d at 211.

\* \* \*

Finally, it bears emphasis that just because Argentina raises numerous arguments in its effort to escape its clear contractual obligations, that does not mean that this case involves complicated issues of Argentine law or that summary judgment was inappropriate. As the district court concluded in rejecting a similar suggestion, it "made 'numerous' rulings against the Republic because the Republic made meritless arguments in an effort to eliminate its liability for breaching the Bylaws—and made a lot of them." SA156 n.1. Argentina has taken the same approach on appeal, and it warrants the same result.

## III. The District Court Correctly Determined The Damages That Argentina Owes Plaintiffs.

Argentina's efforts to undermine the district court's damages award are equally unavailing. The district court correctly calculated the damages award in U.S. dollars, correctly determined the date on which Argentina triggered its tender-offer obligation under the Bylaws, and properly exercised its discretion in awarding prejudgment interest. Argentina's various contrary arguments are entirely meritless.

A.    **The District Court Correctly Calculated Plaintiffs' Damages in Dollars.**

Argentina begins its challenge to the district court's damages award not by contesting the actual amount it owed under the Bylaws and failed to pay, but by contesting the district court's calculation of that amount in dollars. It argues that the district court should have calculated the damages that Argentina owed in 2012 in Argentine pesos, and then converted them to U.S. dollars using the conversion rate as of the 2023 judgment date—a procedure that would conveniently wipe out some *95%* of Plaintiffs' damages, based solely on the precipitous fall in the value of the peso over the last decade.  JA3499.  Nothing in law or logic requires that unlikely and remarkably inequitable result, and the district court correctly rejected it.

1. Argentina bases its argument on New York Judiciary Law §27, which as relevant here provides:

(a)  Except as provided in subdivision (b) of this section, judgments and accounts must be computed in dollars and cents. …

(b)  In any case in which the cause of action is based upon an obligation denominated in a currency other than currency of the United States, a court shall render or enter a judgment or decree in the foreign currency of the underlying obligation.  Such judgment or decree shall be converted into currency of the United States at the rate of exchange prevailing on the date of entry of the judgment or decree.

N.Y. Jud. Law §27; *see* Arg.Br.72-73.  According to Argentina, its contractual obligation under the Bylaws to make a tender offer was "an obligation denominated in a currency other than currency of the United States," and so Judiciary Law §27(b)

67

required the district court to enter judgment in Argentine pesos and then convert that judgment to U.S. dollars at the judgment-date conversion rate. *See* Arg.Br.72-73.

As the district court correctly recognized, that argument fails. First, the underlying obligation that Argentina breached here was a *performance* obligation, not a *payment* obligation "denominated" in a particular foreign currency. N.Y. Jud. Law §27(b). Under the Bylaws, Argentina was obligated upon acquiring control of 49% or more of YPF's shares to make a tender offer to minority shareholders, which those shareholders would have been free to accept or reject. *See* JA652, JA674. Plaintiffs are accordingly "suing for the breach of the Republic's obligation to perform its tender offer," not for the breach of an obligation to pay them a "sum certain denominated in pesos" (or in any other particular currency). SA147; *see Nature's Plus Nordic A/S v. Nat. Organics, Inc.*, 78 F.Supp.3d 556, 557-58 (E.D.N.Y. 2015) (Judiciary Law §27(b) "is inapplicable" to a "performance obligation"). Second, even if a performance obligation could conceivably be "denominated" in a particular currency, the Bylaws here "are silent as to denomination," SA147, and in context plainly contemplate a tender offer to ADR holders in U.S. dollars rather than pesos, *see infra* pp.73-74. For both reasons, Plaintiffs' claims are not "based upon" any "obligation denominated in a [foreign] currency"—and so Judiciary Law §27(b) does not apply, and the judgment must instead be "computed in dollars and cents"

as of the date of breach under Judiciary Law §27(a).  N.Y. Jud. Law §27; *see* SA146-47; *Nature's Plus*, 78 F.Supp.3d at 557-58.

That outcome is confirmed by the settled canon that a statute "enacted in derogation of the common law" must be "strictly construed … in the narrowest sense that its words and underlying purposes permit." *Malmberg v. United States*, 816 F.3d 185, 193 (2d Cir. 2016) (quoting *Oden v. Chemung Cnty. Indus. Dev. Agency*, 661 N.E.2d 142 (N.Y. 1995)).  As Argentina concedes, New York common law generally requires that judgments be dollar-denominated and that "foreign-currency obligations … be converted using the exchange rate *on the day of breach*," which avoids penalizing defendants for currency devaluations.  Arg.Br.73 (emphasis original); *see, e.g.*, *Newmont Mines Ltd. v. Hanover Ins. Co.*, 784 F.2d 127, 138 (2d Cir. 1986).  Judiciary Law §27(b) represents a narrow statutory departure for obligations that are specifically "denominated in a [foreign] currency," in which case judgment shall be entered "in [that] foreign currency" and converted into dollars at the judgment-day rate.  N.Y. Jud. Law §27(b).  But absent an "obligation denominated in a [foreign] currency" under §27(b)—a phrase that must be "strictly construed" in its "narrowest sense," *Malmberg*, 816 F.3d at 193—the default common-law rule applies, and the judgment is "computed in dollars and cents" as of the date of breach under §27(a).

That result makes perfect sense. When a payment obligation is expressly denominated in a foreign currency, the obligee takes the risk that the currency may fluctuate between the time when the agreement is made and the time when the obligation is paid. *See Competex, S.A. v. Labow*, 783 F.2d 333, 338 (2d Cir. 1986) ("If plaintiff holds an English judgment for £1 and the value of £1 depreciates from $1 to $.60 ... that is merely the consequence of holding an obligation in pounds."). By contrast, where (as here) the obligation is to perform rather than just pay and is not denominated in a foreign currency in any event, the obligee takes no such currency risk, and New York law does not impose it.

Unable to fit within the narrow exception provided by §27(b), Argentina attempts to broaden it, claiming that an obligation is "denominated" in a foreign currency under §27(b) whenever "circumstances indicate that it must be calculated in that currency." Arg.Br.75. Argentina cites no case whatsoever adopting that definition, and for good reason: because it conflicts with the plain meaning of "denominate," which in the context of currency means to "officially set the value of (something) according to an established system or a type of money," *Black's Law Dictionary* (11th ed. 2019). Regardless, even giving "denominate" Argentina's atextual meaning still would not justify expanding §27(b) to cover the tender-offer obligation here, which requires performance rather than payment, and which contemplates payment in U.S. dollars rather than foreign currency in any event, *see*

*infra* pp.73-74. No one would think that a plaintiff suing on a contract that contemplates payment in U.S. dollars for a finished product should be relegated to damages in pesos just because the supplier paid pesos for some of the components that went into that product, even if some part of the damages calculation necessarily involved pesos as a result. *Contra* Arg.Br.75.

Argentina is equally wrong to suggest that because judgments under §27(a) are "computed in dollars and cents," they cannot involve any kind of currency conversion at all. *Contra* Arg.Br.76. On the contrary, judgments under §27(a)—whose "computed in dollars and cents" language has remained unchanged since it was enacted in 1909—are plainly the default mode and just as plainly "computed in dollars and cents" as they were before §27(b) was enacted in 1987. To the extent that computation involves foreign currency and requires applying an exchange rate (as in a hypothetical purchase of a product with foreign-made components), the relevant rate is that on the date of breach. There is thus no "third bucket of cases," *contra* Arg.Br.76; there are just judgments "computed in dollars and cents," and a narrow class of judgments for payment obligations specifically "denominated in [foreign] currency" that use the judgment-day exchange rate under §27(b). Because Argentina's tender-offer obligation was a performance obligation rather than a

payment obligation and was not denominated in foreign currency in any event, this case falls squarely in the former category.[10]

2. All of this is ultimately beside the point, because Argentina was obligated to make a tender offer for the ADR shares Plaintiffs owned in dollars, not pesos. The Bylaws required Argentina to make a tender offer for "all the shares of all classes of [YPF] and all securities convertible into shares," including U.S.-dollar-denominated ADRs traded on the NYSE. JA652 (Bylaws §7(e)(ii)). It required that tender offer to comply with the requirements of all "stock exchanges where [YPF's] shares and securities are listed," JA652 (Bylaws §7(f)), including the NYSE, and required published notice of the tender offer in New York, JA653-54 (Bylaws §7(f)(iv)); *see Petersen II*, 895 F.3d at 199-200. The Bylaws thus make clear beyond peradventure that Plaintiffs (like other ADR holders) were entitled to a tender offer for their ADRs that could only be made in dollars.

ADRs are always issued and traded in U.S. dollars, not foreign currency, which is one of the principal reasons U.S. investors prefer ADRs over the underlying foreign shares. *See, e.g.*, *Stoyas v. Toshiba Corp.*, 896 F.3d 933, 942 (9th Cir. 2018)

---

[10] Argentina's repeated insistence that Plaintiffs' expert Professor Fischel calculated the tender-offer price in pesos and then converted it to dollars thus misses the point. Section 27(b) applies only to obligations "denominated" in a foreign currency, not all obligations whose breach may require some damages calculations involving a foreign currency. N.Y. Jud. Law §27(b).

("ADRs are denominated in U.S. dollars[.]"); JA959. In fact, it is technically impossible to pay Argentine pesos for ADRs in the United States, as the Depositary Trust Company and the American banking system are not set up to allow the transfer of that foreign currency. JA962-63. As such, "[t]he vast majority of ADR tender offers" are priced in U.S. dollars—and in the "few circumstances" where tender offers for ADRs are priced in foreign currency, "the foreign currency would be immediately converted" to U.S. dollars for distribution to the ADR holders. JA962. When YPF held its IPO in 1993, it accordingly made its offer in U.S. dollars and accepted U.S. dollars for the purchase of its ADRs on the NYSE, and its deposit agreement likewise requires that any distributions to ADR holders will be made in U.S. dollars. JA963; *see* JA490 (YPF prospectus listing ADRs in dollars). And consistent with that arrangement, when Repsol and Petersen made their own tender offers for ADRs in New York, they paid in dollars as well. *See* JA3354; JA3494. The Bylaws and common practice thus make clear that if Argentina's obligation to tender for Plaintiffs' ADRs was "denominated" in any currency, it was U.S. dollars.

3. Finally, Plaintiffs also suffered their damages in U.S. dollars. In fact, it is undisputed that if Argentina had carried out its tender-offer obligations, Plaintiffs would have been paid for their ADRs in dollars, not pesos: Even if Argentina had made its tender offer for those ADRs only in pesos (despite its Bylaws obligation to tender for "all securities convertible into shares" in accordance with the

requirements of all "stock exchanges where [those] securities are listed," JA652), the deposit agreement through which the ADRs were administered would have required immediate conversion of those pesos into dollars for distribution to Plaintiffs. *See* JA3339. The harm that Plaintiffs suffered from Argentina's breach of its tender-offer obligations was thus a loss of U.S. dollars, not a loss of Argentine pesos. *See* JA2609 (under Argentine law, "the party aggrieved by the breach of a contract is entitled to full compensation for the harm sustained"); *cf. United States Naval Inst. v. Charter Commc'ns., Inc.*, 936 F.2d 692, 696 (2d Cir. 1991) (damages "are generally measured by the plaintiff's actual loss"). And even if, in some strained hypothetical world, Plaintiffs had somehow received Argentine pesos in 2012 for their ADRs, there is zero chance Plaintiffs would simply have held them for the next decade while they lost 95% of their value rather than immediately converting them to dollars, as it is inconceivable that anyone would retain pesos after choosing a compensated exit to *avoid* being at the mercy of Argentine government policy. Put simply, economic reality accords with New York law: Plaintiffs are entitled to judgment in U.S. dollars as of the date of breach, not devalued Argentine pesos as of eleven years later.

## B. The District Court Correctly Determined the Breach Date and Awarded Appropriate Prejudgment Interest.

Argentina's remaining damages arguments—attacking (1) the district court's factual determination after a bench trial concerning the date on which Argentina first

breached its Bylaws obligations and (2) the court's prejudgment interest award—are likewise meritless.

1. As the district court's carefully reasoned damages opinion explains, both the evidence at trial and common sense make clear that Argentina exercised at least indirect control of a majority of YPF's shares—and therefore triggered its tender-offer obligation under the Bylaws—when it issued its intervention decree on April 16, 2012. Under the Bylaws, Argentina was required to make a tender offer whenever it "directly or indirectly, by any means or instrument … becomes the owner, or exercises the control of," at least 49% of YPF's Class D shares. JA674. As Argentina continues to concede, the intervention gave Argentina total and undisputed control of YPF as a company. Arg.Br.78; *see*, *e.g.*, SA165; JA3627-28; JA3746. Argentina has never explained—and cannot explain—how it could wrest control of a publicly traded company from its majority shareholder without exercising at least *indirect* control of the majority shareholder's shares. The record here shows precisely why that was impossible: By taking control of the company, Argentina *necessarily* deprived Repsol of the key rights associated with its majority shares, including the right to appoint those exercising the power of the YPF Board. *See* SA165-68; *see also, e.g.*, JA3758-61.

As the district court explained, before Argentina launched its intervention on April 16, 2012, Repsol "could use its shares to govern the company and take other

actions as a shareholder." SA165; *see* JA3758-61; JA3847-48, JA3852 (confirming that before the intervention, "Repsol had the power to select its own CEO and chairman … as chairman of YPF's board, because it was the majority shareholder"). Through the intervention, however, Argentina "as a practical matter, eliminated Repsol's ability to do any of these things." SA166. Once Argentina launched its intervention, Repsol "could no longer appoint or remove those with the powers of the Board, as those powers were vested in the government-appointed intervenor," and "could not vote its shares at any shareholder meeting … because the intervenor controlled whether any such meeting was held." SA166-67 (citation omitted); *see* JA3758-61; JA3850-53, JA3859. As this Court previously put it, Argentina "did indeed exercise the rights of Repsol's shares" in April 2012, "using them to cancel YPF's previously-scheduled dividend payment and [shareholder] meeting." *Petersen II*, 895 F.3d at 203. While Argentina did not take formal title to the shares on April 16, 2012 through the intervention decree, it unequivocally held at least indirect control over the shares and the company as of that date.

Argentine officials likewise "recognized that April 16, 2012 was, for all practical purposes, the date on which Repsol could no longer use its shares to control the company." SA168-69. Argentina's Vice-Intervenor Axel Kicillof openly declared in a speech to the Argentine Senate on April 17, 2012 that the intervention had "modified the control that until now belonged to the Repsol group." SA169

(brackets omitted) (quoting JA3690). And when Argentina's federal appraisal agency, the TTN, appraised the value of the YPF shares that Argentina seized from Repsol, it appraised them "as of the date on which Repsol was dispossessed, which the TTN concluded was April 16, 2012." SA169; *see* JA3705; JA3766-67; JA3728 (Argentine official explaining that "the taking of possession … was in April 2012"); JA3732 (head of the TTN panel explaining that the appraisal "was carried out as of the dispossession date … which was April 16, 2012").

The market's reaction further confirms the point. As the district court noted, "[t]he market also recognized that an event having material economic significance had occurred on April 16, 2012," as "[a]fter the Intervention Decree on April 16, YPF shares plummeted by over 40%." SA171; *see* JA3733; JA3832-33. By contrast, when Argentina's formal expropriation law took effect on May 7, 2012, "YPF shares dipped a mere 3%." SA171; *see* JA3733.

Argentina's only response is to contend that the intervention gave it "managerial rights" over YPF on April 16, 2012, but that it only acquired "shareholder rights" on May 7, 2012. Arg.Br.79. But the question under the Bylaws is not when Argentina first acquired the ability to vote Repsol's shares itself, but when it first "directly or indirectly, by any means … exercise[d] the control of" those shares. JA674. As the district court correctly understood, Argentina first acquired that "indirect control" over Repsol's shares "through the intervention" on April 16,

2012, when it "took specific actions to prevent Repsol from exercising" the powers it would otherwise have had as majority shareholder. SA168; *see* SA165-67.[11]

Finally, it bears emphasis that Argentina's position that it could retake control of YPF by executive decree without triggering its tender-offer obligation makes no economic sense. *See* JA3821-23. The Bylaws' tender-offer provision was a precommitment that promised investors "a compensated exit from their ownership position in the firm if Argentina were to decide to renationalize YPF," and that investors relied on in deciding to invest $1.1 billion in the company through the NYSE alone. *Petersen II*, 895 F.3d at 200; *see* JA3825-27, JA3831-32. If Argentina could re-nationalize YPF by executive decree without taking even indirect control of the shares or triggering its tender-offer obligation—and then extend that executive decree indefinitely, *see* JA3855-56—that precommitment would have been illusory. Argentina's reading of the Bylaws accordingly fails the financial-markets test: If Argentina made its view of the Bylaws clear in 1993, no reasonable investor would have bought YPF shares. *See* JA3824-27. The district court thus was plainly correct

---

[11] Argentina claims Plaintiffs' expert Professor Bianchi "admitted" Argentina took "control over Repsol's shares" only on May 7, 2012. Arg.Br.79. But as Professor Bianchi explained at trial, his observation that Argentina "exercised" the rights of those shares on May 7, 2012, JA330, does not alter that it *controlled* the shares on April 16, 2012. *See* JA3750-51, JA3760-65.

to conclude that Argentina triggered its tender-offer obligation under the Bylaws on April 16, 2012, when it issued the intervention decree.

2. Argentina ends with a single paragraph challenging the prejudgment interest rate that the district court selected. There is a reason that Argentina spends so little time on this argument: It agreed below that the rate of prejudgment interest "is entirely a matter for the Court's discretion," SA171, and the district court explained in detail here why the 8% simple interest rate that it chose was proper, *see* SA171-77. That rate is "well within the range imposed by Argentine [c]ourts," and reflects "the rate that [Argentina] agreed to in similar circumstances" in negotiating its payment to Repsol. SA172. That rate is "appropriate and equitable" as well, particularly in light of Argentina's deliberate decision "knowingly to violate the bylaws" and "force Plaintiffs to be its involuntary creditors for a massive amount over the course of a decade." SA171-72, 175. Indeed, if Argentina "could not extract a return exceeding 8% *simple* interest on [the] massive loan" that it extracted from Plaintiffs by refusing to meet its Bylaws obligations, then Argentina "has been a poor steward, and it does not offend equity for it to bear the consequences." SA175.

Argentina makes only one argument in response, asserting that the district court should have followed the interest rates applied by the Argentine federal administrative-law courts, which Argentina claims "would have applied an interest

rate of approximately 0.76%." Arg.Br.81. But as the district court explained, given that this case "involves purely commercial obligations," the more appropriate comparison is "the commercial rate applied by Argentine courts," which "is between 6% and 8%." SA150-51. Especially given Argentina's concession that the "appropriate rate of interest" under Argentine law is "entirely up to the discretion of the court considering the question," SA176, Argentina comes nowhere near showing that the district court abused its discretion here.

## IV. The District Court Made Only Two Errors In Resolving This Case.

The district court made only two mistakes in resolving this protracted litigation: (1) entering judgment for YPF on the claims for YPF's breach of its own distinct obligations under the Bylaws, and (2) dismissing the promissory estoppel claims as duplicative. Those rulings together absolved YPF of any responsibility for the promises it and Argentina made to investors in the Bylaws and subsequent SEC filings, eviscerating the commitments that allowed YPF to raise over a billion dollars from NYSE investors. Through those promises, YPF assured investors that they would not be stranded as minority shareholders in a state-run enterprise in the event of a re-nationalization, and that they would have the option of a compensated exit through a mandatory tender offer if Argentina (or any other shareholder) crossed specified ownership thresholds. More to the point, those promises guaranteed shareholders that YPF would deprive any shares acquired in violation of that tender-

offer requirement of their voting and dividend rights, providing direct and meaningful enforcement for the tender-offer obligation. The district court's conclusion that those promises did not bind YPF after all—and instead were merely a passive reflection of what the company believed acquiring shareholders would voluntarily do—cannot be squared with the text of the Bylaws or the concrete reliance that investors placed on YPF's promises.

## A. The District Court Erred in Granting Summary Judgment for YPF.

Given Argentina's long history of political and financial crises, and its demonstrated tendency toward government intervention in times of economic turmoil, inducing private investors on the NYSE to invest more than a billion dollars in YPF's IPO required more than just promises from Argentina itself. Investors who knew of Argentina's "checkered economic past," JA845, were not likely to rely on Argentina's word alone as a sufficient guarantee that they would have a compensated exit from their investment if the political winds changed and Argentina reverted to its old habits. Recognizing the problem, Argentina and YPF amended the YPF Bylaws to include not only a clear (and clearly mandatory) tender-offer obligation, but also a clear commitment from YPF to enforce that obligation—most prominently, by promising that any shares acquired without the necessary tender offer "shall not grant any right to vote or collect dividends … nor shall they be computed to determine the presence of the quorum" at any shareholders' meeting.

JA657 (Bylaws §7(h)). Through that commitment, YPF specifically envisioned the possibility that Argentina might breach its own tender-offer obligations, and assumed responsibility to take certain actions in that event. *See* SA205 (Civil Code Article 889) (damages are available if the obligor has "assumed responsibility for an act of … force majeure"); JA1118-19 (person who "obligates himself for a third party offering performance … is liable in damages if the third party refuses to perform" (quoting Civil Code Article 1163)). By undertaking that responsibility, YPF ensured that investors would not have to rely solely on Argentina's own promises (or the difficult prospect of suing a foreign sovereign if Argentina breached those promises), but would instead have the added protection provided by YPF's *own* commitment—as an NYSE-listed, SEC-regulated corporation—to take action if the tender-offer obligations were disregarded.

The district court, however, negated those clear promises, holding that the Bylaws "do not impose an obligation on YPF to enforce" the tender-offer requirements. SA107-08. That holding was plainly incorrect, and squarely contradicts this Court's recognition that YPF had a specific contractual "obligation to enforce the tender offer provision." *Petersen II*, 895 F.3d at 210. As this Court explained almost six years ago in rejecting YPF's arguments under the FSIA, "every corporation is obligated to abide by its bylaws," and YPF accordingly had a contractual "obligation to enforce the tender offer provision" and "to enforce the

penalties imposed by section 7(h)" of the Bylaws. *Id.* That holding continues to control here, and requires reversal of the district court's contrary conclusion. *See, e.g.*, *United States v. Peguero*, 34 F.4th 143, 158 (2d Cir. 2022) (recognizing the "longstanding rule" that "a panel of our Court is bound by the decisions of prior panels").

The district court recognized that its decision could not be squared with *Petersen II*'s description of YPF's obligations—but declared itself free to ignore that part of *Petersen II*, on the theory that it merely "pertained to Plaintiffs' allegations" and was "not a binding conclusion." SA108. That was error. This Court's conclusion that YPF was bound to enforce the bylaws was key to its holding that YPF was not entitled to FSIA immunity, insofar as YPF's "failure" to carry out its contractual obligations "caused a direct effect in the United States, namely, the required tender for ADRs listed on the NYSE never took place." *Petersen II*, 895 F.3d at 210. Nor was that conclusion a mere repetition of Plaintiffs' allegations; on the contrary, the Court in *Petersen II* made clear that it was reviewing *de novo* the relevant "legal determinations regarding … subject matter jurisdiction," *id.* at 203, which included YPF's legal obligations under the Bylaws. This Court's holding that YPF owed a contractual "obligation to enforce the tender offer provision" accordingly controls. *Id.* at 210; *see Havlish v. 650 Fifth Avenue Co.*, 934 F.3d 174,

182 (2d Cir. 2019) (applying law-of-the-case doctrine to earlier FSIA jurisdictional determination).

That holding is not just controlling, but eminently correct, as YPF's contractual obligation to enforce the tender-offer requirements is clear under the Bylaws' plain text and Argentine law. Sections 7 and 28 of the Bylaws spell out specific enforcement obligations in connection with acquisitions of control. Those provisions not only place unmistakable obligations on the acquiring shareholder— here, Argentina—to make a tender offer subject to specified pricing formulae, but expressly contemplate the prospect that the acquiring shareholder will breach its own obligations to make a compliant tender offer. In that instance, §7(h), applicable to an acquisition by Argentina through §28(C), provides that acquisitions that violate the Bylaws "shall not grant any right to vote or collect dividends or other distributions." JA657, JA674-75.

As a matter of common sense and Argentine law, the obligation to enforce those Bylaws provisions fell on the company itself. *See* JA951-53; JA1114-15; *see also* JA1092 n.23 (recognizing the general principle in Argentine law that "[t]he Board of Directors must ensure that shareholders comply with the bylaws"). Sections 7 and 28 are written in mandatory terms, each stating that the tender-offer provisions "*shall* apply" and "*shall* be complied with," illicit acquisitions "*shall* be forbidden," and sanctions for noncompliance "*shall* be applied." JA651-52, JA657,

JA674-75 (emphasis added); *see Maine Cmty. Health Options v. United States*, 140 S.Ct. 1308, 1320 (2020) ("The first sign that the statute imposed an obligation is its mandatory language: 'shall.' Unlike the word 'may,' which implies discretion, the word 'shall' usually connotes a requirement."). And the Bylaws expressly grant YPF the authority to enforce these provisions (and all their other provisions), affording the Board of Directors "wide powers to organize, conduct and manage the affairs of the Corporation," including the overarching authority to "perform all the acts for the best fulfillment of the corporate purpose." JA664-67. Nor is there any other entity that could enforce those mandatory obligations, as it is plainly incumbent on the company itself and not some other actor to determine which shares are qualified to vote at shareholder meetings and to receive dividends. YPF's claim that it had no obligation to enforce the Bylaws is thus foreclosed by the Bylaws' plain text.

The district court nevertheless concluded that because the Bylaws "use [the] passive voice when establishing the tender offer requirement," YPF did not have any contractual obligation to enforce those provisions. SA110. That reading disregards the basic rule that "every corporation is obligated to abide by its bylaws," *Petersen II*, 895 F.3d at 210, and would unreasonably allow YPF to reap the benefit of billions of dollars in international investment without incurring any legal obligations. Read in context, the Bylaws' use of the passive voice does not leave them "silent as to how [the tender-offer provisions] are to be enforced," *contra* SA110; instead, the use of

the passive voice reflects the obvious reality that there was no need to specify the actor, because context made it clear that YPF was the party obligated to strip rights from shares acquired in contravention of the Bylaws (and the only party that could do so). *See, e.g.*, *Bartenwerfer v. Buckley*, 598 U.S. 69, 76 (2023) (recognizing that "context can confine a passive-voice sentence to a likely set of actors"); *E.I. du Pont de Nemours & Co. v. Train*, 430 U.S. 112, 128 (1977) (although statutory provision "speaks only in the passive voice," context "leave[s] little doubt" to whom it applies). Indeed, that would be especially obvious in the case of a non-compliant acquisition that did not transfer control; if Petersen had not complied with its tender-offer obligations when it crossed the 15% threshold, it would be clear that YPF would be obligated under the Bylaws to "not grant any right to vote or collect dividends or other distributions" to Petersen in conjunction with the non-compliant shares. JA657, JA674-75. As the Bylaws make explicit in §28(C), which specifically applies §7(h) to acquisitions by Argentina, the result is no different in a re-nationalization. JA674.

The district court nevertheless read context in the opposite direction, asserting that because some other Bylaws provisions use the active voice and specifically identify the actors subject to different mandatory commands, the passive voice here "unambiguous[ly]" shows that the Bylaws "impose no affirmative obligation requiring YPF to enforce [the tender-offer requirements]." SA111-12. But the fact

that the Bylaws "are careful to specify who owes what obligations and under what circumstances" elsewhere, SA111-12, only underscores the point: As to *these* provisions, the fact that the obligation runs to YPF is so clear from context that any more explicit statement would be superfluous.

The district court was untroubled by the fact that under its reading, the Bylaws do not require *anyone* to enforce the tender-offer provisions, despite their plainly mandatory terms. Those provisions "still ha[d] meaningful force," the district court concluded, because Plaintiffs could successfully sue Argentina itself for its "failure to do what the Bylaws unequivocally required *it* to do." SA112 (emphasis in original). But that ignores that §7(h)'s command only kicks in when a recalcitrant acquirer refuses to honor its obligation to make a tender offer. Rendering §7(h) just another obligation breached by the acquirer renders the provision toothless. The whole point of the provision is to impose a distinct obligation on a distinct actor— namely, YPF—when the acquirer contravenes its obligations. The district court's effort to transfer the §7(h) obligation to Argentina also ignores that §7(h) applies even to acquisition of as little as 15% of YPF's shares. In those circumstances, it would be nonsensical to say the responsibility to deny the still-minority shareholder voting and dividend rights falls on the minority shareholder, rather than YPF. Section 7(h) operates no differently when the non-compliant shareholder acquires

control: Whether a shareholder is acquiring 15% or 51% of the company, the obligation to enforce §7(h) rests on YPF, not the acquiring shareholder itself.

If there were any remaining doubt, YPF's own contemporaneous assurances to investors would resolve it. YPF told investors repeatedly that it would enforce the Bylaws' tender-offer obligations both generally and specifically vis-à-vis Argentina. In its IPO prospectus, YPF assured investors that any person engaging in a control acquisition "must … make a public tender offer for all outstanding shares" and "will be required to provide [us] with notice of … any such tender offer," that the tender offer "must be carried out in accordance with a procedure specified in the By-laws," and that the acquirer "will be obliged to acquire all tendered shares." JA511-12. As to acquisitions by Argentina in particular, YPF promised that Argentina "would be required to make a cash tender offer to all holders of Class D Shares on specified terms and conditions," and that "[a]ny Control Acquisition carried out by the Argentine Government other than in accordance with the procedure described … will result in the suspension of the voting, dividend and other distribution rights of the shares so acquired." JA502, JA513.

Under Argentine law principles of estoppel, or "*actos propios*," those prior representations bar YPF from now denying its obligations under the Bylaws. *See* JA1136 (recognizing that *actos propios* "prevents a party from bringing a claim that contradicts their earlier conduct"). Crediting YPF's argument that it had no

88

obligations whatsoever to enforce the tender-offer requirement would make a mockery of YPF's repeated assurances that these provisions would be enforced in order to raise billions of dollars from private investors. Argentine law accordingly precludes YPF from recharacterizing its contractual promises in the Bylaws to be inconsistent with its prior representations.

## B. The District Court Erred in Dismissing the Promissory Estoppel Claims as Duplicative.

The district court's only other error in this case came years ago, when it dismissed Petersen's promissory estoppel claims against Argentina and YPF.[12]  The district court did not dispute that Argentine law recognizes the doctrine of promissory estoppel; but relying on an out-of-context snippet from one of Petersen's experts, Professor Bianchi, the district court concluded that doctrine "is not an autonomous source of obligation" under Argentine law, and that in any event the estoppel claims here were "duplicative" because they did not identify any promise in the prospectus or YPF's SEC filings "distinct from the obligations imposed by the Bylaws."  SA46 (emphasis omitted).

Neither of those conclusions provided an adequate basis for dismissing the promissory estoppel claims at the pleading stage.  As to the former, as YPF's own

---

[12] Eton Park sued after the district court dismissed Petersen's promissory estoppel claims, and so did not plead a separate promissory estoppel count, *see* JA439-44, but could move to amend its complaint if necessary.  *See* Fed. R. Civ. P. 15(b)(2).

89

expert Dr. Kemelmajer recognized, estoppel *can* provide an autonomous source of obligation under Argentine law in "the absence of a contractual relationship between the parties." JA249.[13]  Of course, for all the reasons explained above, the better view is that both Argentina and YPF *were* contractually bound by the tender-offer provisions in the Bylaws, *see supra* pp.45-62, 81-89, and so there should be no need to invoke estoppel to hold Argentina and YPF to their recurring promises with respect to those provisions.  But if this Court were to conclude that either Argentina or YPF was not contractually bound by the tender-offer provisions—as the district court concluded with respect to YPF—then estoppel should provide an alternative basis for holding them to their clear and repeated promises.  *See* JA249.

So too for the district court's conclusion that the promissory estoppel claims were duplicative of the contract claims.  As this Court has made clear, "if there is 'a dispute over the existence, scope, or enforceability of the putative contract,'" then "a plaintiff may plead … promissory estoppel claims in the alternative" to a breach-of-contract claim.  *Goldberg v. Pace Univ.*, 88 F.4th 204, 214-15 (2d Cir. 2023).  Because Argentina and YPF continue to dispute the existence, scope, and enforceability of their contractual obligations under the Bylaws, the district court

---

[13] It appears Professor Bianchi likewise intended to acknowledge only that estoppel under Argentine law requires some obligation-creating relationship, which can be contractual or non-contractual.  JA337-38.

erred in dismissing Petersen's promissory estoppel claims as duplicative. In fact, the promises in the prospectus and in YPF's subsequent SEC filings are if anything even clearer than the Bylaws themselves, underscoring that any person making a control acquisition "must … make a public tender offer" and "will be obliged to acquire all tendered shares," that the Argentine government in particular "would be required to make a cash tender offer to all holders of Class D Shares," and that failing to do so "will result in the suspension of the voting, dividend, and other distribution rights of the shares so acquired." JA502, JA511-13; *see* JA1429-30; *supra* pp.13, 88-89. Those clear and unambiguous promises—on which investors relied to the tune of billions of dollars—confirm that Argentina and YPF are bound by their repeated commitments and provide an alternative basis for liability here.

## CONCLUSION

This Court should affirm the judgment for Plaintiffs against Argentina and reverse the judgment for YPF and dismissal of the promissory estoppel claims.

Respectfully submitted,

MARK C. HANSEN
DEREK T. HO
ANDREW E. GOLDSMITH
KELLOGG, HANSEN, TODD, FIGEL,
& FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, DC 20036

RANDY M. MASTRO
KING & SPALDING LLP
1185 Avenue of the Americas,
34th Floor
New York, NY 10036

s/Paul D. Clement
PAUL D. CLEMENT
 *Counsel of Record*
C. HARKER RHODES IV
NICHOLAS M. GALLAGHER*
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

*Supervised by principals of the firm who are members of the Virginia bar

*Counsel for Plaintiffs-Appellees-Cross-Appellants*

March 25, 2024

92

## CERTIFICATE OF COMPLIANCE
## WITH TYPE-VOLUME LIMITATION

I hereby certify that:

1. This brief complies with the type-volume limitation of Local Rule 28.1.1(b), as enlarged by this Court's order dated February 7, 2024 (Dkt.57), because it contains 21,468 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), as determined by the word counting feature of Microsoft Word 2016.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point font.

September 6, 2024

<u>s/Paul D. Clement</u>
Paul D. Clement

## CERTIFICATE OF SERVICE

I hereby certify that, on September 6, 2024, an electronic copy of the foregoing brief was filed with the Clerk of Court using the ACMS system and thereby served upon all counsel appearing in this case.


<u>s/Paul D. Clement</u>
Paul D. Clement