# 23-7376(L)

## 23-7471(XAP), 23-7667(XAP)

**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

————————————

ETON PARK CAPITAL MANAGEMENT, L.P., ETON PARK MASTER FUND, LTD.,
ETON PARK FUND, L.P.,

*Plaintiffs-Appellees-Cross-Appellants*,

v.

ARGENTINE REPUBLIC,

*Defendant-Appellant-Cross-Appellee*,

YPF S.A.,

*Defendant-Conditional Cross-Appellant.*

————————————

On Appeal from the United States District Court for the
Southern District of New York, No. 16-cv-08569

————————————

**PETITION FOR REHEARING EN BANC**

————————————

| | |
|---|---|
| MARK C. HANSEN | PAUL D. CLEMENT |
| DEREK T. HO | *Counsel of Record* |
| ANDREW E. GOLDSMITH | C. HARKER RHODES IV |
| KELLOGG, HANSEN, TODD, | CLEMENT & MURPHY, PLLC |
| FIGEL, & FREDERICK, P.L.L.C. | 706 Duke Street |
| 1615 M Street, N.W., Suite 400 | Alexandria, VA 22314 |
| Washington, DC 20036 | (202) 742-8900 |
| | paul.clement@clementmurphy.com |

*Counsel for Plaintiffs-Appellees-Cross-Appellants*

May 8, 2026

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a), Plaintiffs-Appellees state the following:

Plaintiffs-Appellees Petersen Energía Inversora, S.A.U. and Petersen Energía, S.A.U. (together, "Petersen") are nongovernmental corporate entities. Petersen Energía Inversora, S.A.U. is a Spanish corporation wholly owned by Petersen Energía Inversora Holdings, S.A.U., a Spanish corporation that in turn is wholly owned by Petersen Energía Inversora, S.A., a privately held Argentine corporation. Petersen Energía, S.A.U. is a Spanish corporation wholly owned by Petersen Inversiones Spain, S.A.U., a Spanish corporation that in turn is wholly owned by Petersen Energía Inversora, S.A., a privately held Argentine corporation. No public corporation owns 10% or more of the stock of either Petersen Energía Inversora, S.A.U. or Petersen Energía, S.A.U.

Plaintiffs-Appellees Eton Park Capital Management, L.P., Eton Park Master Fund, Ltd., and Eton Park Fund, L.P. (together, "Eton Park," and together with Petersen, "Plaintiffs") are non-governmental entities that have no parent corporations. No public corporation owns 10% or more of the stock of either Eton Park Capital Management, L.P. or Eton Park Fund, L.P. Eton Park Master Fund, Ltd. is in liquidation; Burford Capital Limited, a public corporation, indirectly acts as its liquidator and owns more than 10% of its stock.

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF AUTHORITIES.......................................................................... iii

INTRODUCTION AND RULE 40(B)(2) STATEMENT ......................................... 1

BACKGROUND ........................................................................................ 4

ARGUMENT ............................................................................................ 7

I.    The Panel Majority's Decision Leaves U.S. Investors With No Meaningful Remedy For Argentina's Flagrant Violation Of Its Contractual Obligations .................................................................. 7

II.    The Panel Majority Failed To Adequately Consider The District Court's Persuasive Analysis....................................................... 9

III.   The Panel Majority's Decision Is Egregiously Wrong. ............................... 12

CONCLUSION ......................................................................................... 17

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases**

*Animal Sci. Prods., Inc. v. Hebei Welcome Pharm. Co.*,
  585 U.S. 33 (2018).................................................................................12

*Bugliotti v. Argentina*,
  952 F.3d 410 (2d Cir. 2020) ...................................................................10

*Curley v. AMR Corp.*,
  153 F.3d 5 (2d Cir. 1998) .......................................................................10

*NML Cap., Ltd. v. Argentina*,
  727 F.3d 230 (2d Cir. 2013) .....................................................................9

*Petersen Energía Inversora S.A.U. v. Argentine Republic*,
  895 F.3d 194 (2d Cir. 2018) ......................................................... *passim*

*Petroleos de Venezuela S.A. v. MUFG Union Bank*,
  106 F.4th 263 (2d Cir. 2024)...................................................................11

*Weisgram v. Marley Co.*,
  528 U.S. 440 (2000).................................................................................10

*Yavuz v. 61 MM, Ltd.*,
  465 F.3d 418 (10th Cir. 2006)..................................................................11

**Statute**

28 U.S.C. §1605(a)(2)....................................................................................9

**Other Authorities**

*Gutiérrez v. Neumáticos Gutiérrez SA*, October 16, 2012, CN Com,
  Room A (TR LA LEY AR/JUR/62470/2012)......................................13

*Zullo v. Kehoe*, CN Com., Room A, July 22, 2008
  (TR LA LEY AR/JUR/8909/2008)......................................................13

## INTRODUCTION AND RULE 40(B)(2) STATEMENT

This case arises from Argentina's "knowing and flagrant violation of the promises it made to foreign investors," i.e., U.S. investors on the NYSE. Op.51. When Argentina privatized its state-owned oil company YPF, S.A. in the 1990s, it promised those investors, who were rightly skeptical given Argentina's penchant for economic nationalism, that if it ever decided to retake control of the company, it would offer shareholders a compensated exit through a tender offer at a price set by a predetermined investor-protective formula. But when Argentina returned to its ways and seized back control of a majority stake in YPF in 2012, it calculated the costs of giving investors their due and openly flouted its tender-offer obligations, defying its clear promises and causing Plaintiffs billions of dollars of harm and driving them into liquidation.

A prior panel of this Court recognized Plaintiffs' contract rights and declined to accept Argentina's and YPF's assertions of the act-of-state doctrine and sovereign immunity. As a result, over the following decade, the litigants and the district court dedicated enormous resources to ascertaining Argentine law and providing investors with their promised compensated exit. The district court's efforts were aided both by experts subject to adversarial testing and by the avowed and flagrant nature of Argentina's breach. After all, everyone knew that giving foreign investors their bargained-for protection would be costly, and Argentina did the calculations and

simply refused to pay. After reviewing hundreds of pages of briefing, reports, and rebuttal reports from experts on Argentine law, and holding a multi-day trial, an experienced district judge entered a $16.1 billion judgment against Argentina. The size of that judgment—while (as the panel majority emphasized) undeniably large— could have surprised no one, as it was a simple matter of applying the YPF Bylaws' investor-protective formula and adding the interest caused by a decade-plus of Argentina's recalcitrance and delay.

The divided panel decision wipes out that judgment and lays waste to years of judicial effort, leaving Plaintiffs with no compensated exit and no judicial remedy for Argentina's "knowing and flagrant violation" of the promises that allowed it to raise well over a billion dollars on the NYSE. As circuit law now stands, foreign companies can come to the NYSE and raise over a billion dollars from American investors with promises of a compensated exit, and U.S. courts can do nothing to make the investors whole if those promises are breached.

That rule and the panel's decision are both profoundly misguided. The panel's rationale conflicts with this Court's prior decision in this very case, in *Petersen Energía Inversora S.A.U. v. Argentine Republic*, 895 F.3d 194 (2d Cir. 2018) ("*Petersen II*"), where this Court held that Argentina's breach of its Bylaws obligations was a commercial act, not the kind of sovereign act that could only be challenged in specialized Argentine courts. It pays no heed to the district court's

2

careful and persuasive analysis of Argentine law and the exhaustive record supporting that analysis. And it flunks the test of common sense, as Argentina would never have been able to raise over a billion dollars on the NYSE if investors had believed that Argentina's Bylaws promises were a mirage enforceable only in the courts of the very sovereign that brazenly broke its promises. As Argentina itself calculated in real time, it promised investors billions in compensation and breaking those promises caused billions in harm, underscoring the importance of holding Argentina accountable for its breach.

In short, neither law nor basic economics supports the panel majority's decision to allow Argentina to game the system by raising capital on the NYSE with promises that turn out to be illusory and then leave investors to suffer the massive resulting harm. Especially after the prior panel (correctly) permitted this case to proceed—leading to years of extensive litigation efforts by the parties and the district court, and the largest judgment ever rendered in this Circuit—the last word on that judgment should not rest with a divided three-judge panel. Worse still, allowing the panel's decision to stand without further review will seriously undermine this Court's preeminent role in protecting the integrity of the U.S. capital markets, not to mention New York's position as a leading international hub for foreign investment. This Court should grant en banc review.

3

## BACKGROUND

1. In the 1990s, Argentina privatized its state-owned energy company YPF. To overcome foreign investors' skepticism in light of Argentina's "checkered economic past," JA845, Argentina and YPF amended YPF's Bylaws "to incorporate protections for investors" from "attempts by Argentina to renationalize the company," *Petersen II*, 895 F.3d at 199.

The amended Bylaws prohibit a shareholder from crossing certain ownership thresholds without making a tender offer to other shareholders at a price set by a predetermined formula. *Id.* The Bylaws expressly extend that tender-offer requirement to Argentina itself. JA674-75. Those promises served their intended purpose, enabling Argentina to raise "billions of dollars in investment capital" by privatizing YPF, with "the largest share (more than $1.1 billion in total)" coming from investors in the United States. *Petersen II*, 895 F.3d at 200.

In 2012, however, Argentina returned to its old ways and seized control of a majority of YPF's shares. *Id.* at 202. Argentina calculated internally that compliance with the Bylaws would cost "between 11 billion and 14.5 billion dollars," and breaching the Bylaws would "probably involve lawsuits." JA1380-82. But having done the math, Argentina was "quick to declare" it had "no intention of complying with the tender offer provisions," *Petersen II*, 895 F.3d at 202, describing as "fools

... those who think that the State has to be stupid" and comply with the Bylaws, and dismissing the tender-offer requirement as a "bear trap." JA3693.

2. Plaintiffs sued Argentina and YPF for that undisguised breach and, needless to say, they chose to sue at the scene of the promises, rather than in the courts of the very sovereign that blatantly disregarded those promises. The district court rejected Argentina's and YPF's claims of sovereign immunity under the Foreign Sovereign Immunities Act ("FSIA"), and this Court unanimously affirmed, recognizing Plaintiffs' contractual rights and holding that Argentina's and YPF's breaches of those rights "were indisputably commercial in nature." *Petersen II*, 895 F.3d at 207-10 (Chin, J., joined by Calabresi and Winter, JJ.).

The district court subsequently granted summary judgment against Argentina on liability, finding Argentina had clearly breached its contractual obligations. SA114-24. After in-depth review of the parties' expert reports and rebuttal reports on Argentine law, the court rejected Argentina's numerous contrary arguments. SA126-41. The court then held a three-day bench trial on damages, where it heard many of the parties' Argentine-law experts testify live, and awarded Plaintiffs $16.1 billion for Argentina's flagrant breach of its contractual obligations. SA188-91.

3. A divided panel of this Court reversed. The panel began by declining to reach Argentina's arguments that the case should be sent to Argentina's own courts for forum non conveniens or international comity reasons, *see* Op.25-29, apparently

5

unwilling to conclude that Argentina had "satisfie[d] the high bar for reversal in this procedural posture" on those grounds. Op.27.

At that point, however, the panel split. After emphasizing the size of the judgment, the panel majority (Chin, J., joined by Robinson, J.) acknowledged "the Republic's knowing and flagrant violation of the promises it made to foreign investors," Op.50, but held that Plaintiffs had no contractual remedy for that deliberate breach, concluding that YPF's Bylaws did not give rise to any enforceable "contractual obligation on the part of [Argentina] to YPF's other shareholders." Op.39-44. Alternatively, the panel majority held that Plaintiffs' claims were precluded by Argentina's General Expropriation Law because they would impede Argentina's sovereign act of expropriation, Op.39, 44-49—despite *Petersen II*'s prior unanimous holding that Argentina's breach was commercial and not sovereign in nature, 895 F.3d at 207-10. According to the panel majority, the only remedy Argentine law afforded Plaintiffs was to try "to enforce the Bylaws' protections in Argentine court." Op.51.

Judge Cabranes dissented. Given the district court's "close familiarity with the facts and law of the case" after "ten years of painstaking consideration," and the practical reality that "determinations of another sovereign's law frequently call for fact-like procedures that a district court is better situated to implement," Judge Cabranes would have afforded "special consideration and respect to a District Court

6

that has closely evaluated every aspect of the facts and … the governing law" and would have affirmed. Dis.2-4.

## ARGUMENT

**I.**   **The Panel Majority's Decision Leaves U.S. Investors With No Meaningful Remedy For Argentina's Flagrant Violation Of Its Contractual Obligations.**

The panel majority's decision sets an exceptionally dangerous precedent. By allowing Argentina (and other foreign nations) to make explicit investor-protecting promises to raise massive amounts of capital in U.S. markets, only to repudiate those promises without consequence, the panel majority's decision will have severe ramifications for foreign investment on U.S. exchanges. Investors will be harmed directly in the short run, and everyone will suffer in the long run from the inability to hold foreign sovereigns in need of capital to their word. This Court should not permit that decision to stand as circuit law.

As the panel majority recognized, Argentina deliberately "t[ied] its own hands with a tender offer requirement" in the YPF Bylaws and repeatedly "tout[ed] these protections in its IPO prospectus and SEC filings" to "assure private investors— many of whom were based in the United States—that they would be protected" if Argentina renationalized YPF. Op.50. Argentina simply "would not have been able to raise $1.1 billion from YPF's NYSE-listed [shares] without these investor protections," nor would subsequent investors have paid billions more for those

7

shares. Op.50. Argentina nevertheless flagrantly "violated YPF's Bylaws," refusing to make the tender offer that the Bylaws promised. Op.50. Argentina ran the numbers and made a calculated decision to breach, deriding as "fools" anyone who thought Argentina would be "stupid" enough to comply with its obligations. JA3693. The panel majority nevertheless left the investors that Argentina brazenly betrayed with no meaningful remedy at all, relegating them to seeking "to enforce the Bylaws' protections in Argentine court," Op.50-51—an alternative that is impossible to square with the undisturbed rulings denying Argentina's forum non conveniens motions, *see* SA30-37, SA62-87. It should go without saying that forcing investors on U.S. markets to sue in the courts of the very sovereign that betrayed their trust is an illusory remedy. If Argentina had made clear at the outset that the only remedy for a breach was a lawsuit in Buenos Aires, it would have come back from the NYSE empty-handed.

By allowing Argentina to make clear promises to attract investors, and then "refus[e] to honor those protections two decades after making them," the panel majority's decision "cast[s] doubt on the security of foreign investment in [Argentina] more broadly." Op.50. Still worse, by straining to excuse Argentina from the consequences of its breach, the decision undermines the prior panel decision and the basic promise of the FSIA's commercial-activity exception: that U.S. courts will hold foreign sovereigns to their commercial obligations. *See* 28

8

U.S.C. §1605(a)(2); *Petersen II*, 895 F.3d at 203-05. While the circumstances have varied, numerous decisions of this Court have held Argentina to account in U.S. courts for promises made to U.S. investors. *See, e.g.*, *NML Cap., Ltd. v. Argentina*, 727 F.3d 230 (2d Cir. 2013). The throughline of those decisions is that suing in the sovereign courts of a defaulting sovereign is no remedy at all. This Court should not permit the dangerous and outlying precedent here to stand without further review.

## II.     The Panel Majority Failed To Adequately Consider The District Court's Persuasive Analysis.

The panel majority's decision displays a striking disregard for the experienced district court judge's thorough analysis of the controlling issues of Argentine law. As Judge Cabranes emphasized in dissent, "[f]or more than ten years, a distinguished judge of the Southern District has presided with meticulous care" over this litigation, investing "ten years of painstaking consideration of the law and facts on the ground." Dis.1-2. And "[b]ased on its close familiarity with the facts and law of the case, the District Court rejected Argentina's arguments," holding that Argentina "had bilateral obligations towards the plaintiffs" "enforceable under the Argentina Civil Code," and that Argentina's General Expropriation Law "does not bar plaintiffs' claims." Dis.3. The decade-long history of this litigation—and the hundreds of pages of briefing and expert reports that the district court considered, along with its unique ability to observe live testimony from multiple experts at the multi-day damages trial—warrant "special consideration and respect to a District Court that has closely

9

evaluated every aspect of the facts and, importantly, the governing law of Argentina." Dis.4.

The panel majority's opinion displays none of that special consideration and respect. Instead, despite acknowledging that the district court "has presided over these difficult and lengthy cases for over a decade" and "engaged deeply with complex questions of Argentine law," the panel majority dismissed the district court's analysis in a footnote, relying instead on its own "ability to 'find and apply foreign law' in the first instance." Op.51 n.14 (quoting *Curley v. AMR Corp.*, 153 F.3d 5, 12 (2d Cir. 1998)).

That disregard for the district court's meticulous analysis and deep familiarity with the case confirms that further review is warranted. While this Court "undoubtedly ha[s] discretion to decide [a] question of Argentine law in the first instance," the panel majority's utter failure to grapple with the district court's reasoning is inexcusable. *Bugliotti v. Argentina*, 952 F.3d 410, 413 (2d Cir. 2020). Needless to say, appellate courts should always "give due consideration to the first-instance decisionmaker's 'feel' for the overall case," and "be constantly alert to the trial judge's first-hand knowledge of witnesses, testimony, and issues." *Weisgram v. Marley Co.*, 528 U.S. 440, 443 (2000). That consideration is especially warranted as to questions of foreign law, which are reviewed de novo but which "frequently call for fact-like procedures that a district court is better situated to implement."

10

Dis.4 (quoting *Petroleos de Venezuela S.A. v. MUFG Union Bank*, 106 F.4th 263, 269 (2d Cir. 2024)); *see, e.g.*, *Yavuz v. 61 MM, Ltd.*, 465 F.3d 418, 431 (10th Cir. 2006) (recognizing that the "better practice" in resolving questions of foreign law is to leave it to the district court "to permit the parties to present the applicable law and … any facts that may be relevant under that law").

This case exemplifies the point. After a decade of hard-fought litigation, the district court had a uniquely "close familiarity with the facts and law of the case," informed by hundreds of pages of briefing and expert reports. Dis.3. The panel majority nevertheless casually tossed the district court's analysis aside, instead relying on Argentina's own description of its laws and a handful of unvetted amici. *See* Op.30-50. But while a federal court "should carefully consider a foreign state's views about the meaning of its own laws," there is obvious "cause for caution" when those views are offered "in the context of litigation," especially when those views conveniently save the sovereign billions in liability for disregarding promises that the sovereign knew would generate lawsuits. The district court had the benefit of rebuttal reports and live testimony and was far better positioned to see Argentina's self-serving presentation for what it was—a distortion of basic and uncomplicated principles of contract law. For instance, the district court witnessed Argentina's effort to undermine her summary judgment ruling by obtaining an extraordinary advisory opinion from a sitting Argentine judge. *See* SA159-61. The notion of

11

deference to the foreign sovereign under such circumstances is difficult to fathom. The district court's "careful and thorough treatment of the evidence" here deserves far more weight than Argentina's own self-serving assertions. *Animal Sci. Prods., Inc. v. Hebei Welcome Pharm. Co.*, 585 U.S. 33, 46 (2018).

### III. The Panel Majority's Decision Is Egregiously Wrong.

The panel majority's decision ignores clear record evidence and reaches a result that cannot be squared with Argentina's clear promises to U.S. investors, Argentina's real-time calculation of what it owed, or this Court's unanimous prior opinion.

1. As the panel majority recognized, the Bylaws are "the contract governing the relationship among YPF, Argentina (in its capacity as a shareholder), and other YPF shareholders." Op.42. That contract included a straightforward promise by Argentina: If it ever acquired control of a majority of YPF's shares, it would make a tender offer to the remaining shareholders at the investor-protective price specified in the Bylaws. JA652-55, JA674. Under Argentine law, Argentina's breach of that contractual promise "give[s] rise to contractual civil liability." JA1087-88; SA201; SA205.

Despite recognizing the contractual nature of Argentina's promises, the panel majority adopted Argentina's argument that the Bylaws "did not create bilateral promises giving rise to a contractual obligation." Op.39. Instead, the panel majority

12

concluded, the tender-offer requirement was part of a "plurilateral organizational contract" and did not create any "specific bilateral obligations" enforceable by a breach-of-contract claim. Op.36; *see* Op.39-45. But as the district court recognized, that conclusion was undermined by Argentina's own expert, who conceded that corporate bylaws *can* include bilateral contractual promises that support a breach-of-contract claim. SA125; JA1735-36; JA3957. The panel majority's attempt to support its holding by claiming that Plaintiffs never cited "any Argentine cases" recognizing a "contract suit between shareholders arising out of a violation of corporate bylaws," Op.44, was equally incorrect; in reality, Plaintiffs and their experts cited multiple such cases. *See, e.g.*, *Zullo v. Kehoe*, CN Com., Room A, July 22, 2008 (TR LA LEY AR/JUR/8909/2008) ("Actions that arise from the bylaws … may be exercised by the company against the shareholders or by the shareholders among themselves or against the company."); *Gutiérrez v. Neumáticos Gutiérrez SA*, October 16, 2012, CN Com, Room A (TR LA LEY AR/JUR/62470/2012) (shareholders can recover damages for claims "against other shareholders or by them against the company" that arise from "relationships that are covered by the bylaws"); *see also* Dkt.199 at 33.

The panel majority alternatively asserted that even if corporate bylaws can create bilateral obligations under Argentine law the Bylaws created no such obligations here. Op.43. But as the district court recognized, the Bylaws set forth

13

precisely the kind of specific bilateral obligation that the panel majority demanded: Section 28(A) requires Argentina to make a tender offer to all other shareholders if it acquires control of a certain percentage of YPF's shares, and section 7 sets out a reciprocal obligation for each other shareholder to make a tender offer to the others (including Argentina) upon acquiring a different (lower) control threshold—which is why Petersen itself made a tender offer to other shareholders when it crossed that threshold. JA657, 674-75; *see* SA125-26; *Petersen II*, 895 F.3d at 200. That bilateral obligation is enforceable by a breach-of-contract suit under Argentine law. SA125-26; *see* JA1735-36; JA3957.

2. The panel majority held that claims against Argentina for its "knowing and flagrant violation of the promises it made to foreign investors" were precluded by Argentina's General Expropriation Law, which bars third-party suits that would "impede the expropriation or its effects." Op.46, 51; *see* Op.45-50. But as the district court explained, enforcing Argentina's contractual obligations under the Bylaws does not impede the expropriation in any way. SA136-40. Allowing Plaintiffs' claims to proceed (and the judgment for Plaintiffs to stand) does not deprive Argentina of the property that Argentina expropriated, or limit Argentina's right to that property; it just requires Argentina to abide by the obligations that Argentina voluntarily accepted in order to induce NYSE investors to put more than a billion dollars into YPF. *Id.*

14

Indeed, the whole point of *Petersen II* is that the expropriation and the contractual breach were separate, and nothing in the YPF Expropriation Law or the General Expropriation Law (or any other Argentine authority) treats Argentina's expropriation of the YPF shares as eliminating its separate contractual obligations. 895 F.3d at 208-09; *see* Dkt.198 at 65-66. Argentina could have chosen to expropriate Plaintiffs' shares, or "could have expropriated … just the contractual rights of shareholders to receive tender offers" (and compensated Plaintiffs accordingly), but decided it would be cheaper (in the short run) to breach Plaintiffs' contractual rights. *Petersen II*, 895 F.3d at 211. Treating that clear contractual breach as a quasi-expropriation enforceable only in Argentine courts rewards Argentina for its calculated breach.

Argentina's own contemporaneous conduct proves the point. In the days and weeks after expropriating a majority of YPF's shares in April 2012, Argentina never once claimed that its General Expropriation Law somehow superseded its tender-offer obligations under the Bylaws. Instead, it simply repudiated those obligations, declaring that it would not be "stupid" enough to comply with its prior promises. JA3693. The panel majority erred by ignoring those contemporaneous admissions.

The panel majority's view cannot be reconciled with *Petersen II*. In *Petersen II*—written by Judge Chin himself, and joined by Judges Calabresi and Winter—the Court made clear that Plaintiffs' claims are "based on Argentina's breach of a

15

commercial obligation," not on any sovereign act. 895 F.3d at 207. That is precisely why *Petersen II* concluded that Argentina and YPF were not entitled to sovereign immunity from Plaintiffs' claims: Their obligations under the Bylaws, and their "subsequent repudiation" of those obligations, "were indisputably commercial in nature." *Id.* Because Plaintiffs "seek[] relief for injuries caused by commercial, rather than sovereign, activity," their claims cannot impermissibly interfere with the sovereign act of expropriation. *Id.* at 206; *see id.* at 209 (recognizing that Argentina's breach "was an act separate and apart from Argentina's expropriation"). The panel majority's footnoted attempt to reconcile that contradiction—by claiming that Argentina's breach was "not 'sovereign' for purposes of … jurisdiction under the FSIA" but nevertheless "implicate[s] foreign public law that governs actions performed by a sovereign," Op.38 n.12—acknowledges rather than avoids the clear conflict, and underscores the need for this Court to sit en banc to resolve it.

3. The panel majority's ruling on Plaintiffs' claims against YPF is equally indefensible. The panel majority's holding that the Bylaws imposed no "affirmative obligation on the part of YPF to enforce the tender offer requirements or enforce sanctions against [Argentina] for failing to conduct a tender," Op.53, conflicts with *Petersen II* and would turn the Bylaws' tender-offer requirement and its detailed enforcement mechanism into a dead letter. *See* 895 F.3d at 210 (recognizing YPF's "obligation to enforce the tender offer provision"). And the panel's promissory-

16

estoppel ruling ignores YPF's own expert's concession that estoppel *can* provide an autonomous source of obligation under Argentine law in "the absence of a contractual relationship between the parties." JA249. *Contra* Op.51-52. The panel majority's contrary holding leaves Plaintiffs with no remedy at all for the billions of dollars of harm that they suffered from Argentina's "knowing and flagrant violation of the promises it made to foreign investors." Op.50.

In the end, the panel decision fails the market test. If Argentina had made clear to investors that its unambiguous obligation to provide a compensated exit to minority shareholders was an unenforceable plurilateral promise, or that the breach was really an expropriation that could be redressed only in Argentine courts, or that YPF need do nothing to enforce the Bylaws, Argentina would have gone back from the NYSE empty-handed. In reality, Argentina raised over a billion dollars by making valid commercial promises that this Court should enforce. En banc review is needed to restore that sensible rule and defend the U.S. capital markets.

## CONCLUSION

This Court should grant rehearing en banc.

17

Respectfully submitted,

s/Paul D. Clement

MARK C. HANSEN
DEREK T. HO
ANDREW E. GOLDSMITH
KELLOGG, HANSEN, TODD,
FIGEL, & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, DC 20036

PAUL D. CLEMENT
C. HARKER RHODES IV
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

*Counsel for Plaintiffs-Appellees-Cross Appellants*

May 8, 2026

18

## CERTIFICATE OF COMPLIANCE

I hereby certify that:

1. This brief complies with Federal Rule of Appellate Procedure 40(d)(3)(A) because it contains 3,897 words, excluding the parts of the response exempted by Federal Rule of Appellate Procedure 32(f), as determined by the word counting feature of Microsoft Word 2016.

2. This response complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the typestyle requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point font.

May 8, 2026

s/Paul D. Clement
Paul D. Clement

**CERTIFICATE OF SERVICE**

I hereby certify that, on May 8, 2026, an electronic copy of the foregoing brief was filed with the Clerk of Court using the ACMS system and thereby served upon all counsel appearing in this case.

<u>s/Paul D. Clement</u>
Paul D. Clement

# Attachment

23-7370 (L); 23-7376 (L)
*Petersen Energía Inversora et al.; Eton Park Cap. Mgmt. et al. v. Argentine Republic, YPF S.A.*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term 2025

(Argued: October 29, 2025     Decided: March 27, 2026)

Docket Nos. 23-7370 (L), 23-7463 (XAP), 23-7614 (XAP)
and 23-7376 (L), 23-7471 (XAP), 23-7667 (XAP)

PETERSEN ENERGIA INVERSORA S.A.U., PETERSEN ENERGIA S.A.U.,

*Plaintiffs-Appellees-Cross-Appellants,*

*- against -*

ARGENTINE REPUBLIC,

*Defendant-Appellant-Cross-Appellee,*

YPF S.A.,

*Defendant-Conditional Cross-Appellant.*

ETON PARK CAPITAL MANAGEMENT, L.P., ETON PARK MASTER FUND, LTD.,
ETON PARK FUND, L.P.,

*Plaintiffs-Appellees-Cross-Appellants,*

*- against -*

ARGENTINE REPUBLIC,

*Defendant-Appellant-Cross-Appellee,*

YPF S.A.,

*Defendant-Conditional Cross-Appellant.**

-------

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

-------

Before:

CABRANES, CHIN, and ROBINSON, *Circuit Judges.*

-------

Appeal from orders and final judgment of the United States District

Court for the Southern District of New York (Preska, *J.*) in two consolidated

cases, culminating in a combined damages award of $16.1 billion to minority

shareholders of an Argentine oil and gas company. The district court entered

judgment for the shareholders, finding that the Argentine Republic violated

Argentine law by expropriating a majority of the company's common shares in a

-------

* The Clerk of the Court is respectfully directed to amend the official captions as shown
above.

manner that violated its bylaws, and it awarded judgment to the company with respect to the shareholders' claims against the company. The Argentine Republic appeals, arguing that the judgment and preceding orders rested on, *inter alia*, erroneous interpretations of Argentine law. The shareholders cross-appeal, challenging the district court's judgment for the company and its dismissal of their promissory estoppel claims against both defendants. We hold that the shareholders' breach of contract damages claims against the Argentine Republic and the company are not cognizable as a matter of Argentine law, and that the shareholders' remaining claims against the Argentine Republic and the company are without merit.

AFFIRMED in part, REVERSED in part, and REMANDED for further proceedings consistent with this opinion.

Judge Cabranes dissents in a separate opinion.

_____

> PAUL D. CLEMENT (C. Harker Rhodes IV, Nicholas M. Gallagher, *on the brief*), Clement & Murphy, PLLC, Alexandria, VA, and Mark C. Hansen, Derek T. Ho, Andrew E. Goldsmith, Kellogg, Hansen, Todd, Figel, & Frederick, PLLC, Washington, D.C.; Randy M. Mastro, King & Spalding LLP, New York, NY, *on the brief, for Plaintiffs-Appellees-Cross-Appellants Petersen*

- 3 -

*Energía Inversora, S.A.U., Petersen Energía S.A.U., Eton Park Capital Management, L.P., Eton Park Master Fund, Ltd., Eton Park Fund, L.P.*

ROBERT J. GIUFFRA, JR. (Amanda F. Davidoff, Thomas C. White, Morgan L. Ratner, Sergio Galvis, Adam R. Brebner, Pedro José Izquierdo, *on the brief*), Sullivan & Cromwell LLP, New York, NY, and Washington, D.C., *for Defendant-Appellant-Cross-Appellee Argentine Republic.*

MARK P. GOODMAN (Shannon Rose Selden, J. Robert Abraham, Wendy B. Reilly, Carl Riehl, Sol Czerwonko, *on the brief*), Debevoise & Plimpton LLP, New York, NY, *for Defendant-Conditional Cross-Appellant YPF S.A.*

Jeffrey R. White, American Association for Justice, Washington, D.C.; Robert S. Peck, Center for Constitutional Litigation, PC, Washington, D.C., *for Amicus Curiae* American Association for Justice, *in support of Plaintiffs-Appellees-Cross-Appellants.*

Steven M. Shepard, Stephanie Spies, Susman Godfrey LLP, New York, NY, *for Amici Curiae* Investment Bankers and Investment Professionals, *in support of Plaintiffs-Appellees-Cross-Appellants.*

Donald Earl Childress III, Three Crowns LLP, Washington, D.C., *for Amici Curiae* Professors Ronald A. Brand and David P. Stewart, *in support of Plaintiffs-Appellees-Cross-Appellants.*

Alex H. Loomis, Dennis H. Hranitzky, Quinn Emanuel Urquhart & Sullivan, LLP, Boston, MA, and Salt

- 4 -

Lake City, UT, *for Amici Curiae* Professors William S. Dodge and Maggie Gardner, *in support of Plaintiffs-Appellees-Cross-Appellants.*

Andrew Loewenstein, Clara Brillembourg, Nicholas Renzler, Foley Hoag LLP, Boston, MA, New York, NY, and Washington, D.C., *for Amici Curiae* the Federative Republic of Brazil and Oriental Republic of Uruguay, *in support of Defendant-Appellant-Cross-Appellee.*

Todd G. Cosenza, Willkie Farr & Gallagher LLP, New York, NY, *for Amici Curiae* Law Professors, *in support of Defendant-Appellant-Cross-Appellee.*

Quinn Smith, GST LLP, Miami, FL, *for Amici Curiae* María Gabriela Ábalos, Enrique Bacigalupo, Antonio Boggiano, Eduardo M.P. Bordas, et al., *in support of Defendant-Appellant-Cross-Appellee.*

Eric L. Lewis, Chiara Spector-Naranjo, David Short, Lawis Baach Kaufmann Middlemiss, Washington, D.C., *for Amici Curiae* Organización Federal de Estados Productores de Hidrocarburos ("OFEPHI"), *in support of Defendant-Appellant-Cross-Appellee.*

Samuel Estreicher, NYU School of Law, New York, NY; Adam K. Magid, J.B. Howard, Ellen V. Holloman, Rachel A. Skene, Cadwalader, Wickersham & Taft LLP, New York, NY, *for Amici Curiae* Professors of Law and International Relations, *in support of Defendant-Appellant-Cross-Appellee.*

Adam S. Lurie, Patrick C. Ashby, Emilio Minvielle, Aviva Kushner, Linklaters LLP, New York, NY,

- 5 -

for *Amici Curiae* Public Bar Association of the City of Buenos Aires and Argentine Legal Scholars, *in support of Defendant-Appellant-Cross-Appellee.*

John Ansbro, Darrell Cafasso, Rebecca Greene, Orrick, Herrington & Sutcliffe LLP, New York, NY, *for Amici Curiae* the Republic of Chile and the Republic of Ecuador, *in support of Defendant-Appellant-Cross-Appellee.*

David A. Berger, Michael S. Vogel, Allegaert Berger & Vogel, LLP, New York, NY, *for Amici Curiae* Chamber of Companies (Cámara de Sociedades) and Bar Association of the City of Buenos Aires (Colegio de Abogados de la Ciudad de Buenos Aires), *in support of Defendant-Conditional Cross-Appellant.*

Jared R. Butcher, Berliner Corcoran & Rowe LLP, Washington, D.C., *for Amici Curiae* Law School Professors, *in support of neither party.*

––––––––––––––––––

CHIN, *Circuit Judge*:

Defendant-Appellant Argentine Republic (the "Republic") appeals from several orders and the final judgment of the United States District Court for the Southern District of New York (Preska, *J.*) in two cases resulting in the Republic being ordered to pay a combined damages award of $16.1 billion, an award that equals approximately 45% of the Republic's entire national fiscal

- 6 -

budget for 2024.  Plaintiffs-Appellees Petersen Energía Inversora S.A.U. and Petersen Energía S.A.U., two Spanish entities owned by an Argentine family (together, "Petersen"), and Eton Park Capital Management, L.P., Eton Park Master Fund, Ltd., and Eton Park Fund, L.P., entities of a New York hedge fund (together, "Eton Park," and together, with Petersen, "Plaintiffs"), were minority shareholders of Defendant-Conditional Cross-Appellant YPF S.A. ("YPF"), an Argentine oil and gas company that had been owned by private shareholders from 1993 until 2012, at which point the Republic nationalized YPF by expropriating a majority of YPF's common shares.  The Republic did so without conducting a tender offer to minority shareholders, as required by YPF's corporate bylaws.  Plaintiffs thereafter brought, *inter alia,* breach of contract and promissory estoppel claims under Argentine civil law against the Republic and YPF in the Southern District of New York, seeking damages for the Republic's non-compliance with the tender offer requirement as set forth in YPF's bylaws, and for YPF's failure to enforce those requirements.  After eight years of litigation, Plaintiffs prevailed on their claims against the Republic, and the district court granted summary judgment to YPF.

- 7 -

We hold that Plaintiffs' breach of contract damages claims against the Republic are not cognizable under Argentina's civil codes and public law governing expropriation, and accordingly REVERSE the district court's entry of judgment for Plaintiffs on those claims.  We AFFIRM the district court's dismissal of the promissory estoppel claims against the Republic and YPF and its entry of judgment for YPF on Plaintiffs' breach of contract claims.  Finally, we REMAND for further proceedings consistent with this opinion.[1]

### BACKGROUND

These appeals are taken from two of many cases brought in the wake of the Republic's controversial decision in 2012 to renationalize YPF, the country's largest oil and gas company, following a decade marked by economic decline and the rise of political nationalism.  We summarize the factual and procedural history of these two suits as is relevant to the primary issue before us now: the merits of Plaintiffs' contract-based damages claims against the Republic.

---

[1]     Because we affirm the district court's dismissal of Plaintiffs' claims against YPF, we need not consider YPF's conditional cross-appeal challenging the district court's damage calculations.

I.      *Factual Background*

A.      *The Republic Privatizes YPF*

YPF was founded as a state-run oil company in 1922 and is incorporated under Argentine law.  It was wholly owned and operated by the Argentine government until 1993.  As part of the country's free-market reform and deregulation movement in the early 1990s, the Argentine government decided to privatize YPF by selling the company to private investors through an initial public offering ("IPO").  In preparation for the IPO, the Republic and YPF amended certain key provisions of YPF's corporate bylaws (the "Bylaws").

Central to this case are provisions of the Bylaws that protect YPF's minority shareholders from takeover acquisitions.  Under § 7(d) of the Bylaws, an acquiring shareholder must make a public tender offer to all holders of YPF's outstanding shares -- that is, to all other YPF shareholders -- if the transaction would result in the acquirer owning more than 15% of YPF's common stock, known as its "Class D" shares.  The acquirer is required to ensure the tender adheres to procedures set out in §§ 7(e)-(f), including by complying with New York Stock Exchange ("NYSE") and Securities and Exchange Commission ("SEC") rules and regulations, publishing notice in New York City, and tendering the

shares at an above-market price determined by the highest result of several pricing formulas outlined in the Bylaws.

These tender offer requirements are expressly extended to control acquisitions by the Argentine government. Section 28(A) of the Bylaws states that the procedures of §§ 7(e)-(f) apply to "all acquisitions made by the National Government, whether indirectly or directly, by any means or instrument, of shares or securities of [YPF]" that result in "the National Government becom[ing] the owner, or exercis[ing] the control of," a cumulative 49% of YPF's shares. Joint App'x at 674 § 28(A). In essence, § 28(A) provides that minority shareholders would be offered a compensated exit if and when the Argentine government ever renationalized YPF. The Bylaws also provide that any Class D shares acquired in breach of the tender offer requirements, including those acquired by the Republic in a § 28(A) transaction, "shall not grant" voting, dividend, quorum, and other rights. *Id.* at 657 § 7(h).

The Bylaws (as amended) took effect in May 1993, after the Argentine executive branch ratified them via executive order and instructed the Argentine Ministry of Economy and Public Works and Services to, in its capacity as a YPF shareholder, submit the Bylaws and "cause the same to be approved."

Dist. Ct. Dkt. 363, Ex. 73 at 1-2.[2]  The Bylaws and the tender offer requirements therein were explicitly referenced in YPF's IPO Prospectus filed with the SEC, which assured investors that if the Republic were to retake majority control of YPF, it "first would be required to make a cash tender offer to all holders of Class D shares on specified terms and conditions" outlined in the Bylaws.  Joint App'x at 502.

YPF's IPO raised billions of dollars from private investors.  On June 29, 1993, YPF's Class D shares were listed on the Buenos Aires Stock Exchange, and corresponding American Depositary Receipts ("ADRs") were listed on the New York Stock Exchange ("NYSE").[3]  The sale of NYSE-listed ADRs, the largest portion of YPF's IPO, generated over $1.1 billion in revenue for the Republic.  All in, the Republic sold 80% of its interest in YPF, including 59% of its Class D shares.  Post-IPO, the Republic remained a minority, non-controlling shareholder of YPF.

---

[2]  District court materials cited are from the docket in *Petersen Energía Inversora S.A.U. v. Argentine Republic*, No. 1:15-cv-02739 (S.D.N.Y.).

[3]  ADRs are dollar-denominated certificates, issued by a U.S. bank, that represent ownership shares of a foreign security.  To create an ADR, a U.S. depositary bank buys shares of a foreign security and holds them in a foreign custodian bank.  Issued ADRs can be listed and traded on U.S. stock exchanges.  In YPF's IPO, Bank of New York Mellon purchased Class D shares deposited in the Republic and issued ADRs, each of which represented an interest in a Class D share, that were then listed on the NYSE.

**B.**     *Plaintiffs Purchase YPF Stock*

By 2008 -- fifteen years after the IPO -- nearly all of YPF's capital stock was owned by Repsol S.A. ("Repsol"), a Spanish oil company. It was from Repsol that Petersen began purchasing YPF ADRs. By 2011, Petersen had bought ADRs representing just over 25% of YPF's Class D shares. Its stock acquisitions were financed by highly leveraged loans from Repsol and a syndicate of financial institutions that were secured against Petersen's YPF shares. Petersen intended to service its loan interest with the dividend payments associated with the collateralized shares. To facilitate this, it entered into a shareholder's agreement with Repsol in which Repsol agreed to cause YPF to distribute 90% of its profits as dividends twice a year, and to pay a one-time "special dividend" of $850 million after the purchase. *Id.* at 3294-95.

Eton Park began purchasing YPF ADRs in November 2010. By March 2012, Eton Park owned ADRs representing about 3% of YPF's Class D shares. At the time of the Republic's expropriation in 2012, Petersen and YPF were the second- and third-largest holders of YPF's common stock.

- 12 -

C.       *The Republic Expropriates YPF Stock*

By the early 2010s, the Republic's domestic oil and gas production had steadily declined following a decade marked by currency crises, price controls, and nationalist economic policies.  The Argentine government began to criticize Repsol's management of YPF, accusing Repsol of paying out YPF's profits in shareholder dividends instead of investing them to develop new energy reserves or increase its oil production during a period in which the Republic had become a net energy importer, rather than exporter.

In early 2012, the Argentine press began reporting rumors that the Republic was considering renationalizing YPF.  The company's stock price fell sharply in response to the rumors of renationalization.  The reports proved true -- on April 16, 2012, then-Argentine President Cristina Fernández de Kirchner announced that the government would take a 51% controlling stake in YPF.  It would do so through a process known as expropriation, in which the Argentine government is permitted under its domestic law to, under certain circumstances, take private property for public use or benefit -- analogous to the concept of eminent domain in U.S. law.  To effectuate the expropriation, Kirchner submitted a bill to the Argentine legislature authorizing the expropriation of 51%

- 13 -

of YPF's Class D shares from Repsol. The government simultaneously issued an executive order, Decree No. 530/2012 (the "Intervention Decree"), declaring that the Republic was temporarily seizing YPF, taking immediate and complete control of the company, and appointing an "Intervenor" vested with the powers of YPF's Board of Directors and President to "ensure full compliance" with the proposed legislation. Sp. App'x at 249.

The proposed expropriation legislation (the "YPF Expropriation Law"), was passed by the Legislature on May 3, 2012, and took effect on May 7, 2012. *See* Law No. 26,741, May 3, 2012, [CXX] B.O. 32391. In accordance with the Argentine Constitution and its General Expropriation Law, the YPF Expropriation Law pronounced a national public need for the expropriation and declared 51% of YPF's shares (held by Repsol) to be "a public interest and subject to expropriation." Sp. App'x at 241. The YPF Expropriation Law also gave the Argentine executive branch the right to "exercise all the political rights associated with the shares subject to expropriation until the transfer of political economic rights is completed." *Id.* at 241-42.

The Republic never conducted a tender offer as required by § 7 and § 28(A) of the Bylaws. Indeed, Argentine officials voiced their express refusal to

- 14 -

do so. The day after the executive branch issued its Intervention Decree, the Republic's Deputy Economy Minister Axel Kicillof -- who had been appointed the temporary Vice-Intervenor of YPF -- announced in a speech before the Argentine Senate that the government did not intend to issue a tender offer because the requirements were a "bear trap" and it would be "stupid" for the Republic to "buy everything according to the law of YPF itself, respecting its bylaws." Joint App'x at 3693.

Some of YPF's minority shareholders quickly challenged the Republic's failure to comply with the Bylaws' tender offer requirement. At YPF's first post-expropriation shareholders' meeting on June 4, 2012 -- which Plaintiffs did not attend -- several shareholders asserted that the Argentine government violated the Bylaws and thus could not vote its shares or have them counted towards the meeting quorum. The Republic voted the expropriated shares anyway. After that June 4 meeting, some YPF shareholders sued in an Argentine court alleging that the Republic had violated the Bylaws, and sought to compel the Republic to conduct a tender. Repsol also sued in Argentina and Spain, and brought a putative class action in the Southern District of New York on behalf of all private shareholders challenging various aspects of the expropriation. These

- 15 -

suits, including the one in the Southern District, were dismissed after Repsol agreed to a global settlement of all past and future minority shareholder claims in connection with the expropriation for $5 billion. The global settlement was reviewed and approved by the Republic's National Court of Appraisals, which determined that the $5 billion compensation was "fair and reasonable" in light of the value of the expropriated shares. Joint App'x at 3309-10. The Republic paid the settlement and Repsol transferred title to the expropriated shares to the Republic on May 8, 2014.

Unable to service its loan interest without YPF's dividend payments, Petersen defaulted on its obligations, and its lenders foreclosed on its YPF ADRs in May 2012. Petersen entered insolvency proceedings in Spain two months later. As part of its bankruptcy liquidation plan, Petersen sold its claims in this case to Prospect Investments LLC, a wholly owned subsidiary of Burford Capital LLC ("Burford"), for €15 million. Under this litigation financing agreement, Burford would receive 70% of the total judgment Petersen obtains in this lawsuit; Petersen would receive the remaining 30%. Burford acquired Eton Park's claims in this case in 2016, and would receive 75% of Eton Park's recovery.

- 16 -

## II.     *Procedural History*

### A.     *Filing of Suit, Motions to Dismiss, and Interlocutory Appeal*

Petersen filed suit in the Southern District of New York against the Republic and YPF ("Defendants") on April 8, 2015.  It brought breach of contract, anticipatory breach, and promissory estoppel claims, alleging that the Republic had violated the Bylaws by failing to conduct a tender offer, and that YPF had breached its obligations under the Bylaws by failing to enforce the tender requirement and associated penalties against the Republic.  Petersen also brought good faith and fair dealing claims, alleging that Defendants had engaged in a campaign to depress YPF's share price leading up to expropriation to the detriment of minority shareholders.

The district court denied Defendants' motions to dismiss the breach of contract claims, rejecting their arguments based on, *inter alia,* the Foreign Sovereign Immunities Act (the "FSIA"), act of state doctrine, and *forum non conveniens.  See Petersen Energía Inversora, S.A.U. v. Argentine Republic,* No. 15 Civ. 02739, 2016 WL 4735367, at *5, *7, *13 (S.D.N.Y. Sept. 9, 2016) (*Petersen I*).  The court dismissed the promissory estoppel claims against both Defendants, finding

- 17 -

them duplicative of the breach of contract claims. *Id.* at *16. It also dismissed the good faith and fair dealing claim against YPF. *Id.* at *15.

On interlocutory appeal, this Court affirmed the FSIA ruling and declined to reach the act of state question, holding that "under the bylaws, Argentina's expropriation triggered an obligation to make a tender offer for the remainder of YPF's outstanding shares." *Petersen Energía Inversora S.A.U. v. Argentine Republic*, 895 F.3d 194, 206 (2d Cir. 2018) (*Petersen II*), *cert. denied*, 139 S. Ct. 2741 (2019); *see also id.* at 212. While Petersen's appeal was pending, Eton Park filed a substantively similar suit against the Republic and YPF in November 2016. The district court designated the two actions as related, and they have since proceeded in tandem.

Upon remand to the district court, Defendants filed a renewed motion to dismiss based on *forum non conveniens*. The district court considered the *forum non conveniens* arguments anew under the three-part analysis set forth in *Iragorri v. United Techs. Corp.*, 274 F.3d 65, 72 (2d Cir. 2001) (en banc). *See Petersen Energía Inversora S.A.U. v. Argentine Republic*, No. 15 Civ. 02739, 2020 WL 3034824, at *6-14 (S.D.N.Y. June 5, 2020) (*Petersen III*). It again declined to dismiss after reasoning that the addition of New York-based Eton Park strengthened the

- 18 -

deference owed to Plaintiffs' choice of forum, public interests weighed heavily in favor of litigation in New York, and the need to make and apply conclusions of Argentine law did not warrant dismissal. It also rejected, in a footnote, Defendants' invocation of abstention based on international comity, finding that they had not shown "exceptional circumstances" justifying dismissal, and that dismissal at that stage would be "woefully inefficient" given the time and money already expended in what was then five years of litigation. *Id.* at *14 n.15.

**B.** *Summary Judgment, Trial, and Judgment*

After three more years of discovery, the parties cross-moved for summary judgment. The district court granted summary judgment for Plaintiffs on their breach of contract claims against the Republic on liability, but not damages. *See Petersen Energía Inversora, S.A.U. v. Argentine Republic*, No. 15 Civ. 02739, 2023 WL 2746022, at *2, 4-5 (S.D.N.Y. Mar. 31, 2023) (*Petersen IV*). The court construed Plaintiffs' claims as seeking damages for a straightforward breach of contract based on § 28(A) of the Bylaws, and it reasoned that the elements of such claims under Argentine civil law are analogous to those in U.S. common law. It then found liability after noting that "key facts are not in serious dispute" -- the Bylaws required the Republic to conduct a tender offer if and

- 19 -

when it made a control acquisition, the Republic made such an acquisition via the 51% expropriation, and it did not make the required tender. *Id.* at *5; *see also id.* at *14. The district court then rejected the Republic's slate of defenses based on Argentine contract, corporate, and public expropriation law.

The district court also granted summary judgment to YPF on the breach of contract claims against it, finding that the Bylaws did not create an affirmative obligation on the part of YPF to enforce the tender requirements or enforce sanctions against the Republic for its noncompliance.[4]

The cases proceeded to a bench trial on damages in July 2023. The sole factual issue was whether, for purposes of calculating the required tender offer price (and resulting damages), the Republic "acquired control" of the expropriated shares and thus breached its Bylaw obligations when it issued its Intervention Decree on April 16, 2012, or when the YPF Expropriation Law went into effect on May 7, 2012. The court found that the Republic exercised indirect control over the expropriated Repsol shares beginning April 16, 2012, when it "deprived Repsol of control over its shares" through the Intervention Decree.

---

[4] The district court also granted summary judgment for the Republic on the good faith and fair dealing claim, finding that Argentine law does not recognize a good-faith cause of action independent of a traditional breach of contract claim. Plaintiffs do not contest this ruling on appeal.

- 20 -

*Petersen Energía Inversora, S.A.U. v. Argentine Republic*, No. 15 Civ. 02739, 2023 WL 5827596, at *1 (S.D.N.Y. Sept. 8, 2023). It then selected an 8% simple interest rate for prejudgment interest.

On September 15, 2023, the district court entered final judgment of $7.5 billion in damages plus $6.9 billion in prejudgment interest to Petersen, and $898 million in damages plus $817 million in prejudgment interest to Eton Park.[5] Together, the judgment exceeds $16.1 billion, with post-judgment interest accruing.[6]

---

[5] The district court also dismissed all other claims against Argentina, including the anticipatory breach, good faith and fair dealing, and promissory estoppel claims, and dismissed all claims against YPF.

[6] Because we conclude that the district court's grant of summary judgment for Plaintiffs on their breach of contract claim against the Republic was erroneous, the district court's post-judgment order requiring the Republic to transfer its YPF shares to Plaintiffs in satisfaction of the judgment is vacated. Our decision thus may render moot some or all of the pending appeals of the district court's orders related to turnover and post-judgment discovery, some of which have already been stayed pending resolution of these appeals on the merits. *See, e.g., Petersen Energía Inversora, S.A.U., et al. v. Argentine Republic,* No. 25-2362-cv (2d Cir. 2026), *stay granted*, Dkt. No. 88 (2d Cir. Mar. 18, 2026); *Eton Park Cap. Mgmt. et al. v. Argentine Republic,* No. 25-2363-cv (2d Cir. 2026), *stay granted*, Dkt. No. 75 (2d Cir. Mar. 18, 2026); *Petersen Energía Inversora, S.A.U., et al. v. Argentine Republic,* No. 25-1687 (2d Cir. 2026); *Eton Park Cap. Mgmt. et al. v. Argentine Republic,* No. 25-1689-cv (2d Cir. 2026); *Petersen Energía Inversora, S.A.U., et al. v. YPF S.A.,* No. 25-2629-cv (2d Cir. 2026); *Eton Park Cap. Mgmt. et al. v. YPF S.A.,* No. 25-2630-cv (2d Cir. 2026).

*DISCUSSION*

Faced with an unprecedented multi-billion dollar damages award, Defendants now raise a host of challenges to the district court's rulings on the motions to dismiss and cross-motions for summary judgment, and its entry of final judgment. We first discuss the Republic's threshold challenges based on Plaintiffs' standing, *forum non conveniens,* and international comity. We then turn to the merits, beginning with an overview of relevant Argentine civil and public laws that govern Plaintiffs' substantive contract-based claims. After determining that Plaintiffs' breach of contract claims against the Republic fail as a matter of Argentine law, we conclude with a discussion of their promissory estoppel claims against the Republic and remaining claims against YPF.

## I. *Threshold Issues*

The Republic advances several arguments for reversal that we address prior to the merits. We first discuss the Republic's challenge to Plaintiffs' standing based on the timing of when the Republic's obligation to tender was triggered, and conclude that Plaintiffs do have standing to bring suit. We next consider the Republic's threshold arguments that these two cases should never have been adjudicated in a United States court based on *forum non conveniens* and

international comity-based abstention, and conclude that we need not decide whether the district court abused its discretion in its application of either doctrine given the procedural posture of these cases and our decision to reverse on the fully briefed and litigated merits.

A.      *Standing*

As a preliminary matter, we agree with the district court that Plaintiffs have standing to bring their breach of contract claims against the Republic.  Section 28 of YPF's Bylaws extends the tender offer requirement to "all acquisitions made by the National Government, whether directly or indirectly" that result in the government "becom[ing] the owner, or exerci[sing] the control of" an aggregate 49% of YPF's common stock.  Joint App'x at 674 § 28(A).  The Republic argues that the "acquisition[]" triggering the obligation to tender did not occur until the Republic formally received title to the expropriated Repsol shares in May 2014, at which point Plaintiffs no longer held YPF shares and thus no longer had standing to pursue these claims because they lacked a concrete stake in the outcome of the litigation.

We disagree.  The Republic at least "indirectly" owned or controlled the shares it expropriated from Repsol upon passage of the YPF Expropriation

Law two years earlier in May 2012.  The YPF Expropriation Law authorized the seizure of 51% of YPF's shares held by Repsol, pushing the Republic's ownership of YPF over the 49% threshold required to trigger the tender obligation in § 28(A) that forms the basis of Plaintiffs' claims.  Although the YPF Expropriation Law did not formally deliver title of the shares to the Republic, it explicitly granted the Republic the authority to "exercise all the political rights associated with the shares subject to expropriation until the transfer of political and economic rights is completed" -- that is, until the time period to settle expropriation-related compensation set out under Argentina's General Expropriation Law elapsed, at which point the shares would be formally transferred.  YPF Expropriation Law art. 9 (Sp. App'x at 241).  Indeed, the YPF Expropriation Law stipulated that the Republic's authority to "exercise . . . rights associated with the shares" was for the specific purpose of "ensur[ing] compliance with [the law's] objectives" -- that is, the objective of renationalizing YPF by controlling the majority of its common stock.  *Id.*  And the Republic clearly did "exercise the control of" those shares, by cancelling dividend payments and shareholder meetings, voting the shares at the June 4, 2012 shareholder meeting, and, at the very least, depriving Repsol of the ability to exercise rights associated with the shares it had formerly controlled.

Accordingly, the Republic exercised control of 51% of YPF's common stock when the YPF Expropriation Law was enacted in May 2012, thus triggering its obligation to conduct a tender under § 28(A) of the Bylaws. It is undisputed that Plaintiffs held YPF shares when the YPF Expropriation Law went into effect. Plaintiffs therefore have standing to bring their contract-based claims based on the Republic's noncompliance with § 28(A).

**B.      Forum Non Conveniens** *and International Comity*

The Republic next asserts that the district court should have dismissed these cases at the outset under the doctrine of *forum non conveniens* and the principle of abstention based on international comity.

Although Plaintiffs' substantive legal claims are governed by Argentine law, *see infra* Part II.B, the Republic's threshold arguments based on *forum non conveniens* and international comity are governed by U.S. federal law. *See Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 509 (1947) (adopting doctrine of *forum non conveniens* as a matter of federal law); *Royal & Sun All. Ins. Co. of Canada v. Century Int'l Arms, Inc.*, 466 F.3d 88, 92-94 (2d Cir. 2006) (discussing abstention based on international comity as a matter of federal law).

The principle of *forum non conveniens* provides an exception to the established rule that federal courts have a "virtually unflagging obligation . . . to exercise the jurisdiction given them." *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976).  The district court assessed whether to exercise this exception twice in this case -- first in response to Defendants' initial motion to dismiss, and again in response to Defendants' renewed motion to dismiss following our decision in the FSIA interlocutory appeal.  In conducting the second analysis, the district court reasoned, under the three-part test set forth in *Iragorri*, 274 F.3d at 71-75, that the addition of New York-based Eton Park increased the deference warranted to Plaintiffs' choice of forum, private interests in favor of litigating in the Republic were neutral, and the public interests "weigh[ed] heavily in favor of litigation in New York." *Petersen III*, 2020 WL 3034824, at *14.

We acknowledge that there are serious forum-related issues presented by these cases -- the propriety of the Republic's decision to "take" the property of a Spanish company under Argentine law has now been litigated in a U.S. court for ten years.  Nonetheless, our Court has explained that *forum non conveniens* is a non-jurisdictional doctrine, the application of which "lies wholly

- 26 -

within the broad discretion of the district court." *Iragorri*, 274 F.3d at 72 (citing

*Scottish Air Int'l, Inc. v. British Caledonian Group, PLC*, 81 F.3d 1224, 1232 (2d Cir.

1996)). Accordingly, we review *forum non conveniens* rulings for abuse of

discretion, *see Esso Expl. & Prod. Nigeria Ltd. v. Nigerian Nat'l Petroleum Corp.*, 40

F.4th 56, 70 (2d Cir. 2022), and parties challenging such rulings after a full trial on

the merits must display "substantial prejudice" warranting reversal. *Indasu Int'l,*

*C.A. v. Citibank, N.A.*, 861 F.2d 375, 380 (2d Cir. 1988); *see also In re Air Crash*

*Disaster Near New Orleans*, 821 F.2d 1147, 1168 (5th Cir. 1987) (reasoning that "the

trial's occurrence and completion bolsters the district court's original decision to

deny the motion to dismiss" based on *forum non conveniens*), *vacated on other*

*grounds, Pan American World Airways, Inc. v. Lopez*, 490 U.S. 1032 (1989).[7]

Given the latitude afforded to district courts on *forum non conveniens*

determinations, the reality that we are reviewing this decision *after* a trial has

been conducted and final judgment has been entered, and our ruling on the

merits, we need not decide whether the district court abused its discretion here

in a manner that satisfies the high bar for reversal in this procedural posture.

---

[7]    Moreover, it is exceedingly rare for our Court to reverse a district court's decision
to *deny* a motion to dismiss based on *forum non conveniens* at any stage of litigation. *See*
*Figueiredo Ferraz E Engenharia de Projecto Ltda. v. Republic of Peru*, 665 F.3d 384, 400 (2d
Cir. 2011) (Lynch, J., dissenting).

The district court also rejected the Republic's argument -- presented as a component of the *forum non conveniens* argument below and as a standalone argument on appeal -- that Plaintiffs' suits were precluded by abstention principles based on international comity. We typically review an international comity ruling for abuse of discretion, but have noted that because such rulings implicate a district court's "decision to abstain from exercising jurisdiction," our inquiry is "more rigorous" and has "little practical distinction" from *de novo* review. *Royal & Sun*, 466 F.3d at 92 (citation modified).

On the Republic's telling, it has a strong sovereign interest in adjudicating these cases, as expressed by its existing statutory framework for resolving expropriation-related claims, requiring the district court to "surrender" its jurisdiction even in the absence of a parallel proceeding in Argentine court. *Cf. id.* at 93-94 (setting forth a series of non-exhaustive factors that may constitute "exceptional circumstances" as required to justify abstention where there are pending parallel proceedings in a foreign court). Again, however, the merits of Plaintiffs' claims have been fully decided by a district court and extensively briefed on appeal. Accordingly, we also decline to decide whether international comity concerns warranted abstention here.

- 28 -

Because we ultimately conclude that Plaintiffs' claims fail as a matter of Argentine law, we need not -- and indeed do not -- rest our conclusions on the Republic's threshold arguments about the propriety of conducting this litigation in a U.S. court. Assuming without deciding that proceeding in Plaintiffs' choice of forum was permissible, we nevertheless reverse the district court's decision on the merits of Plaintiffs' primary breach of contract claims as a matter of substantive Argentine law.

## II.     The Merits

### A.     Standard of Review

The district court's interpretation and application of foreign law is reviewed *de novo*. *Animal Sci. Prods., Inc. v Hebei Welcome Pharm. Co.*, 585 U.S. 33, 42 (2018). While we give "respectful consideration" to the Republic's interpretation of its own law, we are "not bound to accord conclusive effect" to its statements, and instead "may consider any relevant material or source" in making our determination *de novo*. *Id.* at 36 (*citing* Fed. R. Civ. P. 44.1).

We review the district court's decision to grant summary judgment on the breach of contract claim *de novo*, "construing the evidence in the light most favorable to the party against whom summary judgment was granted and

drawing all reasonable inferences in that party's favor."  *Unkechaug Indian Nation v. Seggos*, 126 F.4th 822, 828 (2d Cir. 2025) (citation modified).  "Summary judgment is required if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *Id.*

Finally, we review the district court's dismissal of Plaintiffs' promissory estoppel claims under Rule 12(b)(6) *de novo* as well.  *See Ezrasons, Inc. v. Travelers Indem. Co.*, 89 F.4th 388, 394 (2d Cir. 2023).

### B.  *Argentine Legal Framework*

The parties agree that Plaintiffs' substantive legal claims -- that is, their breach of contract and promissory estoppel claims -- are governed by Argentine law.  YPF is incorporated under the laws of the Republic, and the Bylaws contain a choice of law clause providing that they, and any claims arising from them, are "governed by Argentine law."  Joint App'x at 519.  We apply New York choice of law rules, *see Thea v. Kleinhandler*, 807 F.3d 492, 497 (2d Cir. 2015), under which questions related to the "internal affairs" of a corporation -- including those involving the relationship between a company and its shareholders -- are generally "decided in accordance with the law of the place of

- 30 -

incorporation." *Scottish Air*, 81 F.3d at 1234; *see also Eccles v. Shamrock Cap.*

*Advisors*, 245 N.E.3d 1110, 1122-23 (N.Y. 2024).

Accordingly, we begin with an overview of the Argentine legal

codes implicated by Plaintiffs' claims. First, we summarize the relevant

Argentine civil and commercial codes and, second, we summarize the Argentine

General Expropriation Law.

### 1. Argentine Civil and Commercial Codes[8]

The primary Argentine legal codes at issue are the Argentine Civil

Code and Commercial Code, which outline the relevant doctrines of Argentine

contract and corporate law, respectively.[9] Under the Civil Code, contracts are

categorized as "unilateral" or "bilateral." Código Civil [Cód. Civ.] [Civil Code]

art. 1138 (Sp. App'x at 208). These definitions mirror those in U.S. common law:

---

[8] Unless otherwise noted, we rely throughout this opinion on the English translations of Argentine legal materials that the Republic provided in the Special Appendix and Joint Appendix. Plaintiffs have not provided any additional translations on appeal. The parties disagree over the translation of one provision of the Argentine Civil Code -- Article 653 -- that we do not address here. The record before us does not indicate any dispute over the proffered translations of the legal materials discussed in this decision.

[9] The Republic's Civil and Commercial codes were merged into a single code in August 2015. *See* Código Civil y Comercial de la Nación, Law No. 26,994, Oct. 7, 2014, [CXXII] B.O. 32985 Suplemento. The translations provided by the parties in the Special Appendix and Joint Appendix appear to reference the pre-2015 codes, which governed at the time Petersen filed its Complaint in April 2015.

Unilateral contracts are "those in which only one of the parties undertakes an

obligation with respect to the other," while bilateral contracts are "those in which

both parties to the contract assume *reciprocal obligations*." *Id.* (emphasis added).

The two types of contractual obligations have different corresponding remedial

mechanisms. If a party has not performed its promise "in contracts with

reciprocal obligations" -- that is, in a bilateral contract -- the non-breaching party

"may demand that the non-performing party fulfill their obligation" -- that is,

demand specific performance. Cód. Civ. art. 1204 (Sp. App'x at 205); *accord*

Código de Comercio [Cód. Com.] [Commercial Code] art. 216 (Sp. App'x at

210).[10] Then, if a waiting period has elapsed "without the obligation being

---

[10]     Contrary to Plaintiffs' contention, the breach of contract claims as framed by Plaintiffs are governed by Article 1204 of the Civil Code and Article 216 of the Commercial Code. Plaintiffs argue repeatedly in their briefs that the Bylaws constituted a bilateral contract between the Republic and YPF's minority shareholders. If the Bylaws are a bilateral contract, then they are governed by Articles 1204 and 216, which expressly apply to "contracts with reciprocal obligations." Cód. Civ. art. 1204 (Sp. App'x at 205); *accord* Cód. Com. art. 216 (Sp. App'x at 210). Moreover, the breach of contract cases cited by the Republic are all governed by Article 216 of the Commercial Code, which is worded identically to Article 1204 of the Civil Code in the translations provided by the parties. *See* Cámara Nacional de Apelaciones en lo Comercial de la Capital Federal [CNCom.] [National Court of Commercial Appeals of the Federal Capital], Chamber A, 2010/06/10, "Lipnik, Alberto Teodoro v. Constructora San José the Republic S.A.," L.L. Online, AR/JUR/32215/2010 (Arg.) (Sp. App'x at 369-70), CNCom., Chamber A, 1999/08/31, "Lezcano, Juan C. v. Arismendi S.C.S.," La Ley [L.L.] (2000-D-

fulfilled," the contract is terminated and the non-breaching party "shall have the right to seek compensation for damages."  Cód. Civ. art. 1204 (Sp. App'x at 205); *accord* Cód. Com. art. 216 (Sp. App'x at 210).

The Commercial Code also contains the General Companies Law ("GCL"), which sets forth Argentine corporate governance law.  *See* Law No. 19,550, Apr. 25, 1972, [LXXX] B.O. 22409, as amended.  The GCL provides, among other things, a process by which a company's shareholders may challenge actions that violate the corporation's bylaws.  Shareholders representing at least 5% of the capital stock can convene a special shareholder's meeting to challenge a decision made in violation of the bylaws.  At that meeting, shareholders can challenge any resolution adopted in contravention of the bylaws as void, and then bring legal action against the company within three months of the meeting. If the adopted resolutions are ultimately deemed void, the shareholders who voted in favor of it face joint and several liability.

---

12) (Arg.) (Sp. App'x at 344-45).  Although we need not decide whether Plaintiffs were required to seek specific performance before suing the Republic for damages, we conclude, for purposes of determining whether these claims are cognizable under Argentine law, that Articles 1204 and 216 apply to the contract-based claims that Plaintiffs have advanced.

- 33 -

### 2. Argentine General Expropriation Law

Despite Plaintiffs' effort to cast this as an ordinary breach of contract dispute between two corporate shareholders, it is evident that this case is not so simple. Plaintiffs' claims -- even if styled as typical contractual claims -- arise from the Republic's renationalization of YPF through an act of expropriation. They therefore necessarily implicate the Republic's public law regime in addition to its private law civil codes.

Article 17 of the Argentine Constitution provides that the government may expropriate property if such an expropriation has been "authorized by law" and the owners of the property have been "previously compensated." Art. 17, Constitución Nacional [Const. Nac.] (Arg.) (Sp. App'x at 195). The procedures, conditions, and remedies for expropriation are governed by the General Expropriation Law ("GEL"). *See* Law No. 21,499, Jan. 17, 1977, [LXXXV] B.O. 23581. Article 4 of the GEL provides:

> Property of any kind that is suitable or necessary for the satisfaction of the "public utility," irrespective of its legal nature, may be the subject of expropriation, including assets in the public or private domain, whether they qualify as things or otherwise.

GEL art. 4 (Sp. App'x at 229).

Although the government may make such a "public utility" determination to effectuate an expropriation, it must also pay the owner of the expropriated property compensation that "include[s] only the objective value of the asset and the damages that are a direct and immediate consequence of the expropriation." GEL art. 10 (Sp. App'x at 230).

The amount of this compensation is determined pursuant to a process laid out in the GEL. If the expropriator and property owner cannot agree on the amount of compensation, the expropriator can bring judicial action within two years of the authorizing law going into effect to fix the value of the property taken. While this two-year clock for judicial action is running, Article 28 of the GEL provides that:

> No action by third parties may impede the expropriation or its effects. The rights of the claimant shall be considered transferred from the thing to its price or to the compensation, leaving the thing free of any encumbrance.

GEL art. 28 (Sp. App'x at 233).

With these Argentine legal codes in mind, we now turn to the merits of Plaintiffs' contract-based claims against the Republic.

- 35 -

C.          *Plaintiffs' Claims Against the Republic*

The crux of this ten-year-old litigation is Plaintiffs' breach of contract claims against the Republic for damages arising from the Republic's failure to conduct a tender offer upon expropriation.  Plaintiffs also argue, in essence, that if the Court rules for the Republic on their breach of contract claims, then it should revive the promissory estoppel claims that were dismissed at the Rule 12(b)(6) stage.  We address each set of claims in turn.

1.          **Breach of Contract**

We turn to the merits of Plaintiffs' breach of contract claims against the Republic with two overarching observations in mind.

First, under Argentine law, as under United States law, corporate bylaws are not generally understood to create bilateral obligations among shareholders of a company that are enforceable under contract law, even if they set forth a contractual relationship among those shareholders.  As one of the Republic's experts explained, bylaws are a "plurilateral organizational contract" and thus "do not create specific bilateral obligations between shareholders."  Joint App'x at 1561-62.  Although bylaws are often colloquially referred to, including in U.S. law, as "contracts" among shareholders, that analogy holds to the extent

that, for example, the meaning of their text is discerned through traditional tools

of contract interpretation.  *See, e.g., Centaur Partners, IV v. Nat'l Intergroup, Inc.*,

582 A.2d 923, 928 (Del. 1990) (reasoning that bylaws are "contracts among the

shareholders of a corporation" in that "the general rules of contract interpretation

are held to apply"); *see also* Joint App'x at 3438-40 (YPF's Expert Report

explaining the limits of the "contract" metaphor under Argentine law from a

comparative lens).

The primary function of corporate bylaws, however, is to provide a

set of rules governing a corporation's internal operations, rather than to stipulate

a set of legal obligations owed by the contractual parties to one another.  *See* Joint

App'x at 1561 (Republic's Expert Report explaining that bylaws are "rules that

govern how a company functions"), 3437 (YPF's Expert Report explaining that

bylaws provide the "governance rules of corporations"); *see also Hollinger Intern.,*

*Inc. v. Black*, 844 A.2d 1022, 1078-79 (Del. Ch. 2004) ("Traditionally, the bylaws

have been the corporate instrument used to set forth the rules by which the

corporate board conducts its business.").  It follows, then, that the comparison of

- 37 -

bylaws to contracts for purposes of textual interpretation does not automatically

import the host of contract-based *remedies* to the bylaws context.[11]

Second, as noted above, this is not a run-of-the-mill civil contract

dispute between two private parties. Instead, Plaintiffs' claims against the

Republic arise from, and are being litigated in the shadow of, a governmental

expropriation.[12] These damages suits -- even if styled as ones brought to

remediate contract-based injuries -- thus necessarily implicate the GEL, which, by

---

[11]     Although not dispositive, amici also note that at least two U.S. courts have rejected, as a matter of state law, shareholder-versus-shareholder breach of contract claims based on corporate bylaws akin to Plaintiffs' claims. *See* Brief of Amicus Curiae Law Professors in Support of Defendant-Appellant-Cross-Appellee at 8-11, *Petersen Energía Inversora S.A.U. v. Argentine Republic*, *YPF S.A.* (2d Cir. 2025) (No. 23-7370-cv) (discussing *Quantum Tech. Partners II, L.P. v. Altman Browning & Co.*, No. 08-CV-376-BR, 2009 WL 4826474 (D. Or. Dec. 8, 2009), *aff'd*, 436 F. App'x 792 (9th Cir. 2011) (applying Delaware law), and *In re Pearl*, No. 16-20305, 2017 WL 932951 (Bankr. E.D. Ky. Mar. 8, 2017) (applying Kentucky law)).

[12]     Contrary to Plaintiffs' contention, our decision in the FSIA interlocutory appeal does not preclude our recognition that these cases were brought following an act of expropriation. In our prior decision, we held that Petersen's claims were "based on" the Republic's breach of a commercial obligation that had a direct effect on the United States, such that the claims fell within the FSIA's commercial activity exception. *See Petersen II*, 895 F.3d at 207, 211. This was true even if the Republic's "obligation to conduct a tender offer . . . was *triggered* by its sovereign act of expropriation." *Id.* at 207 (emphasis added). But our holding that an act was not "sovereign" for purposes of determining whether a U.S. court had subject matter jurisdiction under the FSIA does not mean, by necessity or by implication, that the act does not implicate foreign public law that governs actions performed by a sovereign, including acts of expropriation by a sovereign government.

- 38 -

its plain language and purpose, serves as the primary legal framework governing expropriation under Argentine law.

Taking these observations into consideration, we now reverse the decision of the district court for two independent reasons. First, under Argentine civil law, the Bylaws did not create bilateral promises giving rise to a contractual obligation on the part of the Republic to YPF's other shareholders, including to Plaintiffs. Second, even assuming the Bylaws did create a bilateral contract, Plaintiffs' breach of contract claims for damages are precluded by the Republic's public law governing expropriation.

### a. Argentine Contract Law

The principles of contract interpretation under Argentine law mirror those of U.S. common law. Argentine law instructs courts to look to the objective plain meaning of contractual language, as it is understood "according to general usage." Cód. Com. art. 217 (Sp. App'x at 210). If the contractual language is clear and unambiguous, it "cannot be modified by interpretations based on the spirit of the clauses, presumed intention of the parties or the purposes pursued." Cámara Nacional de Apelaciones en lo Comercial de la Capital Federal [CNCom.] [National Court of Commercial Appeals of the Federal Capital], Chamber B, 1997/12/30, "Motta v. Abraxas Construcciones," La Ley

[L.L.] (1998-F-283) (Arg.) (Joint App'x at 2945).

The elements of a breach of contract claim under Argentine law are "(1) the existence of a valid and binding contract; (2) a breach of that contract; (3) damages to the plaintiff; (4) that the damages were attributable to the breaching party; and (5) the breaching party acted negligently or willfully or was subject to strict liability." *Petersen IV*, 2023 WL 2746022, at *6. For a breach claim to be valid, therefore, there must be a "valid and binding contract" between the parties; here, there would have to be a valid contract between Plaintiffs and the Republic in the latter's capacity as a shareholder of YPF. Accordingly, the question is whether § 7 and § 28(A) of YPF's Bylaws create the type of "valid and binding contract" between two corporate shareholders that gives rise to a valid breach of damages claim under Argentine law.

The definition of a bilateral contract under Argentine law is parallel to that under U.S. common law. *See* Cód Civ. art. 1138 (Sp. App'x at 208) (defining bilateral contracts as "those in which both parties to the contract assume reciprocal obligations"); *cf.* 1 Williston on Contracts § 1:18 (4th ed. 2025) ("A bilateral contract exists when both parties exchange mutual or reciprocal promises."). The defining feature of a bilateral contract under Argentine (and

- 40 -

U.S.) law is the existence of "reciprocal obligations," such as promises between contractual parties to provide goods or services in exchange for payment. *See, e.g.,* "Lipnik," L.L. Online, AR/JUR/32215/2010 (Sp. App'x at 346) (contractor suing for unpaid fees after a construction company failed to pay its work progress certificate); "Lezcano," L.L. (2000-D-12) (Sp. App'x at 344) (plaintiff suing for damages and losses incurred due to a defendant's unilateral breach of an oral distribution agreement). Bilateral contracts under Argentine law thus resemble what we commonly understand in U.S. common law as contracts resulting from agreements "containing mutual promises imposing some legal duty or liability on each promisor." 1 Williston on Contracts § 1:18.

As noted above, corporate bylaws, on the other hand, do not typically contain "mutual promises" that a corporation's shareholders owe to one another, and are instead more aptly understood as creating a set of multilateral rules between the corporation and its shareholders that dictate the internal governance of the corporate entity. One of the Republic's commercial appellate courts has explained that, under Argentine law, "the rights and the obligations of the [shareholders] revolve around their relations with the legal subject called the company," rather than "in relation to each one of the other [shareholders]

- 41 -

individually . . . ."  CNCom., Chamber A, 1999/10/22, "Gatti, Ernesto Ignacio and other v. Bulad, Alfredo Ragueb s/ summary," El Derecho [E.D.] (2000-188-694) (Arg.) (Sp. App'x at 335).  Consistent with *Gatti*'s articulation of the nature of corporate bylaws under Argentine law, we have previously described YPF's Bylaws as a "contract governing the relationship among YPF, [the Republic] (in its capacity as a shareholder), and other YPF shareholders."  *Petersen II*, 895 F.3d at 199.  Neither *Gatti*'s explanation of the general operation of corporate bylaws under Argentine law nor our formulation of YPF's Bylaws specifically in *Petersen II* suggest that they would create bilateral obligations between shareholders that are enforceable through a contract-based damages suit.

Plaintiffs acknowledge that corporate bylaws generally do not give rise to bilateral obligations, but argue that they *could* do so if they contained specific duties owed by certain shareholders to others.  Section 28(A) of the Bylaws, Plaintiffs contend, does just that by specifically articulating an obligation owed by one shareholder (the Argentine government) to others (the minority shareholders) upon the occurrence of a contractually specified condition (a renationalizing transaction).  *See also Petersen IV*, 2023 WL 2746022, at *12 (reasoning that "the Republic promised security holders that *it* would provide

- 42 -

*them* with a compensated exit if it reacquired control over the requisite number of shares").

Even assuming corporate bylaws *could* contain embedded bilateral obligations under Argentine law, there are no such obligations created by § 28(A). To be sure, § 28(A) singles out the Republic among all other current or potential YPF shareholders, stating that that the tender offer requirements "shall apply to all acquisitions made by the National government" that result in the Republic cumulatively holding 49% or more of YPF's shares. Joint App'x at 674 § 28(A). But the only reason the "National government" is mentioned by name in § 28(A) is because the section contains a higher triggering share percentage than what applies to ordinary acquirers under § 7(d). In other words, the purpose of specifically naming the Republic in § 28(A) is to establish a higher threshold for the size of the control block the Republic can acquire before it must conduct a tender, rather than to create a specific bilateral obligation that it owes to the minority shareholders. This is underscored by the fact that § 28(A) never names the minority shareholders as beneficiaries of or counterparties to the tender offer requirement. Indeed, if we were to view § 28(A) -- or even the Bylaws as a whole -- as establishing a set of "reciprocal obligations," it is difficult to identify what

- 43 -

the minority shareholders would owe as a "mutual promise" to the Republic in exchange for the Republic's obligation to tender.

Moreover, Plaintiffs and their experts have not cited to any Argentine cases, below or on appeal, that recognize a breach of contract suit between shareholders arising out of a violation of corporate bylaws. And indeed, Plaintiffs' chosen cause of action and remedy were not pursued by the many other similarly situated YPF minority shareholders, who, rather than bringing contract-based damages claims following the expropriation, instead attempted to enforce § 28(A) through Argentine corporate law mechanisms. YPF's other minority shareholders objected to the Republic's attempt to participate in the June 4, 2012 shareholders' meeting, then filed suit in the Argentine courts to nullify shareholder resolutions passed at that meeting as adopted in violation of the Bylaws -- all in accordance with the GCL's procedure for challenging actions that violate a company's bylaws.

Perhaps it is true that, as Plaintiffs argue, the Republic made "uniquely clear promises" in these Bylaws and committed a "uniquely egregious breach" by flagrantly refusing to conduct a tender offer to YPF's many private investors who had bought assuming they would be protected from

- 44 -

renationalization.  Plaintiffs' Br. at 51.  But in interpreting the unambiguous language of § 28(A) in accordance with its "general usage," and in the absence of Argentine authority guiding us otherwise, we decline to find a reciprocal obligation in § 28(A) that is enforceable in a contract-based damages suit brought by one corporate shareholder against another.

### b. The General Expropriation Law

Our interpretation of the Bylaws is based on the "general usage" of the language of § 28(A).  But it is also informed by the context of the governmental expropriation from which these claims arise.  Accordingly, even if bylaws could create reciprocal obligations, and even if we assumed § 28(A) does so, Plaintiffs' claims would nonetheless be precluded by the GEL -- the Republic's public law governing expropriation.

We are unpersuaded by Plaintiffs' argument that this case does not implicate the GEL, which establishes a comprehensive procedure for resolving claims arising from expropriation.  Although we need and do not decide whether the GEL displaces the private contract law of the Civil Code, the subject and substance of the GEL certainly suggest that these claims implicate Argentine public law.  *See* Cód Civ. art. 2611 (Sp. App'x at 206) (providing that "[r]estrictions imposed on private ownership solely in the public interest are

- 45 -

governed by Administrative Law").  Moreover, when YPF's other minority

shareholders sought a judicial order from an Argentine court to compel the

Republic to conduct a tender offer shortly after the expropriation, the Republic's

highest federal court stated that it was "clear that the aspects of administrative

law" -- that is, the GEL -- "are of primary relevance to the resolution of this case."

Corte Suprema de Justicia de la Nación [CSJN] [National Supreme Court of

Justice], 2014/08/20, "De San Martín, José et al. v. EN – PEN," S.C. Comp. 731. L.

XLIX (Arg.) (Sp. App'x at 255).[13]  Plaintiffs' claims -- though seeking damages for

breach of contract, rather than an order to compel the execution of the tender

offer -- stem from the same expropriation and failure to tender by the Republic,

thus also implicating the GEL.

Moreover, the GEL clearly contemplates the possibility of parties

bringing judicial action against the expropriator in the aftermath of an

expropriation.  In anticipation of this reality, the GEL explicitly forecloses actions

"by third parties [that] impede the expropriation or its effects" while the

---

[13]     *De San Martín* is not wholly dispositive of the question presented here because it was a jurisdictional rather than merits determination, and because the *De San Martín* plaintiffs sought to enforce the Bylaws by compelling the Republic to conduct the required tender offer.  Here, by contrast, Plaintiffs seek damages resulting from the Republic's failure to tender, rather than seeking to compel specific performance.

expropriator and property owner determine the amount of compensation owed

to the owner. GEL art. 28 (Sp. App'x at 233). The GEL's preclusion of third-party

lawsuits was likely intended to mitigate the fallout from the exact kinds of claims

brought by Plaintiffs here, which have clearly "impede[d]" the Republic's

expropriation of Repsol's shares by subjecting the Republic to protracted

litigation regarding the propriety of its actions, imposing costs on the Republic

beyond those assessed in connection with the expropriation itself, and ultimately

rendering the Republic's control of the shares uncertain. *See Petersen Energía*

*Inversora, S.A.U. v. Argentine Republic*, No. 15 Civ. 02739, 2025 WL 1796392, at *1

(S.D.N.Y. June 30, 2025) (granting transfer of the Republic's YPF shares in

satisfaction of the judgment).

It is true that, as Plaintiffs argue, the tender offer requirement did

not literally bar the expropriation, because the Republic did successfully deprive

Repsol of control over 51% of its shares and eventually take title to them. But it

is difficult to conclude that the evident consequences of Plaintiffs' lawsuits,

which have saddled the Republic with ten years of litigation and a damages

award representing 45% of its annual national budget, fall outside the plain

meaning of "impede." These cases -- which functionally seek to extract payment

for the Republic's seizure of Repsol's shares to the tune of $16.1 billion -- have undoubtedly "interfere[d] with" the act of expropriation, even if they did not actually prevent its completion.

The Republic also points to several other Argentine cases in which Argentine courts have held that GEL article 28 renders impermissible private contractual conditions that interfere with a properly declared expropriation, even if they do not literally prevent its occurrence. In one case, the Argentine National Supreme Court of Justice held that the plaintiff could not enforce a contractual provision requiring the city to give five years' notice before an expropriation, because doing so "would entail conditioning the State in the exercise of its irrevocable discretion to establish the moment at which the public interest [in expropriation] exists." CSJN, 1975/04/14, "Sociedad de Electricidad de Rosario," Fallos (1975-291-290) (Arg.) (Sp. App'x at 312). There, the court explained that "the expropriation itself is not a negotiable issue [between the parties], since its public nature does not reconcile with the free will representing contractual negotiations." *Id.* Accordingly, the decision to expropriate overrode any existing contractual conditions to the extent they would affect or "impede" the expropriation, even if the parties may negotiate "the determination of a fair

compensation for the expropriation" pursuant to the process laid out in the GEL. *Id.* In another case, the Supreme Court invalidated a contract obligation requiring the government to build two crossings over the land it expropriated under GEL article 28's identically worded statutory predecessor, reasoning that the expropriator was instead required to compensate the owner for such encumbrances out of the value of the expropriated property. *See* CSJN, 1911/11/21, "Ferrocaril Central Argentino v. L. de Fusse," Fallos (1912-115-59) (Arg.) (Sp. App'x at 283).

As these cases illustrate, GEL article 28 precludes private suits brought in the wake of expropriation based on existing contractual obligations to the extent fulfillment of those obligations would "impede," or interfere with, the expropriation. It instead channels those disputes into the compensation-setting mechanism set forth elsewhere in the GEL. Perhaps Plaintiffs could have sought compensation by bringing a claim against the Republic under the GEL's procedures, or more likely against Repsol's $5 billion global settlement with the Republic, given it was Repsol's YPF shares that were "taken" through the expropriation. We do not opine on whether Plaintiffs should have done so. We merely conclude that these claims for contract-based damages -- even if they

were cognizable under Argentine contract and corporate law -- likely "impede the expropriation or its effects," and are thus barred under the text and purpose of the GEL.  GEL art. 28 (Sp. App'x at 233).

*　　*　　*

At the end of the day, none of the parties involved in these two cases dispute that the Republic violated YPF's Bylaws.  The Republic did so after tying its own hands with a tender offer requirement and repeatedly "tout[ing] these protections" in its IPO prospectus and SEC filings in the 1990s.  *Petersen II*, 895 F.3d at 200.  Its reason for doing so was plainly to assure private investors -- many of whom were based in the United States -- that they would be protected in the event the Republic decided to renationalize the country's largest oil and gas company if the economic and political winds ever shifted, just as they did in the early 2010s.  It may well be that the Republic would not have been able to raise $1.1 billion from YPF's NYSE-listed ADRs without these investor protections.  And its refusal to honor those protections two decades after making them cast doubt on the security of foreign investment in the country more broadly.

Despite these factual realities, however, we are faced now with the narrow legal question of whether the cause of action that Plaintiffs brought and the remedy they seek in the face of the Republic's actions are permitted under

Argentine law. Notwithstanding the Republic's knowing and flagrant violation

of the promises it made to foreign investors, the answer to that question is no.[14]

But to the extent that the Republic committed a wrong against the shareholders it

promised to protect, Argentine law did not leave YPF's minority shareholders

without any remedy -- Plaintiffs could have sought, and indeed other

shareholders did seek, to enforce the Bylaws' protections in Argentine court

through causes of action recognized under Argentine law.

### 2. Promissory Estoppel

The district court did not err in dismissing Petersen's promissory

estoppel claim against the Republic under Rule 12(b)(6).[15] This claim also fails as

a matter of Argentine law. Promissory estoppel is not "an autonomous source of

---

[14] As the dissent notes, the district court has presided over these difficult and lengthy cases for over a decade. *See* Dissent at 3-4. And we agree with the dissent's observation that, in the process of adjudication, the district court has engaged deeply with complex questions of Argentine law that are now the subject of our review. *See id.* Nonetheless, given our ability to "find and apply foreign law" in the first instance, *Curley v. AMR Corp.*, 153 F.3d 5, 12 (2d Cir. 1998), our conclusion stands, especially as we are doing so on substantially the same factual record as was before the district court. *Cf. Bugliotti v. Republic of Argentina*, 952 F.3d 410, 414 (2d Cir. 2020) ("[C]onsiderations of judicial economy will occasionally lead us to remand rather than review a foreign legal question with which the district court did not, or did not fully, engage.").

[15] Eton Park brought its suit after the district court had dismissed Petersen's promissory estoppel claims against Argentina and YPF, and did not assert separate estoppel claims against either Defendant.

- 51 -

an obligation" separate from a breach of contract claim, and is otherwise precluded by the existence of a contractual relationship between the parties. Sp. App'x at 46 (quoting Joint App'x at 250, 338). Petersen argues that if we conclude that the Bylaws did not create a contractually binding obligation on the part of the Republic, then promissory estoppel should provide an "alternative basis" for liability. Plaintiffs' Br. at 90. This argument, however, conflates our holding that the Bylaws do not create a bilateral obligation enforceable through a contract-based damages suit with a finding that the Bylaws do not constitute *any* sort of written contractual relationship between the parties, which, if true, may have permitted an estoppel claim. It also elides the fact that Plaintiffs still have not identified any "obligation" on the part of the Republic separate from the Bylaws provisions on which they premise their failed breach of contract claim, thus failing to plausibly plead an independent claim for promissory estoppel under Argentine law.[16]

---

[16] The Second Circuit case to which Plaintiffs cite that allows estoppel claims as an alternative to breach claims is irrelevant, because Plaintiffs' claims are not governed by New York law. *See* Plaintiffs' Br. at 90 (citing *Goldberg v. Pace Univ.*, 88 F.4th 204, 214-15 (2d Cir. 2023)).

**D.** *Plaintiffs' Claims Against YPF*

We conclude by briefly discussing Plaintiffs' breach of contract and promissory estoppel claims against YPF that were dismissed by the district court at earlier stages of this litigation.

The district court did not err in granting summary judgment for YPF on Plaintiffs' breach of contract claims. Looking to the language of §§ 7(d)-(f), 7(h), and 28 as understood "according to general usage," we do not find any affirmative obligation on the part of YPF to enforce the tender offer requirements or enforce sanctions against the Republic for failing to conduct a tender. Cód. Com. art. 217 (Sp. App'x at 210). [17] Section 7(d) states that if the terms of §§ 7(e)-(f) are not complied with, "it shall be forbidden to acquire shares . . . if, as a result of such acquisition, the purchaser becomes [a controlling shareholder]." Joint App'x at 651 § 7(d). This only places limitations on the purchasing shareholder, and does not create an obligation on the part of YPF. Section 7(e) states that "the bidder" wishing to conduct a control acquisition must "(i) [o]btain

---

[17]    For the same reasons as noted above with regard to the claims against the Republic, this conclusion is not inconsistent with *Petersen II*, which only described the operation of the Bylaws as relevant to determining whether Defendant's actions fell within the FSIA's commercial activity exception, *see Petersen II*, 895 F.3d at 210, not whether those actions would create contractual liability for YPF under Argentine law.

- 53 -

the prior consent of [certain] class A shareholders" and "(ii) [a]rrange a takeover bid for all of the shares . . . ." *Id.* at 652 § 7(e). Again, this imposes obligations on the bidder, not on YPF. Section 7(f) sets out the required procedure for the tender offer, in which the only requirement of YPF is that "the Corporation shall send by mail to each shareholder . . . a copy of the notice delivered to the Corporation," *id.* at 653 § 7(f)(iii), which YPF correctly characterizes as a "narrow administrative task." YPF Br. at 29. Section 7(h) states that shares acquired in breach of the Bylaws "shall not grant any right to vote or collect dividends or other distributions." Joint App'x at 657 § 7(h). By its plain language and in context, this provision strips the rights of acquired shares, and does not create an enforcement prerogative on the part of YPF. And finally, § 28, which extends the tender offer requirements to the Republic, again imposes no obligations on YPF. *Id.* at 674 § 28(A).

We are not persuaded by Plaintiffs' arguments to the contrary. For example, the fact that YPF or its Board could not enforce the Bylaws does not mean that no one can. If anything, the remedial scheme set out by the GCL suggests that this ability lies in the hands of YPF's minority shareholders -- some of whom *did* seek to compel a tender offer by challenging the Republic's exercise

- 54 -

of the expropriated shares at a shareholder's meeting, then bringing action in Argentine court. And the fact that YPF assured investors of the tender offer requirement in its IPO Prospectus is inapposite to the question of whether YPF had an obligation to enforce that requirement.

Even if the Bylaws did create a contractual obligation on the part of YPF, Plaintiffs' breach of contract claims against YPF have the same fundamental defect as their claims against the Republic -- these claims are not cognizable under Argentine law. Just as Argentine law likely does not authorize damages suits between shareholders for a breach of corporate bylaws, it also likely does not recognize suits brought by a shareholder against a *corporation*. That makes good sense, because allowing individual shareholders to sue a corporation for damages would "allow shareholders to transform themselves into standard creditors of the corporation" and deplete corporate assets at the expense of other shareholders. Joint App'x at 3451.

Finally, Petersen's promissory estoppel claims against YPF, which were dismissed at the motion to dismiss stage, fail for the same reasons as discussed above with the regard to the estoppel claims brought against the Republic. *See supra* Part II.C.2.

- 56 -

## *CONCLUSION*

For the foregoing reasons, we REVERSE the district court's entry of judgment for Plaintiffs on their breach of contract claims against the Republic, AFFIRM the district court's dismissal of the promissory estoppel claims against the Republic and YPF, AFFIRM the district court's grant of judgment for YPF, and REMAND for further proceedings consistent with this opinion.

*23-7370 (L); 23-7376 (L)*
*Petersen Energía Inversora et al. v. Argentine Republic, YPF S.A.;*
*Eton Park Cap. Mgmt. et al. v. Argentine Republic, YPF S.A.*

JOSÉ A. CABRANES, *Circuit Judge*:

I respectfully dissent.

The majority decision rests on an analysis of the corporate and expropriation law of the Republic of Argentina. Its opinion is a careful and respectful description of that complex body of law.

At this stage of the long-lived litigation the parties agree that the applicable substantive law is that of Argentina.

Under Fed. R. Civ. P. 44.1, "[a] court's determination [of foreign law] must be treated as a ruling on a question of law." It is thus not surprising that, as Judge Diane Wood, then of the Seventh Circuit, reminded us, "[r]easoning through foreign law is 'notoriously difficult, because the U.S. reader is likely to miss nuances in the foreign law, to fail to appreciate the way in which one branch of the other country's law interacts with another, or to assume erroneously that the foreign law mirrors U.S. law when it does not.'"[1]

As the majority opinion succinctly and accurately reports, "[t]he crux of this ten-year litigation is Plaintiffs' breach of contract claims against the Republic for damages arising from the Republic's failure to conduct a tender offer upon expropriation."[2]

For more than ten years, a distinguished judge of the Southern District has presided with meticulous care over the "factual realities"

---

[1] *Menghistab v. Garland*, 37 F. 4th 1240, 1246 (7th Cir. 2022).

[2] Op. at 35 (emphasis added).

that included complex arrangements designed to assure "private investors – many of whom were based in the United States – that they would be protected in the event the Republic decided to renationalize the country's largest oil and gas company if the economic and political winds ever shifted, just as they did in the early 2010s."[3]

The majority concludes that despite these "factual realities," we are required to limit our review of ten years of painstaking consideration of the law and facts on the ground by a demanding district judge to "the narrow legal question of whether the cause of action and remedy that Plaintiffs seek in the face of the Republic's actions is permitted under Argentine law."[4]

Lest we forget the "factual realities" that the majority opinion would have us minimize if not forget, I recall for the record some of the "factual realities" that make it impossible for me to join an otherwise outstanding majority opinion.

Over the course of more than ten years, the District Court heard about:

1. Argentina's forcible expulsion of YPF's board members from their premises;[5]

---

[3] *Id.* at 50.

[4] *Id.* at 50–51.

[5] Tr. of Trial at 296–97 (Aug. 15, 2023), *Petersen Energia Inversora, S.A.U. v. Argentine Republic*, No. 15 Civ. 2739, Dkt. No. 489.

2. "A well-founded fear of prosecution of [plaintiffs]' counsel if the instant action were brought in Argentina";[6]

3. Argentine law as expounded by experts of all parties;[7]

4. Argentina's own acknowledgement, calculation, and repudiation of its liabilities.[8]

Based on its close familiarity with the facts and law of the case, the District Court rejected Argentina's arguments as to breach of contract. Specifically, it held that the Republic had bilateral obligations towards the plaintiffs, enforceable under the Argentina Civil Code, remediable by damages, and not precluded by the General Corporations Law.[9] The District Court also found that Argentina's General Expropriation Law does not bar plaintiffs' claims. In reaching its conclusions, the District Court relied on, and cited, various expert reports.[10]

---

[6] *Petersen Energia Inversora, S.A.U. v. Argentine Republic*, 2016 WL 4735367, at \*12 (S.D.N.Y. Sept. 9, 2016), *aff'd in part, appeal dismissed in part sub nom. Petersen Energia Inversora S.A.U. v. Argentine Republic & YPF S.A.*, 895 F.3d 194 (2d Cir. 2018).

[7] *See generally Petersen Energia Inversora, S.A.U. v. Argentine Republic*, 2023 WL 2746022 (S.D.N.Y. Mar. 31, 2023), *on reconsideration in part*, 2023 WL 3625784 (S.D.N.Y. May 24, 2023).

[8] *Petersen Energia Inversora, S.A.U. et al v. Argentine Republic et al.*, No. 15-cv-02739-LAP, Dkt. No. 371-06.

[9] *Id.* at \*12–13.

[10] *See, e.g., id.* at \*12–13, \*15.

Although there is no doubt that "we undoubtedly have discretion to decide [a] question of Argentine law in the first instance and would not be limited to the record created in the district court were we to do so,"[11] "we have recognized that determinations of another sovereign's law 'frequently call for fact-like procedures that a district court is better situated to implement."[12] This is especially true when it comes to a civil-law jurisdiction like Argentina, whose legal system is "much different."[13]

We owe special consideration and respect to a District Court that has closely evaluated every aspect of the facts and, importantly, the governing law of Argentina.

On this basis, I would affirm the judgment of the District Court.

---

[11] *Bugliotti v. Republic of Argentina*, 952 F.3d 410, 413 (2d Cir. 2020).

[12] *Petroleos de Venezuela S.A. v. MUFG Union Bank*, 106 F.4th 263, 269 (2d Cir. 2024).

[13] *See Curley v. AMR Corp.*, 153 F.3d 5, 14 (2d Cir. 1998).

4